

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, THE STATE OF CALIFORNIA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF FLORIDA, THE STATE OF GEORGIA, THE STATE OF HAWAII, THE STATE OF ILLINOIS, THE STATE OF INDIANA, THE STATE OF IOWA, THE STATE OF LOUISIANA, THE STATE OF MARYLAND, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MICHIGAN, THE STATE OF MINNESOTA, THE STATE OF MONTANA, THE STATE OF NEVADA, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OKLAHOMA, THE STATE OF RHODE ISLAND, THE STATE OF TENNESSEE, THE STATE OF TEXAS, THE COMMONWEALTH OF VIRGINIA, THE STATE OF WASHINGTON, THE STATE OF WISCONSIN, AND THE DISTRICT OF COLUMBIA, *ex rel.* RONALD J. STRECK<br><br>Plaintiffs,<br><br>v.<br><br>TAKEDA PHARMACEUTICALS AMERICA, INC., ASTELLAS PHARMA US, INC., ACTAVIS, LLC, BERLEX, INC., BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., CELGENE CORPORATION, DAIICHI SANKYO, INC., ELI LILLY AND COMPANY, FIRST HORIZON PHARMACEUTICAL CORPORATION n/k/a SHIONOGI INC., JOM PHARMACEUTICAL SERVICES, INC., MERCK & CO., INC., ORGANON USA, INC., ROCHE LABORATORIES, INC., SANTARUS, INC., TEVA PHARMACEUTICALS, USA, INC.<br><br>Defendants. | 14CV9412<br>JUDGE CASTILLO<br>MAG. JUDGE SOAT BROWN<br><br><br>CIVIL ACTION NO. _____<br><br>**CHIEF JUDGE CASTILLO**<br><br><br>**RELATOR'S COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3729 *ET SEQ.* AND SUPPLEMENTAL STATE FALSE CLAIMS ACTS**<br><br><br>**FILED UNDER SEAL**<br><br>**JURY TRIAL DEMANDED**<br><br><br>FILED<br><br>NOV 2 4 2014<br>NOV 24 2014<br>THOMAS G. BRUTON<br>CLERK, U.S. DISTRICT COURT |

1.    Ronald Streck ("Relator") brings this action on behalf of the United States, the State of California, the State of Colorado, the State of Connecticut, the State of Delaware, the State of Florida, the State of Georgia, the State of Hawaii, the State of Illinois, the State of Iowa, the State of Indiana, the State of Louisiana, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the State of Minnesota, the State of Montana, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of New York, the State of North Carolina, the State of Oklahoma, the State of Rhode Island, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, the State of Washington, the State of Wisconsin and the District of Columbia (collectively "the States" or "the Plaintiff States"), for violations of the Federal False Claims Act, 31 U.S.C. §§3729 *et seq.*, as well as for violations of the following state false claims acts: The California False Claims Act, Cal. Gov't Code §§12650 *et seq.*; The Colorado Medicaid False Claims Act, § 25.5-4-304, *et seq.*; The Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b; The District of Columbia False Claims Act, D.C. Code Ann. §§2-308.03 *et seq.*; The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§1201 *et seq.*; The Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*; The Georgia False Medicaid Claims Act, Ga. Code Ann. §§49-4-168 *et seq.*; The Hawaii False Claims Act, Haw. Rev. Stat. §§661-21 *et seq.*; The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. Ann. §§175/1 *et seq.*; The Indiana False Claims and Whistleblower Protection Act, Indiana Code §5-11-5.5; The Iowa False Claims Act, §685.1, *et seq.*; The Louisiana Medical Assistance Programs Integrity Law, La. R.S. 46:437.1 *et seq.*; The Maryland False Health Claims Act, § 2-601, *et seq.*; The Massachusetts False Claims Act, Mass. Ann. Laws. Ch. 12, §§5A *et seq.*; The Michigan Medicaid False Claims Act, MCLS §§400.601 *et seq.*; Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*; Montana False Claims Act, Mont. Code Anno. §§17-8-401 et *seq.*;

The Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; The New Jersey False Claims Act, N.J. Stat. §2A:32C-1 *et seq.*; The New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 *et seq.*; The New York False Claims Act, NY CLS St. Fin. §§187 *et seq.*; The North Carolina False Claims Act, 2009-554 N.C. Sess. Laws §§1-605 *et seq.*; The Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§5053 *et seq.*; The Rhode Island False Claims Act, R.I. Gen. Laws §§9-1.1-1 *et seq.*; The Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-171 *et seq.*; The Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001 *et seq.*; The Virginia Fraud Against Taxpayers Act, Va. Code §§8.01-216.1 *et seq.*; The Washington Medicaid Fraud False Claims Act, RCW 74.09.201 *et seq.*; and the Wisconsin False Claims for Medical Assistance Act, Wis. Stats. §§20.931 (hereinafter referred to as the "State False Claims Acts") to recover all damages, civil penalties and all other recoveries provided for under the Federal False Claims Act and the State False Claims Acts against the following defendants, and their affiliates, subsidiaries, agents, successors and assigns: Takeda Pharmaceuticals America, Inc., Astellas Pharma US, Actavis, LLC, Inc., Berlex, Inc., Boehringer Ingelheim Pharmaceuticals, Inc., Celgene Corporation, Daiichi Sankyo, Inc., Eli Lilly and Company, First Horizon Pharmaceutical Corporation n/k/a Shionogi Inc., JOM Pharmaceuticals Services, Inc., Merck & Co., Inc., Organon USA, Inc., Roche Laboratories, Inc., Santarus, Inc., Teva Pharmaceuticals, USA Inc. (collectively, "Defendants").

## I.  **PROCEDURAL HISTORY**

2.  Relator Ronald Streck previously filed a related action, *United States et al. ex rel. Streck v. Allergan, Inc. et al.*, Civ. A. No. 08-5135, in the District Court for the Eastern District of Pennsylvania on October 28, 2008 (referred to herein as the "related action"). The Defendants in the related action at one time included some of the same Defendants named herein, including Astellas, Boehringer Ingelheim, Celgene, Daiichi, First Horizon, Lilly, JOM, Merck, Roche,

2

Santarus, Takeda, Teva and Watson. Upon motion by the Relator, the aforementioned defendants were dismissed without prejudice by the Court in an Order dated September 29, 2011. Thus, the claims against the Defendants named herein are no longer pending in the related action. The currently pending complaint in the related action is the Fourth Amended Complaint filed on September 7, 2011 against thirteen pharmaceutical manufacturers under the Federal and State False Claims Acts for underpaying Medicaid rebates owed to the government. For purposes of explaining the rebate fraud scheme, Relator classified the defendants as Discount Defendants[1] and Service Fee Defendants.[2] After an initial investigation, the United States and various states declined to intervene. On July 3, 2012, the District Court for the Eastern District of Pennsylvania dismissed all claims against the Service Fee Defendants and dismissed the pre-2007 claims against the Discount Defendants, but permitted the case to proceed against the Discount Defendants for all fraudulent claims presented after January 1, 2007.

## II.    SUMMARY

3.    Congress established the Medicaid Drug Rebate Program to ensure that Medicaid, the government health care program for the indigent, would enjoy the same discounts on the price of prescription drugs as other large public and private purchasers. Congress therefore decided to "establish a rebate mechanism in order to give Medicaid the benefit of the best price for which a manufacturer sells a prescription drug to any public or private purchaser." H.R. Rep. No. 101-881, at 96 (1990), *reprinted in* 1990 U.S.C.C.A.N., 2017, 2108.

---

[1] The Discount Defendants named in the related action's Fourth Amended Complaint are: AstraZeneca Pharmaceuticals LP, Biogen Idec, Inc., Cephalon, Inc., and Genzyme Corporation.

[2] The Service Fee Defendants named in the related action's Fourth Amended Complaint are: Allergan, Inc., Amgen, Inc., Bradley Pharmaceuticals, Inc., Eisai, Inc., Mallinckrodt, Inc., Novo Nordisk, Inc., Reliant Pharmaceuticals, Inc., Sepracor, Inc., and Upsher-Smith Laboratories, Inc.

4.     To ensure that state Medicaid programs receive the best or lowest possible price for pharmaceuticals, the Social Security Act ("SSA") requires manufacturers whose products are sold to Medicaid beneficiaries to execute a rebate agreement with the federal government. 42 U.S.C. § 1396r-8(a)(1). Under this agreement, manufacturers pay rebates to state Medicaid programs. *Id.* The amounts of the rebates are based on the Average Manufacturer's Price ("AMP"), which is self-reported and quantified by the manufacturers themselves.

5.     AMPs are reported by manufacturers to the Centers for Medicaid and Medicare Services ("CMS"). Since Medicaid rebates depend entirely on pricing data that the pharmaceutical manufacturers self-report to CMS, the accuracy of the data is critical.

6.     Generally, the higher the AMP reported by a manufacturer, the greater the rebate owed by the manufacturer to Medicaid. The necessity of paying rebates incentivizes unscrupulous manufacturers to underreport their reported AMPs.

7.     The Defendants named in this Complaint knowingly reported materially inaccurate AMPs to CMS from January 1, 2004 through the present (the "Relevant Time Period"), and thereby defrauded the federal and state governments ("Government Plaintiffs").

8.     Beginning no later than 2004, Defendants and the pharmaceutical industry's wholesalers began executing and implementing distribution services agreements ("Service Agreements"). Service Agreements provide for a new trade structure known as "fee-for-service." Service Agreements generally obligate manufacturers to pay a fee to wholesalers (also referred to herein as "distributors") in exchange for services the wholesalers provide (the "Service Fee"). The Service Fee is typically an amount equal to a set percentage of the wholesalers' gross purchases of the manufacturers' products. For example, if a wholesaler's

4

Service Fee is 2% of gross purchases, and gross purchases for a given quarter are $100, the Service Fee owed by the manufacturer is $2.

9.     In exchange for the Service Fee, the wholesaler provides certain services to the manufacturer. While the Service Agreements at issue herein differ in certain particulars, many of the primary services addressed in the various Service Agreements are similar and include distribution services (buying, storing, packing, and shipping drugs), inventory management services (maintaining an adequate supply of the manufacturer's drugs in inventory, without "over-purchasing" drugs), and data reporting services (providing detailed daily, weekly or monthly reports of sales and inventory data). *See* Section VII below for a more detailed discussion of the services provided under the Service Agreements.

10.     Defendants use these Service Fees to artificially lower their reported AMPs, which enable them, in violation of law, to materially underpay rebates to the state Medicaid programs. Each of the Defendants executed this fraud through the "Discount Scheme," "Service Fee Scheme," or the "Hybrid Scheme."

11.     The Discount Defendants – In calculating AMP, manufacturers must include all discounts they offer to wholesalers and other purchasers. 42 U.S.C. §1396r-8(k)(1); Medicaid Rebate Agreement, §1(a).   The practical effect of including a discount in AMP is to *lower* AMP by the amount of the discount.

12.     For reasons which are discussed in detail below, each of the services provided by a wholesaler has value to the manufacturer who purchases the service. That is to say, in the absence of a wholesaler to perform these services, the manufacturer would have to pay a third party to perform the services (or perform those services on its own at a substantial cost to the company). As such, the fees paid for the services are *bona fide*.

13. Notwithstanding the bona fide nature of the Service Fees they pay, the Discount Defendants fraudulently characterized their payments to wholesalers for these services as "discounts," "reductions, "credits," or "credit memos," as opposed to what they were: fees for valuable services actually rendered. Since discounts, by law, are included in the calculation of AMP, this knowing mischaracterization of the fees paid to wholesalers reduced the manufacturers' reported AMPs by the amount of the "discount," "reduction," "credit," or "credit memo." The fact that some Discount Defendants characterize "discounts" as "reductions," "credits," or "credit memos," does not change the analysis because the outcome is the same—an illegal deflation of AMP. Consequently, the Discount Defendants fraudulently understated their rebate obligations to the Government Plaintiffs.

14. <u>The Service Fee Defendants</u> – As noted above, manufacturers *must include all price increases in AMP*. Price increases cause AMP to rise, resulting in higher rebate obligations for manufacturers. However, all *bona fide* service fees are *excluded* from AMP. Thus, to the extent a manufacturer can disguise a price increase by hiding it within its contractual definition of "Service Fee," the price increase will not cause the manufacturer's reported AMP – and its consequent rebate obligations to the Government Plaintiffs – to rise.

15. The Service Agreements at issue in this case contain so-called "price appreciation" clauses. These clauses provide that when a manufacturer *increases* its prices on a particular drug, the Service Fee owed by the manufacturer to the wholesaler is *lowered* by the amount of the wholesaler's units in inventory (of that drug), multiplied by the amount of the price increase. Thus, when a manufacturer raises the price of a drug, that price increase *applies retroactively to the wholesaler's inventory*, even though the wholesaler previously purchased that inventory at a lower price.

6

16.     The effect of these "price appreciations" is offset against the Service Fee. Specifically, the manufacturer pays the Service Fee by retroactively raising the price of its products and then reducing the Service Fee by the amount of the price increase, dollar for dollar. Price "appreciations," therefore, are retroactive price increases. However, no invoice is sent from the manufacturer to the wholesaler for these price increases. For purposes of this Complaint, "price appreciations on inventory" and "price appreciation credits" will be referred to as "off-invoice price increases."

17.     Under the Medicaid Drug Rebate Program, manufacturers must include all price increases – including off-invoice price increases – in their calculations of AMP. In violation of this obligation, the Service Fee Defendants disguised these off-invoice price increases by including them in the definition of Service Fee. This led to a reduction in the Service Fee by the amount of the off-invoice price increase, rather than an increase in AMP by the amount of the off-invoice price increase, thus providing Service Fee Defendants with a convenient, but illegal, method to exclude off-invoice price increases from their AMP calculations.

18.     The Hybrid Defendants – The Hybrid Defendants simply combine the Discount Scheme and the Service Fee Scheme. Specifically, the Service Agreements utilized by the Hybrid Defendants allow them to either (1) treat the Service Fee as a discount or (2) hide the off-invoice price increase in the Service Fee. This allows the Hybrid Defendant to choose the scheme that is most advantageous to its needs. However, regardless of its choice, the result is the same—a fraudulent deflation of AMP.

19.     Through these three schemes, the Discount Defendants, the Service Fee Defendants, and the Hybrid Defendants knowingly reported, and continue to report, materially deflated AMPs for the drugs governed by the Service Agreements (the "Relevant Drugs"). By

purposely and materially understating their AMPs, the Discount Defendants, the Service Fee Defendants, and the Hybrid Defendants paid and continue to pay materially inadequate rebates to the Government Plaintiffs.

III.  **JURISDICTION AND VENUE**

20.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1345, 28 U.S.C. §1367, and 31 U.S.C. §3732.

21.    This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §3732(a).

22.    Venue is proper in the Northern District of Illinois pursuant to 31 U.S.C. § 3732(a), because Defendants transact business in this District.

IV.  **PARTIES**

23.    Relator Ronald J. Streck is a lawyer and pharmacist.  He has worked in the pharmaceutical industry for more than 40 years in various capacities, including sales, regulatory affairs and association management.  He served eleven years as the president and chief executive officer of the Healthcare Distribution Management Association, representing drug wholesaler members, and then worked as the president and chief executive officer of Rx Distribution Network ("the Network"), representing a group of regional drug wholesalers.

24.    In his capacity as CEO of the Network, Relator has negotiated the terms of agreements between pharmaceutical manufacturers and the wholesalers the Network represents, including the types of agreements at issue in this *qui tam* action.  Through his work, Relator became thoroughly familiar with the Service Agreements that manufacturers, including Defendants, execute with wholesalers.  Relator discovered that Defendants, as a matter of contract, misreported and continue to misreport pricing data to government programs.

8

25.     The United States was defrauded though the schemes outlined above and is a plaintiff in this action. Throughout the Relevant Time Period, the United States Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") were agencies of the United States and their activities, operations and contracts were paid from United States funds.

26.     The following states were also defrauded through these schemes: California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, Wisconsin, and the District of Columbia ("Plaintiff States"). The Plaintiff States are plaintiffs in this action. Throughout the Relevant Time Period, Defendants' Relevant Drugs were provided to Medicaid recipients in each of the Plaintiff States, and those prescriptions were paid for in part by the Plaintiff States' respective Medicaid programs.

27.     Defendant Actavis, LLC (referred to herein as "Watson") is a Delaware corporation, formerly known as Watson Pharma, Inc., and is headquartered at 400 Interpace Parkway, Parsippany, New Jersey 07054. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

28.     Defendant Astellas Pharma US, Inc., (referred to herein as "Astellas"), formerly Fujisawa Healthcare, Inc., is headquartered at Three Parkway North, Deerfield, Illinois 60015. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

9

29.     Defendant Berlex, Inc. (referred to herein as "Berlex") is a Delaware corporation, headquartered at 6 West Belt, Wayne, New Jersey 07470. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

30.     Defendant Boehringer Ingelheim Pharmaceuticals, Inc. (referred to herein as "Boehringer Ingelheim"), is a Delaware corporation, headquartered at 900 Ridgebury Road, Ridgefield, Connecticut 06877. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

31.     Defendant Celgene Corporation (referred to herein as "Celgene"), is a Delaware corporation, headquartered at 86 Morris Avenue, Summit, New Jersey 07901. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

32.     Defendant Daiichi Sankyo, Inc. (referred to herein as "Daiichi"), is headquartered at Two Hilton Court, Parsippany, New Jersey 07054. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

33.     Defendant Eli Lilly and Company (referred to herein as "Lilly"), is an Indiana corporation, headquartered at Lilly Corporate Center, Indianapolis, Indiana 46285. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government

Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

34. Defendant First Horizon Pharmaceutical Corporation now known as Shionogi Inc. (referred to herein as "First Horizon") was a Delaware corporation, headquartered in Alpharetta, Georgia. In June of 2006, First Horizon changed its name to Sciele Pharma Inc. Then, in 2008, Shionogi Inc. acquired Sciele Pharma Inc. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

35. Defendant JOM Pharmaceuticals Services, Inc. (referred to herein as "JOM"), is a New Jersey corporation, headquartered at 1 Cottontail Lane, Somerset, New Jersey, 08873. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

36. Defendant Merck & Co., Inc. (referred to herein as "Merck"), is a New Jersey corporation, headquartered at One Merck Drive, Whitehouse Station, New Jersey 08889. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

37. Defendant Organon USA, Inc. (referred to herein as "Organon"), is a New Jersey corporation, headquartered at 56 Livingston Avenue, Roseland, New Jersey 07068. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

38.     Defendant Roche Laboratories, Inc. (referred to herein as "Roche"), is a Delaware corporation, headquartered at 340 Kingsland Street, Nutley, New Jersey 07110. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

39.     Defendant Santarus, Inc. (referred to herein as "Santarus"), is a Delaware corporation, headquartered at 10590 West Ocean Air Drive, Suite 200, San Diego, California 92130. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

40.     Defendant Takeda Pharmaceuticals America, Inc. (referred to herein as "Takeda") is a Delaware corporation, headquartered at One Takeda Parkway, Deerfield, Illinois 60015. Takeda is a wholly owned subsidiary of Takeda Pharmaceuticals Company Ltd. of Japan. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

41.     Defendant Teva Pharmaceuticals USA, Inc. (referred to herein as "Teva/Barr") is a Delaware corporation, headquartered at 1090 Horsham Road, North Wales, Pennsylvania, 19454. Teva acquired Barr Laboratories, Inc. in 2008. Barr Laboratories operates as a subsidiary of Teva. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

## V.  THE APPLICABLE LAW

### A.  The Federal and State False Claims Acts

42.  The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States for treble damages and a civil monetary penalty. 31 U.S.C. § 3729(a)(1)(A)-(B).[3]

43.  The FCA further provides that any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States for treble damages and a civil penalty. 31 U.S.C. § 3729(a)(1)(G).[4]

44.  The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).  Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

45.  "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

---

[3] Prior to the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Public Law 111-21 (enacted May 20, 2009), Section 3729(a)(1)(A) was Section 3729(a)(1), which imposed liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval."

[4] Prior to FERA, Section 3729(a)(1)(G) was formerly Section 3729(a)(7), which imposed liability on any person who "knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."

46.     Each of the Plaintiff States has individually enacted a False Claims Act. Each of those Acts is modeled after the Federal FCA, and each contains provisions similar to those quoted above. Relator asserts claims under the State FCAs for the State portion of Medicaid false claims detailed in this complaint.

## B. The Medicaid Drug Rebate Program

47.     To curb mounting Medicaid program drug expenditures, Congress created the Medicaid Drug Rebate Program ("Medicaid Rebate Program" or "Rebate Program") under the Omnibus Budget Reconciliation Act of 1990. To receive Medicaid coverage for outpatient prescription drugs, drug manufacturers are required to enter into a Medicaid Rebate Agreement with the Secretary of Health and Human Services. *See* 42 U.S.C. §1396r-8(a)(1).

48.     Under the Rebate Program, manufacturers pay a rebate to each individual state's Medicaid program for all outpatient pharmaceuticals paid for by that state's Medicaid program. That is, Medicaid reimburses retail pharmacies for the cost of prescriptions and then, under the terms of the Rebate Program, the state Medicaid programs receive rebates from manufacturers. This process is designed to give Medicaid the benefit of the lowest price at which a manufacturer sold a drug to any commercial customers.

49.     Medicaid is a jointly-funded federal-state program. 42 U.S.C. §1396b(a)(1); 42 U.S.C. §1396r-8(b)(1)(B). The amount paid by the federal government is known as the Federal Matching Assistance Percentage ("FMAP").

50.     Each state's request for money from the federal government and the corresponding FMAP is submitted to CMS on Form CMS-64. This form includes exact dollar figures reflecting the "Drug Rebate Offset" as well as a "Medicaid Drug Rebate Schedule." The amount received by a state in Medicaid rebates is considered a reduction in the total amount expended under the state's Medicaid plan. Therefore, the less any individual state receives in

Medicaid rebates, the greater the total amount expended by the state, and the more the federal government must correspondingly pay to the state to meet the federal government's share of the joint costs.

51.    More specifically, each quarter, state Medicaid programs report to CMS their utilization data – the quantity of each drug paid for by each state Medicaid program during that quarter. 42 U.S.C. §1396r-8(b)(2). At or about the same time, manufacturers report to CMS the AMPs of their drugs for that quarter. *Id.* §1396r-8(b)(3). Relying on the accuracy of the data provided by manufacturers, CMS calculates the unit rebate amount ("URA"), which the states then use to invoice each manufacturer for the rebate it owes.

52.    The amount of the rebate on a generic drug is calculated as the product of: (1) the total number of each dosage form and strength paid for during the rebate period and (2) 11% of the AMP for the rebate period (or, from Jan. 1, 2010 to present, 13% of the AMP for the rebate period. *See* The Patient Protection and Affordable Care Act, Pub. Law No. 111-148, §2501(a) and (b); 42 U.S.C. §1396r-8(c)(3).

53.    For a brand-name drug, the total amount owed by a manufacturer in rebates is the sum of its two principal components: (1) the Basic Unit Rebate Amount ("Basic Rebate") and (2) the Additional Unit Rebate ("Additional Rebate"). 42 U.S.C. §1396r-8(c)(1).

54.    The Basic Rebate for brand drugs is equal to the product of: (1) the total number of each dosage form and strength paid for during the rebate period and (2) the greater of (a) the difference between AMP and the Best Price ("BP")[5] for the dosage form and strength of the drug, or (b) 15.1% of the AMP for the rebate period (or, from Jan. 1, 2010 to the present, 23.1%

---

[5] Specifically, Best Price is "the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States." *See* 42 U.S.C. §1396r-8(c)(1)(C)(i). Best Price includes all discounts, rebates, or other price concessions. *See* 42 U.S.C. §1396r-8(c)(1)(C)(ii).

of the AMP for the rebate period). *See* The Patient Protection and Affordable Care Act, Pub. Law No. 111-148, §2501(a) and (b); 42 U.S.C. §1396r-8(c)(1).

55.    When the percentage increase in AMP for a dosage form and strength of a drug exceeds the percentage increase in the Urban Consumer Price Index ("CPI") since the initial sale of the drug, the manufacturer owes an Additional Rebate.[6]  This additional rebate has the potential to equal or, prior to 2009, exceed AMP.

56.    During the Relevant Time Period, pharmaceutical prices for brand name drugs have risen annually at a pace which far exceeds increases in the CPI.  Consequently, nearly every one of the Defendants' price increases during the same period exceeded the growth in the CPI.

### (i) The Definition of AMP

57.    From the beginning of the Relevant Time Period until November 2010, the SSA defined AMP as the "average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade." 42 U.S.C. §1396r-8(k)(1) Feb. 2010).

58.    The definition of AMP does not contain any temporal limitations.  Specifically, a manufacturer must include all price increases in its calculation of AMP, even if the price increase occurs after the sale of a product.[7]  In fact, AMP regulations contain express provisions placing a

---

[6] *See* 42 U.S.C. §1396r-8(c)(2) (describing the calculation of additional rebate as the amount by which the AMP "for the dosage form and strength of the drug for the period exceeds the [AMP] for ... the calendar quarter beginning July 1, 1990 ... increased by the percentage by which the consumer price index for all urban consumers for the month in which the rebate period begins exceeds such index for September 1990").

[7] *See* Section VII(B). The Defendants' Service Agreements contain "Price Appreciation Clauses." These "Price Appreciation Clauses" allow the Defendants to increase the price of a drug after the wholesaler has already purchased the drug. Thus, a wholesaler could purchase a drug for $100, but owe the manufacturer additional compensation due to a post-sale price increase. This is precisely why AMP regulations place a continuing duty on manufacturers to revise their AMP calculations for up to three years following their initial reporting of AMP. 42 C.F.R. § 447.510(b).

continuing duty on manufacturers to report any revisions to AMP for up to three years following the date on which AMP was originally reported to the government. 42 C.F.R. § 447.510(b).

59. The definition of AMP confirms that: 1) discounts are included in AMP (because they lower the price "paid to the manufacturer"); 2) fees paid in exchange for services should be excluded from AMP, because such fees are payment for legitimate services rendered by wholesalers (and thus are not related to drug prices); and 3) all price increases, regardless of when they occur, should be included in AMP.

60. Through the rulemaking process, CMS promulgated a regulation effective July 2007 which stated what was already clear: *bona fide* Service Fees are excluded from the calculation of AMP. 72 Fed. Reg. 39142 (July 17, 2007) (codified at 42 C.F.R. Part 447) ("2007 AMP Regulation")("AMP excludes … [b]ona fide service fees"). 42 C.F.R. § 447.504(h)(19).

61. The 2007 AMP Regulation defined *bona fide* service fees as:

> Fees paid by a manufacturer to an entity, that represent fair market value for a *bona fide*, itemized service actually performed on behalf of the manufacturer that the manufacturer would otherwise perform (or contract for) in the absence of the service arrangement; and that are not passed on in whole or in part to a client or customer of an entity, whether or not the entity takes title to the drug.

42 C.F.R. § 447.502.

62. This definition encompasses the following four elements:

> 1) The fee paid must be for a *bona fide*, itemized service that is actually performed on behalf of the manufacturer;
>
> 2) The manufacturer would otherwise perform or contract for the services in the absence of the service arrangement;
>
> 3) The fee represents fair market value; and
>
> 4) The fee is not passed on in whole or in part to a client or customer of an entity.

*See* 71 Fed. Reg. 69624, 69667-9 (Dec. 1, 2006) (ASP regulations' definition of *bona fide* service fees); 72 Fed. Reg. 39142, 39182 (2007 AMP Regulation expressly adopts the interpretation of the definition of *bona fide* service fees as set forth in the ASP regulations). CMS interprets the first two elements "to encompass any reasonably necessary or useful services of value to the manufacturer that are associated with the efficient distribution of drugs." 71 Fed. Reg. at 69667-9. With respect to the third element that the fee must represent fair market value, CMS recognizes that it is appropriate to either calculate fair market value for a set of itemized services, or to calculate fair market value on a per-service basis. *Id.* As to the fourth element that the fee is "not passed on," if the fee meets the first three requirements, the manufacturer may presume it was not passed on to a client or customer of an entity. *Id.*

63. In November 2010, the definition of AMP was re-codified to specifically state what was already clear, i.e., that *bona fide* service fees are excluded from AMP:

> (i) In general. – The average manufacturer price for a covered outpatient drug shall exclude –
>
> (II) *bona fide* service fees paid by manufacturers to wholesalers or retail community pharmacies, including (but not limited to) distribution service fees, inventory management fees, product stocking allowances, and fees associated with administrative service agreements and patient care programs (such as medication compliance programs and patient education programs);

42 U.S.C. § 1396r-8(k)(1).

64. As to the Discount Defendants, the Medicaid Rebate Statute again expressly states that discounts must be included in AMP: "any discounts, rebate payments, or other financial transactions that are received by, paid by, or passed through to, retail community pharmacies shall be included in the [AMP] for a covered outpatient drug." *Id.*

65. Further, in the Proposed AMP Rule issued on February 2, 2012, the government expressed concerns that manufacturers are improperly treating bona fide service fees as

discounts: "We continue to be concerned that these [bona fide service] fees could be used as a vehicle to provide discounts, as opposed to fees at 'fair market value' for bona fide services. Thus, to avoid potential fraud concerns, we are retaining our definition [of bona fide service fees]." Medicaid Program; Covered Outpatient Drugs, 77 Fed. Reg. 5318, 5332 (Feb. 2, 2012)(to be codified at 42 C.F.R. pt 447, subpt. I).

### (ii) The Medicaid Rebate Agreement

66.     The Medicaid Rebate Agreement entered into by all manufacturers participating in Medicaid – which includes all of the Manufacturer Defendants in this lawsuit – states that AMP is "the average unit price paid to the Manufacturer for the drug ... by wholesalers." Medicaid Rebate Agrmt, § I(a). The Rebate Agreement further clarifies that "AMP includes cash discounts allowed and all other price reductions ... which reduce the actual price paid." *Id.* Also, the Rebate Agreement requires manufacturers to revise AMP for previous quarters if "discounts or other arrangements subsequently adjust the prices actually realized." *Id.*

67.     Again, the definition of AMP confirms that: 1) discounts are included in AMP (because they lower the price "paid to the manufacturer"); 2) fees paid in exchange for services should be excluded from AMP, because such fees are payment for legitimate services rendered by wholesalers (and thus are not related to drug prices); and 3) all price increases, regardless of when they occur, should be included in AMP. *See also* CMS, Medicaid Drug Rebate Program Release No. 29 (June 5, 1997) (requiring that "[a]ll pricing adjustments affecting the price of any sales must be taken into account if the sales were included in the calculation of AMP").

### (iii) The Medicaid Rebate Operation Training Guide

68.     The Medicaid Rebate Operational Training Guide, F11 (2001), states that AMP should be reduced by discounts:

> Basically, AMP is calculated as NET quarterly sales divided by the number of units sold.
>
> "Net quarterly sales" are derived after all required adjustments are made (e.g., discounts, rebate for state-only programs, breakage, etc.).

### (iv) AMP Includes Discounts and Excludes Service Fees Throughout the Relevant Time Period

69.     Although the AMP statute, the AMP regulation, the Rebate Agreement, and the Medicaid Rebate Operational Training Guide have been amended over time, four obligations have remained consistent. First, discounts are included in AMP because they affect prices actually realized by manufacturers. Second, fees paid in exchange for services rendered are not discounts. Third, off-invoice price increases cannot be excluded from AMP by including those price increases in a self-serving definition of Service Fees or by offsetting Services Fees with off-invoice price increases. Fourth, off-invoice price increases, regardless of when they occur, must be included in AMP calculations.

70.     In addition, there is a parallel statutory drug pricing benchmark – average sales price ("ASP") – which directly corroborates Relator's statement of the law.

71.     ASP is a pricing benchmark which applies to Medicare Part B, while AMP is a pricing benchmark which applies to Medicaid, it also serves a similar function to: limit or "cap" the government's prescription drug costs.

72.     ASP expressly states that discounts should be included in the ASP calculation. 42 U.S.C. § 1395w-3a(c)(1), (c)(3). Further, in 2006, CMS enacted ASP regulations defining *bona fide* Service Fees. The regulations expressly re-affirmed that Service Fees are payments for

20

legitimate services rendered (and thus are not related to the price of the drug), and thus manufacturers must exclude *bona fide* Services Fees from ASP. *See* Fed. Reg. 69624, 69668 (Dec. 1, 2006) (relevant sections codified at 42 C.F.R. § 414.802, 414.804).

73. All else being equal, the higher the AMP, the larger the Medicaid rebate a drug manufacturer must pay. Conversely, the lower the AMP, the less a drug company must pay in Medicaid rebates.

## VI.     The Streck Opinion in the Related Action

74. In his July 2012 ruling on defendants' motion to dismiss in the related action, ("*Streck Opinion*"), Judge Robreno held in part that Relator's case should proceed against the Discount Defendants for all false claims presented after January 1, 2007. The Court's holding with regard to the Discount Defendants was based on the contractual language in the Service Agreements for the Discount Defendants. The contractual language found in the Service Agreements for the Defendants named in this complaint is effectively the same as the language in the Service Agreements for the Discount Defendants in the related action.

75. Specifically, the District Court for the Eastern District of Pennsylvania found that Relator pled sufficient evidence to show that Discount Defendants were "at least reckless" for classifying statutorily-defined *bona fide* service fees as discounts. *Streck Opinion*, p. 29. The *bona fide* services that the Discount Defendants fraudulently mischaracterized include:

> 1. Data reporting;
> 2. Maintenance of target inventory levels;
> 3. Pick, pack, and ship services;
> 4. Accounts receivable management;
> 5. Contract and chargeback administration;
> 6. Returns processing;
> 7. Customer service support;
> 8. Inventory management;
> 9. Submitting 852 data Inventory Reports; and
> 10. Submitting 867 data Inventory Reports.

76. Further with regard to the Service Fee Defendants, the Streck Opinion dismissed those claims and rejected Plaintiff's argument that these Defendants had knowingly underreported the AMPs for their drugs by failing to factor in retroactive price appreciation credits or retroactive price increases, which caused the government to receive less in Medicaid rebates. Plaintiff subsequently filed a motion to alter the judgment on July 30, 2012, arguing that AMPs must be calculated based on the price paid to the manufacturer, not the profit obtained by the wholesaler and also that the statutory and regulatory framework established that AMP is not limited to initial payments. On November 16, 2012, the Court denied the motion as procedurally untimely. On December 10, 2012, Plaintiff moved for the Court to certify as a partial final judgment its Order dated July 3, 2012 dismissing the claims against the Service Fee Defendants which the Court denied on August 2, 2013.

## VII.   DEFENDANTS' SCHEMES TO DEFRAUD GOVERNMENT PAYERS

77. Starting no later than 2004, manufacturers and wholesalers developed a new trade structure that involved the use of Service Agreements. Under Service Agreements, manufacturers periodically pay wholesalers Service Fees. Service Fees are calculated by multiplying a wholesaler's gross purchases of a manufacturer's product by a certain percentage.

78. The Service Agreements at issue in this case differ in certain particulars, but many of the primary services provided by wholesalers pursuant to Service Agreements are as follows:

- **Distribution Services** – buying, storing, packing, and shipping drugs from the manufacturer to customers. This includes emergency delivery services – delivering the manufacturer's products on an emergency 24/7/365 basis.

- **Data Reporting Services** – generating daily, weekly, or monthly inventory reports (EDI 852 data) and sales reports (EDI 867 data).

  The inventory reports (852 data) provides the manufacturer with aggregate sales, the wholesaler's inventory levels (on-hand and on-order), demand forecasts,

22

"morgue inventory" (returned goods), special needs forecast by the distributor for particular events, units ordered by customers, and orders filled by the wholesaler.

The sales reports (867 data) provides the manufacturer with specific information regarding the distributors' customers, including the identity and location of the customer, and the amounts ordered and amounts returned by the customer.

- **Inventory Management** – maintaining an adequate supply of the manufacturer's drugs in inventory without "over-purchasing" drugs in anticipation of a price increase (also known as "speculative buying" or "spec buying"), including using automated inventory balancing systems, and maintaining environmentally controlled storage facilities.

79. Other categories of services, described more fully below, include:

- Chargeback and returns processing services
- Customer service support
- New product launch services
- Consolidated deliveries to providers
- Consolidated account receivable management
- The provision of sophisticated ordering technology

80. These services, according to CMS, are *bona fide* services because they provide "value to the manufacturer that [is] associated with the efficient distribution of drugs" and represent fair market value. 71 Fed. Reg. at 69667-9.

### A.   The Discount Defendants' Scheme

81. Under the law defining AMP during the Relevant Time Period, all discounts are included in AMP. The practical effect of including a discount in AMP is to *lower* AMP by the amount of the discount.

82. As noted above, each of the services provided for in the Service Agreements has real value to the manufacturer. That is to say, in the absence of wholesalers to perform these services, the manufacturer would have to pay third parties to perform the services (or perform those services on its own at a substantial internal cost).

83.     Distribution services, including emergency delivery services, are valuable to Defendants.  If wholesalers did not provide distribution services to the manufacturers, the manufacturers would be required to pay a third party logistics company – e.g., FedEx – to pick up, pack, and ship its products.  These costs can be particularly high when emergency delivery is needed on a 24/7/365 basis.

84.     The 852 inventory data service is valuable to Defendants – among other things, it permits Defendants to use a series of numeric metrics to make critical decisions regarding when and how much of their products need to be manufactured.  If the wholesalers did not provide 852 data services to the manufacturers, the manufacturers would be required to pay a third party for this information, including aggregate sales data, inventory levels (on-hand and on-order), demand forecasts, "morgue inventory" (returned goods), special needs forecasts for particular events, units ordered by customers, and orders filled.

85.     The 867 sales data service is valuable to Defendants – among other things, it permits Defendants to understand who their customers are (including their "problem" customers who return an undue amount of products), and, conversely, to see which potential customers are *not* buying from the manufacturer (and, this, who the manufacturer should target for marketing/sales).  If the wholesalers did not provide 867 data services to the manufacturers, the manufacturers would be required to pay a third party for this information.

86.     Inventory management services are valuable to Defendants.  By requiring wholesalers to maintain an adequate supply of the manufacturer's drugs in inventory, without "over-purchasing" drugs in anticipation of a price increase (also known as "speculative buying"), manufacturers are able to retain profits, which would otherwise inure to wholesalers.  Additionally, by requiring wholesalers to use and maintain environmentally-controlled storage

facilities for inventory, manufacturers avoid the cost and expense of paying a third party to store its products in such an environment.

87.     Based on the Service Agreements themselves, the Discount Defendants fraudulently characterized their Service Fee payments to wholesalers as "discounts," "concessions," "reductions," "credits," or "credit memos," as opposed to what they were: payments for *bona fide* services rendered. Since discounts, by law, are included in AMP, this artificial device created by the Discount Defendants worked: it served to *reduce* AMP by the amount of the "discount," "concession," "reduction," "credit," or "credit memo." Consequently, the Discount Defendants knowingly and fraudulently understated their rebate obligations to the Government Plaintiffs.

**B.     The Service Fee Defendants' Scheme**

88.     As noted above, *bona fide* service fees are *excluded* from AMP. Thus, to the extent a manufacturer can disguise a price increase by offsetting it against a Service Fee, which it excludes from its AMP calculations, the price increase will not cause the manufacturer's AMP – and its rebate obligations to the Government Plaintiffs – to rise as it should.

89.     Also as noted above, the Service Agreements executed by the Service Fee Defendants contain "price appreciation" clauses. These clauses provide that when a manufacturer increases its prices, the Service Fee owed by the manufacturer to the wholesaler is *lowered* by the amount of the wholesaler's units in inventory, multiplied by the amount of the price increase. No invoice is sent from the manufacturer to the wholesaler for these price increases. Instead, the Service Fee Defendants simply reduce the Service Fees owed to the wholesaler by the amount of the price increase on inventory. Thus, when a manufacturer raises the price of a drug, that price increase applies to the wholesaler's inventory, even though the

wholesaler previously purchased that inventory at a lower price. The Service Fee Defendants thereby bury these off-invoice price increases in their accounting for Service Fees.[8]

90.    "Price appreciation" on inventory a wholesaler has previously purchased at a lower price, therefore, is a retroactive price increase that manufacturers must include in their AMP calculations. The effect of the offset against the Service Fee, however, is to conceal the price increase and to illegally exclude it from the calculation of AMP. Excluding the price increase from AMP directly contravenes 42 C.F.R. § 447.510(b), which places a continuing duty on manufacturers to report any revisions (e.g., post-sale price increases) to AMP for up to three years following the date on which AMP was originally reported to the government.

91.    The Service Fee Defendants' definition of Service Fee has enormous evidentiary and legal impact:

- The legal definition of AMP excludes *bona fide* Service Fees.

- As a matter of contract, the Service Fee Defendants defined Service Fees in a manner which "absorbed" off-invoice price increases on inventory.

- The Service Agreements provide direct written evidence that the Service Fee Defendants crammed off-invoice price increases into their respective definitions of Service Fees.

- Since Service Fees are excluded from AMP, and the Service Fee Defendants included off-invoice price increases in their calculation of Service Fees, *a priori*, the Service Fee Defendants knowingly *did not* factor off-invoice price increases into their AMP calculations.

- This knowing failure violated the Medicaid Rebate Statute and the Medicaid Rebate Agreement, and caused substantial financial harm to the Government Plaintiffs.

---

[8] It should be noted that during the Relevant Time Period, the Relator attended numerous industry conferences which addressed Service Agreements. The issue of appreciation clauses as they relate to and affect service fees, rebates and reimbursements was not disclosed or discussed to the Relator's knowledge. Nor did comments by the industry regarding the proposed CMS Rule on AMP ever mention or discuss the presence of price appreciation clauses. *See* Federal Register, Vo. 72, No. 136 (July 17, 2007), 42 C.F.R. Part 447 [CMS-2238-FC].

92.     In sum, the law requires manufacturers to factor all price increases into AMP. 42 C.F.R. § 447.510(b).  Defendants knowingly failed to include off-invoice prices increases on inventory into their AMP calculations, thereby fraudulently reducing their rebate obligations to the Government Plaintiffs.

**C.**     **The Hybrid Scheme**

93.     A few of the Defendants' Service Agreements include elements from both the Discount Scheme and the Service Fee Scheme.  These "Hybrid Defendants" are able to elect the option of (1) treating the Service Fee as a discount and/or (2) hiding the off-invoice price increase in the Service Fee.  This allows the manufacturer to choose the scheme(s) that are most advantageous to its needs.  However, regardless of its choice, the result is the same—a fraudulent deflation of AMP.

**VIII.**  **Specific Allegations Against Each Defendant**

**A.**     **Discount Defendants**

**1.**     **Boehringer Ingelheim**

94.     Boehringer Ingelheim is a Discount Defendant.  See attached Exhibits C and D.

95.     Boehringer Ingelheim and a national wholesaler executed a "Distribution Services Performance Agreement" ("2005 Boehringer Ingelheim Agreement"), effective January 1, 2005 for a term of three years, which will automatically renew for one twelve (12) month term.  2005 Boehringer Ingelheim Agreement § 2.0.

96.     Boehringer Ingelheim and a different national wholesaler executed a "Distribution Performance Agreement" ("2008 Boehringer Ingelheim Agreement"), effective April 1, 2008 through June 30, 2010, which will automatically renew for one twelve (12) month term.  *Id.* § 2.0.

97.    According to the 2008 Boehringer Ingelheim Agreement, the purpose of the agreement is "to define a mutually beneficial relationship between [Boehringer Ingelheim] and [the national wholesaler] in order to achieve [Boehringer Ingelheim]'s goals of high patient level product availability, high levels of consumer and pharmacy confidence in the integrity and quality of [Boehringer Ingelheim] Product, and achievement of a collaborative, transparent, and cost-effective distribution system." 2008 Boehringer Ingelheim Agreement § 1.

98.    Section 6 of the 2008 Boehringer Ingelheim Agreement details the services that the national wholesaler will provide:

- Stocking and distributing Product;
- Maintaining appropriate inventory;
- Forecasting demand;
- Provide EDI 852 Product Activity Reports on a daily basis;
- Provide EDI 867 Product Activity Reports on a weekly basis;
- Refraining from Product Arbitrage; and
- Contract administration.

*Id* at § 6.

99.    In exchange for providing these services, Boehringer Ingelheim agreed to compensate the national wholesaler with a "performance based DPA [Distribution Performance Agreement] Payment" (i.e., a Service Fee). *Id.* at § 8(b). The DPA Payment ranges up to 1.5% of Adjusted Purchases. *Id.* at § 9(c)–(h). Although the maximum DPA Payment will not exceed 1.5% of Adjusted Purchases, this percentage is contingent upon the national wholesaler's performance of the following services:

- For complying with the terms of the 2008 Boehringer Ingelheim Agreement, the national wholesaler qualifies for a "Base Payment of up to fifteen (15) Basis Points." *Id.* at § 9(c).

- The national wholesaler will receive 30 basis points if the Service Fill Rate Range exceeds 98%, but will not receive any basis points if the Service Fill Rate Range is below 96.5%. *Id.* at § 9(d).

28

- If the Inventory Level Goals exceed 12 days and are less than 18 days, then the national wholesaler will receive 45 basis points. *Id.* at § 8(e). However, if the Inventory Level Goals are less than 12 days, but more than 30 days, the national wholesaler will receive 0 basis points. *Id.*

- If the Demand Variability of Average Weekly Demand is less than 20% the national wholesaler will receive 30 basis points, but if the Demand Variability of Average Weekly Demand exceeds 40% then the national wholesaler will receive 0 basis points. *Id.* at § 9(f).

- If the Weekly Electronic Data is 100% complete, then the national wholesaler will receive 20 basis points, but if the completeness is less than 90% or greater than 110% the national wholesaler will receive 0 basis points. *Id.* at § 9(g).

- Finally, if the national wholesaler provides no restricted data in the 867 data reports, then it will receive 10 basis points, but will receive 0 basis points if the restricted data exceeds 29%. *Id.* at § 9(h).

100.    Thus, assuming the national wholesaler satisfies all performance requirements, it will receive a DPA Payment of 1.5% of Adjusted Purchases.

101.    The national wholesaler acknowledges that this DPA Payment is treated as a discount. *Id.* at § 6(k). Specifically, the national wholesaler "acknowledges that the prompt pay discount and the DPA Payment paid hereunder are functional discounts and, as such, will be fully and accurately reported, as required, under Section 1128B(b) of the Social Security Act." *Id.*

102.    In the 2005 Boehringer Ingelheim Agreement, executed with a different national wholesaler, Boehringer Ingelheim also made DPA Payments to the national wholesaler for performing the same types of services as described in the 2008 Boehringer Ingelheim Agreement. 2005 Boehringer Ingelheim Agreement § 6. The calculation of the DPA Payment in the 2005 Boehringer Ingelheim Agreement is identical to the calculation of the DPA Payment in the 2008 Boehringer Ingelheim Agreement. *Id.* at § 9(b).

103.    The national wholesaler acknowledges that this DPA Payment may be treated as a discount. *Id.* at § 6(k). Specifically, the national wholesaler "acknowledges that the prompt pay discount and the DPA Payment paid hereunder may be discounts and, as such, may be required to be fully and accurately reported, as required, under Section 1128B(b) of the Social Security Act." *Id.*

104.    However, Boehringer Ingelheim "acknowledges that [the national wholesaler's] position is that the DPA payment is not a discount but a bona fide fee for service." *Id.*

105.    Further evincing the *bona fide* nature of the services, is the fact that both parties agree that "the relationship between [Boehringer Ingelheim] and [the national wholesaler] is that of an independent contractor." *Id.* at § 14(e); 2005 Boehringer Ingelheim Agreement § 14(e). Thus, the agreements were negotiated at arm's length and for fair market value.

106.    Not only are the services for which Boehringer Ingelheim pays the DPA Payment strikingly similar to the *bona fide* services the Service Fee and Discount Defendants pay to the wholesalers in the related action, but the national wholesaler in the 2005 Boehringer Ingelheim Agreement explicitly states its position "that the DPA payment is not a discount but a bona fide fee for service." *Id.* In addition to this acknowledgment, CMS classifies these same services as *bona fide* because they provide "value to the manufacturer that [is] associated with the efficient distribution of drugs." 71 Fed. Reg. at 69667-9.

107.    Despite the clear regulatory and statutory guidance directing Boehringer Ingelheim to classify these services as *bona fide* services, Boehringer Ingelheim fraudulently elects to classify these services as "discounts" and uses these "discounts" to underreport its AMP calculations. 2008 Boehringer Ingelheim Agreement at § 8(b).

108.    As discussed in detail above, *bona fide* service fees are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide. In defiance of the law, Boehringer Ingelheim improperly classifies *bona fide* service fees as "discounts," which causes it to understate its AMP, and, as a result, underpay Medicaid rebates it owes to the Government Plaintiffs.

109.    During the Relevant Time Period, Defendant Boehringer Ingelheim participated in the Medicaid Program and Boehringer Ingelheim's Relevant Drugs were paid for by all of the Government Plaintiffs.

110.    The Boehringer Ingelheim Agreements, discussed in detail above, improperly characterize *bona fide* service fees as discounts and, thereby, illegally understate its AMP calculations.

111.    By understating its AMP calculations, Boehringer Ingelheim: (1) caused CMS to underreport the unit rebate amounts to the states, (2) underpaid its Basic and Additional Medicaid rebates, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, Boehringer Ingelheim violated Section 3729(a)(1)(A), (B) and (G) of the Federal False Claims Act and comparable sections of the State False Claims Acts.

### 2.    JOM

112.    JOM is a Discount Defendant. See attached Exhibits I, J and K.

113.    JOM and a national wholesaler executed a "Distributor Performance Agreement" ("JOM Agreement"), effective January 1, 2008 for a term of two years, which will automatically renew for successive twelve (12) month terms. JOM Agreement at § 13. This JOM Agreement supersedes a previous distribution agreement entered into by the parties on April 27, 2005 and still in effect as of January 1, 2008. *Id.* §§ 1, 12.2

31

114.     The purpose of the JOM Agreement is for the wholesaler to provide distribution services to JOM.  In addition to stocking and distributing JOM drug products, the wholesaler specifically agrees to provide JOM with the following services, among others:

- Maintain target Service Level Unit Fill Rates;
- Maintain target inventory levels;
- Maintain minimal open deductions; and
- Provide daily Product Activity Data (EDI 852) and Product Transfer and Resale Report Data (EDI 867).

*Id.* at §§ 5.2, 7.9.

115.     In exchange for providing these services, JOM agreed to compensate the national wholesaler with a performance-based "DPA Payment." *Id.* at 5.1. The DPA Payment ranges up to 1.05% of gross purchases less various adjustments. *Id.* Although the maximum DPA Payment will not exceed 1.05% of gross purchases, this percentage is contingent upon the wholesaler's performance of the following services:

- The wholesaler will receive 55 basis points if the Service Level Unit Fill Rate Range exceeds 98%, but will not receive any basis points if the Service Level Unit Fill Rate Range is below 96.5%. *Id.* at § 5.2.1.

- If the Effective Inventory Level is less than 30 days then the wholesaler will receive 10 basis points. *Id.* at § 5.2.2.  However, if the Effective Inventory Level is greater than 30 days then the wholesaler will not receive any basis points. *Id.*

- Finally, if wholesaler maintains an Open Deductions percentage less than or equal to .20% then it will qualify for 40 basis points. *Id.* at § 5.2.3. If the wholesaler's Open Deductions percentage is equal to or exceeds .35% then the wholesaler will not receive any basis points. *Id.*

116.     Thus, assuming the wholesaler satisfies all the performance requirements, it has the opportunity to receive a DPA payment of 1.05% of gross purchases.

117.     The DPA payment is calculated with the following formula:

Gross Direct Purchases during Calendar Quarter
x Basis Points earned by [Wholesaler]
= Gross amount
Less: Inventory Appreciation
= Inventory Adjusted Amount
less: Unauthorized Deductions
= DPA Payment

*Id.* at § 5.1.

118. The wholesaler acknowledges that the Adjusted Payment (cited as the "Inventory Adjusted Amount" in the preceding paragraph) is a discount. *Id.* at § 6.2. Specifically, the wholesaler "shall fully and accurately report this discount." *Id.*

119. The services provided by the wholesaler to JOM are virtually identical to the services at issue in the related action. Specifically, the Court in the *Streck Opinion* held that, in the face of "the change in the statutory and regulatory landscape in 2007," the required knowledge of falsity could be inferred by failing to classify these services as bona fide. *Streck Opinion* at p. 29.

120. Further evincing the *bona fide* nature of the services is the fact that both parties agree that "the relationship between JOM and [the national wholesaler] is that of an independent contractor." JOM Agreement § 8. Thus, the agreement was negotiated at arm's length and for fair market value.

121. Additionally, CMS classifies these same services as *bona fide* because they provide "value to the manufacturer that [is] associated with the efficient distribution of drugs" and represent fair market value. 71 Fed. Reg. at 69667-9.

122. Despite the clear regulatory and statutory guidance directing JOM to classify these services as *bona fide* services, JOM fraudulently elects to classify these services as

"discounts" and utilizes these "discounts" to deflate its AMP calculations. JOM Agreement §
6.2.

123.    As discussed in detail above, *bona fide* service fees are excluded from AMP by
statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational
Training Guide. In defiance of the law, JOM improperly classifies *bona fide* service fees as
"discounts," which causes it to understate its AMP, and, as a result, underpay Medicaid rebates it
owes to the Government Plaintiffs.

124.    During the Relevant Time Period, Defendant JOM participated in the Medicaid
Program and JOM's Relevant Drugs were paid for by all of the Government Plaintiffs.

125.    The JOM Agreement, discussed in detail above, improperly characterizes *bona
fide* service fees as discounts and, thereby, illegally understates its AMP calculations.

126.    By understating its AMP calculations, JOM: (1) caused CMS to underreport the
unit rebate amounts to the states, (2) underpaid its Basic and Additional Medicaid rebates, (3)
caused the states to receive less in rebates than they were entitled to, and (4) caused the federal
government to pay more than it should have in FMAP funds to the states. As a result of this
fraudulent conduct, JOM violated Section 3729(a)(1)(A), (B) and (G) of the Federal False
Claims Act and comparable sections of the State False Claims Acts.

### 3.    Roche

127.    Roche is a Discount Defendant. See attached Exhibit O.

128.    Roche and a national wholesaler executed a "Distribution Services Agreement"
("Roche Agreement") on an unspecified date, most likely in or around September 2005, which is
effective going forward unless canceled by either party within thirty days' notice. The Roche
Agreement amended and supplemented a Wholesale Distribution Agreement already in place
between the parties.

34

129. According to the Roche Agreement, the purpose of the agreement is to "protect[] patient safety and the integrity of the pharmaceutical supply chain, and to allow Roche to better serve its customers and manage its inventory." Roche Agreement § A.

130. Section A details the services the national wholesaler provided to Roche:

- Purchase Roche products exclusively from Roche;
- Not knowingly sell products into alternate markets, which could be resold for speculation purposes;
- Maintain consistent target inventory levels;
- Maintain consistent target return levels;
- Provide Roche with complete and accurate 852 data sets on a daily basis;
- Provide Roche with complete and accurate 867 data sets on a daily basis;
- Maintain consistent purchase patterns; and
- Provide Roche with pricing contract and chargeback administration.

*Id.* at §§ (A)(1–9).

131. In return for providing these services, Roche will provide the national wholesaler with a "price concession." Id. § A. Specifically, Roche agreed to compensate the national wholesaler with a "rebate" equal to "one hundred (100) basis points on all quarterly invoiced Product purchases." *Id.* at § B. This "rebate" serves as a "price concession[]" on products purchased by the national wholesaler. *Id.*; *Id.* at § F.

132. The services provided by the wholesaler are virtually identical to the services at issue in the *Streck Opinion*. Specifically, the Court in the *Streck Opinion* held that, in the face of "the change in the statutory and regulatory landscape in 2007," the required knowledge of falsity could be inferred by failing to classify these services as bona fide. *Streck Opinion* at p. 29.

133. Additionally, CMS classifies these same services as *bona fide* because they provide "value to the manufacturer that [is] associated with the efficient distribution of drugs" and represent fair market value. 71 Fed. Reg. at 69667-9.

35

134. Despite the clear regulatory and statutory guidance directing Roche to classify these services as *bona fide* services, Roche fraudulently elected to classify payment for these services as "rebates" and "price concessions," thereby allowing Roche to fraudulently underreport AMP. Roche Agreement § B; *Id.* at § F.

135. As discussed in detail above, *bona fide* service fees are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide. In defiance of the law, Roche improperly classifies *bona fide* service fees as "rebates" and "price concessions," which causes it to understate its AMP, and, as a result, underpay Medicaid rebates it owes to the Government Plaintiffs.

136. During the Relevant Time Period, Defendant Roche participated in the Medicaid Program and Roche's Relevant Drugs were paid for by all of the Government Plaintiffs.

137. By understating its AMP calculations, Roche: (1) caused CMS to underreport the unit rebate amounts to the states, (2) underpaid its Basic and Additional Medicaid rebates, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, Roche violated Section 3729(a)(1)(A), (B) and (G) of the Federal False Claims Act and comparable sections of the State False Claims Acts.

### 4. **Takeda**

138. Takeda is a Discount Defendant. See attached Exhibit Q.

139. Takeda and a national wholesaler executed a "Wholesaler Services Agreement" ("Takeda Agreement"), effective December 19, 2006 for a period of three (3) years, which will automatically renew for subsequent one-year terms. Takeda Agreement at § 3.2. This Takeda Agreement terminated the prior Wholesaler Services Agreement between the parties which was effective as of April 1, 2005. *Id.* § 3.1.

140. According to the Takeda Agreement, the purpose of the agreement is to provide Takeda with certain services, which include, but are not limited to "distribution, inventory management, reporting, and contract administration" services. *Id.* at p. 1.

141. Exhibit A details the "Schedule of Services" the national wholesaler provided to Takeda:

- Maintaining adequate, but not excessive, availability of supply and inventory management;
- Maintain weekly demand variability;
- Submit 852 data Inventory Reports;
- Submit 867 data Inventory Reports;
- Provide contract and chargeback administration; and
- Provide chargeback reconciliation for the 844 and 849 data sets.

*Id.* at Exhibit A.

142. In exchange for providing these services, Takeda agreed to compensate the national wholesaler with a Service Fee up to 1.15% "of WAC on all Products purchased from Takeda during the relevant quarter." *Id.* at Exhibit B. In order to achieve the maximum Service Fee of 1.15%, the national wholesaler must satisfy the following performance-based goals:

- The national wholesaler will receive 35 basis points if the Service Fill Rate exceeds 98.5%, but will not receive any basis points if the Service Fill Rate is below 98%. *Id.* at § II(C).

- If the Inventory Level Goals exceed 15 days or more, but are less than 21 days, then the national wholesaler will receive 35 basis points. *Id.* at § III(C). However, if the Inventory Level Goals are less than 10 days the national wholesaler will receive 0 basis points. *Id.*

- If the Electronic Data Submissions are on-time at least 95% of the time, then the national wholesaler will receive 5 basis points. *Id.* at § IV(A).

- If the Electronic Data Submissions are 95% complete during the relevant calendar quarter, then the national wholesaler will receive 5 basis points. *Id.* at § IV(B).

- If the "Days on Hand Variance" does not exceed three (3) days, then the national wholesaler will receive 5 basis points. *Id.* at § IV(C).

37

- If the national wholesaler provides a "Comparative %" of 852 Data and 867 Data greater than 95%, then Takeda will pay the national wholesaler 10 basis points. *Id.* at § IV(D).

- If the Demand Variability of Average Weekly Demand is less than 20% then the national wholesaler will receive 20 basis points, but if the Demand Variability of Average Weekly Demand exceeds 30% then the national wholesaler will receive 0 basis points. *Id.* at § V(C).

*Id.*

143.   Takeda uses this 1.15% Service Fee to reduce the net purchase price paid by the national wholesaler. *Id.* at § 2.6. Specifically, under the "Compliance and Reporting Section," Takeda and the national wholesaler agree that:

> If any third party, including Medicare, Medicaid, the U.S. Department of Health and Human Services or a State health care program requests any information about the purchase price paid by Wholesaler for any Product, Wholesaler shall provide such information and shall report the net purchase price (i.e., the purchase price less any payments received from Takeda pursuant to Section 2.4 above, for all applicable units of Product purchased).

*Id.* (emphasis added).

144.   Thus, Takeda reduces the amount of the "purchase price" by the amount of the Service Fee. *Id.*

145.   The services provided by the wholesaler to Takeda are virtually identical to the services at issue in the *Streck Opinion*. Specifically, the Court in the *Streck Opinion* held that, in the face of "the change in the statutory and regulatory landscape in 2007," the required knowledge of falsity could be inferred by failing to classify these services as bona fide. *Streck Opinion* at p. 29.

146.   Additionally, CMS classifies these same services as *bona fide* because they provide "value to the manufacturer that [is] associated with the efficient distribution of drugs" and represent fair market value. 71 Fed. Reg. at 69667-9.

147.     Despite the clear regulatory and statutory guidance directing Takeda to classify these services as *bona fide* services, Takeda fraudulently elected to classify these services as price reductions and applied these price reductions to its calculation of AMP.

148.     As discussed in detail above, *bona fide* service fees are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide. In defiance of the law, Takeda improperly includes these price reductions in its AMP calculations, which causes it to understate its AMP, and, as a result, underpay Medicaid rebates it owes to the Government Plaintiffs.

149.     During the Relevant Time Period, Defendant Takeda participated in the Medicaid Program and Takeda's Relevant Drugs were paid for by all of the Government Plaintiffs.

150.     The Takeda Service Agreement, discussed in detail above, improperly characterizes *bona fide* service fees as price reductions and, thereby, illegally understates its AMP calculations.

151.     By understating its AMP calculations, Takeda: (1) caused CMS to underreport the unit rebate amounts to the states, (2) underpaid its Basic and Additional Medicaid rebates, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, Takeda violated Section 3729(a)(1)(A), (B) and (G) of the Federal False Claims Act and comparable sections of the State False Claims Acts.

### 5.     Teva/Barr

152.     Teva/Barr is a Discount Defendant. See attached Exhibit R.

153.     Teva/Barr and a national wholesaler executed a "Third Party Service and Management Agreement" ("Teva/Barr Agreement"), effective April 1, 2009 through March 31,

2011. Thereafter, the Teva/Barr Agreement renews automatically for successive one-year periods. Teva/Barr Agreement at § 1.

154. According to the Teva/Barr Agreement, the purpose of the agreement is for the national wholesaler to provide various distribution services "in exchange for [...] the Administrative Fee." *Id.* at p. 1.

155. Section 3 details the "Third Party Services" the national wholesaler provides to Teva/Barr:

- Stock, pack, and ship services; and
- Sales administration.

*Id.* at § 3.

156. In exchange for providing these Third Party Services, Teva/Barr agreed to compensate the national wholesaler with an Administrative Fee of 4.6% of Customer Net Sales. *Id.* at § 4. Teva/Barr and the national wholesaler "acknowledge and agree that the Administrative Fee [...] has been determined by the parties through good faith and arms-length negotiations." *Id.* at § 4(C). Thus, the Administrative Fee represents fair market value.

157. The Agreement covers Teva/Barr products with "labeler codes (the "Supplier Labeler Codes") **00093, 00172, 00182, 00555** (excluding the branded product ADDERALL®), **00703** and **50111** (the "Products")." *Id.* at § 3.

158. Teva/Barr clearly recognized the Administrative Fee as a discount. The Teva/Barr Agreement states the following:

> **Reporting Obligations.** To the extent [the national wholesaler] receives rebates, incentives or any other price reductions (including without limitation the Administrative Fee) from [Teva/Barr] as a result of its purchases of Product (collectively, the "Price Reductions"), [Teva/Barr] must, pursuant to its obligations under 42 C.F.R. § 1001.952(h)(2)(iii)(B), fully and accurately report such Price Reductions on any invoices, coupons or statements submitted by [Teva/Barr] documenting the payment of such Price Reductions.

*Id.* at § 5(E).

159.    Thus, according to the terms of the Teva/Barr Agreement, Teva/Barr acknowledges that the Administrative Fee is a "price reduction." *Id.*

160.    The services provided by the wholesaler to Teva/Barr are virtually identical to the services at issue in the *Streck Opinion*. Specifically, the Court in the *Streck Opinion* held that, in the face of "the change in the statutory and regulatory landscape in 2007," the required knowledge of falsity could be inferred by failing to classify these services as bona fide. *Streck Opinion* at p. 29.

161.    Additionally, CMS classifies these same services as *bona fide* because they provide "value to the manufacturer that [is] associated with the efficient distribution of drugs" and represent fair market value. 71 Fed. Reg. at 69667-9.

162.    Despite the clear regulatory and statutory guidance directing Teva/Barr to classify these services as *bona fide* services, Teva/Barr fraudulently elected to classify these services as "price reductions" and applied these "price reductions" to its calculation of AMP.

163.    As discussed in detail above, *bona fide* service fees are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide. In defiance of the law, Teva/Barr improperly includes these "price reductions" in its AMP calculations, which causes it to understate its AMP, and, as a result, underpay Medicaid rebates it owes to the Government Plaintiffs.

164.    During the Relevant Time Period, Defendant Teva/Barr participated in the Medicaid Program and Teva/Barr's Relevant Drugs were paid for by all of the Government Plaintiffs.

165.    The Teva/Barr Service Agreement, discussed in detail above, improperly characterizes *bona fide* service fees as "price reductions" and, thereby, illegally understates its AMP calculations.

166.    By understating its AMP calculations, Teva/Barr: (1) caused CMS to underreport the unit rebate amounts to the states, (2) underpaid its Basic and Additional Medicaid rebates, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, Teva/Barr violated Section 3729(a)(1)(A), (B) and (G) of the Federal False Claims Act and comparable sections of the State False Claims Acts.

**B.    Service Fee Defendants**

**1.    Celgene**

167.    Celgene is a Service Fee Defendant. See attached Exhibit E.

168.    Celgene and a national wholesaler executed a "Distribution Services Agreement" ("Celgene Agreement"), effective April 1, 2005 for a period of three years. Celgene Agreement at § 3.1.

169.    According to the Celgene Agreement, the purpose of the agreement is to provide Celgene with certain services including, but not limited to, logistics, inventory management, administrative, and financial services.

170.    Section 2.1 details the "Base Distribution Services" the national wholesaler provided to Celgene:

- Sophisticated ordering technology;
- Daily consolidated deliveries to providers;
- Emergency shipments to providers 24/7/365;
- Consolidated accounts receivable management;
- Contract and chargeback administration;
- Returns processing;

42

- Customer service support;
- Adequate working inventories to meet customer needs and service levels; and
- Licensed, environmentally controlled, PDMA compliant secure facilities.

*Id.* at § 2.1.

171. In addition to these Base Distribution Services, the national wholesaler agreed to provide "Inventory Management Services" and "Data/Reporting Services." *Id.* at §§ 2.2, 2.3. The Inventory Management Services include maintaining target inventory, purchase limits, and ensuring minimal product shortages. The Data/Reporting Services include data reporting services and customer monitoring.

172. Consistent with the above, Section 4.1 of the Celgene Agreement describes the relationship between Celgene and the national wholesaler as that of a "service buyer-seller." Thus, the agreement was negotiated at arm's length and for fair market value.

173. In exchange for providing these Base Distribution Services, Inventory Management Services, and Data/Reporting Services, Celgene agreed to compensate the national wholesaler with a "Service Fee of 1.50%" that will be "paid quarterly based on the total volume of all Products purchased by [the national wholesaler]." *Id.* at p. 7.

174. Schedule A to the Celgene Agreement explains that the Service Fee will be offset by "Service Fee Credits." *Id.* at Schedule A. Specifically, Celgene "will receive credit toward [the] Service Fee for the following items:

   a. Price Appreciation on Aggregate Inventory after a Customer pricing action.

   b. Margin earned on quarterly promotions, deals, off-invoice allowances, or any other method, excluding those that are intended for [the national wholesaler's] Providers.

*Id.*

43

175.     Thus, Celgene reduces the Service Fee by the amount of the Service Fee Credits (i.e., off-invoice price increases).  By retroactively increasing the price of its drugs, Celgene realizes the benefit of this increased sales price, while, at the same time, failing to report this price increase in its AMP calculations. This failure causes Celgene to materially underpay its Medicaid rebates.

176.     As discussed in detail above, *bona fide* service fees are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide.   Given the *Streck Opinion* and the *bona fide* nature of the services the wholesaler provides to Celgene, the express terms of the Celgene Agreement indicate that Celgene treats the Service Fees it pays as *bona fide*, thus "allowing" Celgene to exclude those fees from its calculations of AMP.  Therefore, by netting off-invoice price increases against the Service Fees, Celgene improperly excludes price increases from its AMP calculations, in turn understates its AMP, and consequently underpays the rebates it owes to the Government Plaintiffs.

177.     During the Relevant Time Period, Defendant Celgene participated in the Medicaid Program and Celgene's Relevant Drugs were paid for by all of the Government Plaintiffs.  Further, the prices on Celgene's drugs increased during the Relevant Time Period, often at a greater percentage than the CPI-U.

178.     By understating its AMP calculations, Celgene: (1) caused CMS to underreport the unit rebate amounts to the states, (2) underpaid its Basic and Additional Medicaid rebates, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states.  As a result of this

fraudulent conduct, Celgene violated Section 3729(a)(1)(A), (B) and (G) of the Federal False Claims Act and comparable sections of the State False Claims Acts.

### 2. Daiichi

179.    Daiichi is a Service Fee Defendant. See attached Exhibit F.

180.    Daiichi and a national wholesaler executed a "Distribution Services Agreement" ("Daiichi Agreement"), effective July 1, 2004 for a term of three years. Daiichi Agreement § 9.

181.    According to the Daiichi Agreement, the purpose of the agreement is to "define more precisely the amount and manner of payment of the consideration to be received by [the national wholesaler] for its performance of [various distribution services]." *Id.* at p. 1.

182.    Sections 1 and 2 of the Daiichi Agreement detail the services the national wholesaler provides to Daiichi:

- EDI 852 Product Activity Reports on a weekly basis;
- EDI 867 Product Activity Reports on a weekly basis;
- Monitor customer ordering patterns;
- Contract and chargeback administration;
- Returns processing;
- Customer service support;
- Adequate working inventories to meet customer needs and service levels;
- Licensed, environmentally controlled, PDMA compliant, secure facilities; and
- Provide promotional marketing programs and services.

*Id.* at §§ 1–2.

183.    In exchange for providing these services, Daiichi agreed to compensate the national wholesaler with a Service Fee "equal to 3.15% of the immediately previous calendar quarter's gross [...] purchases." *Id.* at Exhibit A. This Service Fee is then reduced by any price increases. *Id.* Specifically:

> [The national wholesaler] will issue [Daiichi] credits to be applied to the above [Service Fee] anytime [Daiichi] has a price increase on any Products (the "Price Increase Credits"). The Price Increase Credit will be equal to any inventory

> appreciation [the national wholesaler] receives on its inventory of [Daiichi]'s products on-hand or on-order immediately prior to [Daiichi]'s price increase.

*Id.*

184.    Thus, Daiichi reduces the Service Fee by the amount of the Price Increase Credits (i.e., off-invoice price increases). By retroactively increasing the price of its drugs, Daiichi realizes the benefit of this increased sales price, while, at the same time, failing to report this price increase in its AMP calculations. This failure causes Daiichi to materially underpay its Medicaid rebates.

185.    Furthermore, should the Price Increase Credit exceed the Service Fee, the national wholesaler will credit or refund the amount in excess of the Service Fee back to Daiichi. *Id.* Therefore, as a result of the off-invoice price increases, the national wholesaler could effectively become a debtor, even though it is the one providing the services.

186.    Consistent with the above, Section 8.11 of the Daiichi Agreement describes the relationship between Daiichi and the national wholesaler as that of a "service buyer-seller." Thus, the agreement was negotiated at arm's length and for fair market value.

187.    As discussed in detail above, *bona fide* service fees are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide. Given the *Streck Opinion* and the *bona fide* nature of the services the wholesaler provides to Daiichi, the express terms of the Daiichi Agreement indicate that Daiichi treats the Service Fees it pays as *bona fide*, thus "allowing" Daiichi to exclude those fees from its calculations of AMP. Therefore, by netting off-invoice price increases against the Service Fees, Daiichi improperly excludes price increases from its AMP calculations, in turn understates its AMP, and consequently underpays the rebates it owes to the Government Plaintiffs.

188.    During the Relevant Time Period, Defendant Daiichi participated in the Medicaid Program and Daiichi's Relevant Drugs were paid for by all of the Government Plaintiffs. Further, the prices on Daiichi's drugs increased during the Relevant Time Period, often at a greater percentage than the CPI-U.

189.    By understating its AMP calculations, Daiichi: (1) caused CMS to underreport the unit rebate amounts to the states, (2) underpaid its Basic and Additional Medicaid rebates, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, Daiichi violated Section 3729(a)(1)(A), (B) and (G) of the Federal False Claims Act and comparable sections of the State False Claims Acts.

### 3.    First Horizon

190.    First Horizon is a Service Fee Defendant. See attached Exhibit H.

191.    First Horizon and a national wholesaler executed a "Distribution and Inventory Management Services Agreement" ("First Horizon Agreement"), effective January 1, 2005 for a term of one (1) year which will automatically renew for subsequent one-year periods. First Horizon Agreement at § 3.1.

192.    According to the First Horizon Agreement, the purpose of the agreement is for the national wholesaler to provide First Horizon with certain services including, but not limited to, logistics, inventory management, administrative, and financial services. *Id.* at p. 1; *Id.* at § 2.1.

193.    Section 2.1 details the "Base Services" the national wholesaler provided to First Horizon:

- Sophisticated ordering technology;
- Daily consolidated deliveries to providers;
- Emergency shipments to providers 24/7/365;
- Consolidated accounts receivable management;

47

- Contract and chargeback administration;
- Returns;
- Customer service support;
- Adequate working inventories to meet customer needs; and
- Licensed, environmentally controlled, PDMA compliant secure facilities.

*Id.* at § 2.1.

194.    In exchange for providing these Base Services, First Horizon agreed to compensate the national wholesaler with a "Base Service Fee of 5.00% [that] will be calculated and paid annually based on 110% of the total volume" purchased by the national wholesaler. *Id.* at p. 10.

195.    However, First Horizon "will receive credit towards [the] Service Fee for the following items:

a.   Price Appreciation on Aggregate Inventory after a Customer pricing action.

b.   Margin earned on quarterly promotions, deals, off-invoice allowances, post price increase allocations, or any other method, excluding those that are intended for [the national wholesaler's] Providers.

*Id.*

196.    Thus, First Horizon reduces the Service Fee by the amount of its Price Appreciation (i.e., off-invoice price increases). By retroactively increasing the price of its drugs, First Horizon realizes the benefit of this increased sales price, while, at the same time, failing to report this price increase in its AMP calculations. This failure causes First Horizon to materially underpay its Medicaid rebates.

197.    Further evincing the *bona fide* nature of the services is the fact that both parties agree that "[t]he relationship between First Horizon and [the national wholesaler] is that of an independent contractor." First Horizon Agreement § 4.1. Therefore, the agreement was negotiated at arm's length and for fair market value.

48

198.    Additionally, both parties memorialized the *bona fide* nature of the payment for services in Section 2.6:

> First Horizon entered into this Agreement to receive the services and obligations set forth herein by [the national wholesaler]. As consideration for these services and obligations of [the national wholesaler], First Horizon agrees to pay the fees set forth in Attachment A.

*Id.* at § 2.6.

199.    This clause confirms that the agreement was negotiated at arm's length and for fair market value.

200.    As discussed in detail above, *bona fide* service fees are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide. Given the *Streck Opinion* and the *bona fide* nature of the services the wholesaler provides to First Horizon, the express terms of the First Horizon Agreement indicate that First Horizon treats the Service Fees it pays as *bona fide*, thus "allowing" First Horizon to exclude those fees from its calculations of AMP. Therefore, by netting off-invoice price increases against the Service Fees, First Horizon improperly excludes price increases from its AMP calculations, in turn understates its AMP, and consequently underpays the rebates it owes to the Government Plaintiffs.

201.    During the Relevant Time Period, Defendant First Horizon participated in the Medicaid Program and First Horizon's Relevant Drugs were paid for by all of the Government Plaintiffs. Further, the prices on First Horizon's drugs increased during the Relevant Time Period, often at a greater percentage than the CPI-U.

202.    By understating its AMP calculations, First Horizon: (1) caused CMS to underreport the unit rebate amounts to the states, (2) underpaid its Basic and Additional Medicaid rebates, (3) caused the states to receive less in rebates than they were entitled to, and

(4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, First Horizon violated Section 3729(a)(1)(A), (B) and (G) of the Federal False Claims Act and comparable sections of the State False Claims Acts.

### 4. Lilly

203. Lilly is a Service Fee Defendant. See attached Exhibit G.

204. Lilly and a national wholesaler executed a "Warehousing and Distribution Service Agreement" ("Lilly Agreement"), effective July 1, 2002. Lilly Agreement, p. 1. The Lilly Agreement was amended on January 1, 2005 by the "3rd Amendment to Warehousing and Distribution Service Agreement" ("Lilly Amendment"), which extended the term of the Lilly Agreement through December 31, 2009. Lilly Amendment § 3.

205. The purpose of the Lilly Amendment is to clearly define the compensation the national wholesaler will receive for providing various distribution services. Specifically, the wholesaler agreed to provide Lilly with the following services:

- Maintain inventory levels (total of on hand and on order) of Products of no more than three (3) weeks of Normal Requirements;

- Use best efforts to fill customer orders at a ninety-eight (98%), or greater, Average Weighted Service Level during each calendar month;

- Provide Lilly, on a daily basis, with EDI 852 Data for all of the national wholesaler's facilities that purchase and/or warehouse pharmaceutical products;

- Provide Lilly, on a weekly basis, with EDI 867 Data for all of the national wholesaler's facilities that purchase and/or warehouse pharmaceutical products; and

- Provide Lilly with the national wholesaler's Average Service Levels on a weekly basis.

*Id.* at §§ 1-2

206.    In exchange for providing these services, Lilly agreed to compensate the national

wholesaler with a "Distribution Fee" as follows:

| Date | Basis Points |
|------|-------------|
| January 1, 2005 – December 31, 2005 | 90 |
| January 1, 2006 – December 31, 2006 | 98 |
| January 1, 2007 – December 31, 2007 | 105 |
| January 1, 2008 – December 31, 2009 | 108 |

*Id.* at § 3.

207.    This Distribution Fee (i.e., Service Fee) is paid on a quarterly basis. *Id.* The

Distribution Fee is "calculated by multiplying Lilly's quarterly sales of Products and including

crossdock and drop shipments, invoiced to the [national wholesaler], less Products returned by

the [national wholesaler] during the same quarter, by the appropriate Distribution Fee

percentage." *Id.*

208.    Simply put, the Distribution Fee is a percentage of net sales.

209.    Like the other Service Fee Defendants, Lilly pays the Distribution Fee through

off-invoice price increases on its products.  Specifically:

> [The national wholesaler] shall receive the Distribution Fee through a
> combination of (1) the value of any price increase by Lilly during the quarter for
> Products in [national wholesaler's] inventory ("Price Increase Value") and (2)
> a payment or credit by Lilly.  The Price Increase Value for a Product shall be
> calculated by multiplying the price increase for the Product by the amount of
> inventory of such Product [the national wholesaler] has on the date of the price
> increase.

*Id.*

210.    Lilly also acknowledges that its price increases are so great that they may exceed

the amount of the Distribution Fee.  *Id.*  Specifically, "[i]f the Price Increase Value for all

Products for a quarter is greater than the total Distribution Fee, any excess shall be carried

forward and netted out of future quarterly payments."  *Id.*  As a result, these off-invoice price

increases have the power to transform Lilly from a debtor into a creditor.

211.    Consistent with the *bona fide* nature of the Lilly Agreement, Section III (F) describes the relationship between Lilly and the national wholesaler as that of a "service buyer-seller." Lilly Agreement § III (F). Thus, the agreement was negotiated at arm's length and for fair market value.

212.    As discussed in detail above, *bona fide* service fees are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide. Given the *Streck Opinion* and the *bona fide* nature of the services the wholesaler provides to Lilly, the express terms of the Lilly Agreement and Amendment indicate that Lilly treats the Distribution Fees it pays as *bona fide*, thus "allowing" Lilly to exclude those fees from its calculations of AMP. Therefore, by netting off-invoice price increases against the Service Fees, Lilly improperly excludes price increases from its AMP calculations, in turn understates its AMP, and consequently underpays the rebates it owes to the Government Plaintiffs.

213.    During the Relevant Time Period, Defendant Lilly participated in the Medicaid Program and Lilly's Relevant Drugs were paid for by all of the Government Plaintiffs. Further, the prices on Lilly's drugs increased during the Relevant Time Period, often at a greater percentage than the CPI-U.

214.    By understating its AMP calculations, Lilly: (1) caused CMS to underreport the unit rebate amounts to the states, (2) underpaid its Basic and Additional Medicaid rebates, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, Lilly violated Section 3729(a)(1)(A), (B) and (G) of the Federal False Claims Act and comparable sections of the State False Claims Acts.

**5.** **Merck**

215.    Merck is a Service Fee Defendant. See attached Exhibit L.

216.    Merck and a national wholesaler executed a "Product Distribution Program" agreement ("Merck Agreement"), effective April 1, 2006.  Merck Agreement at p. 1.

217.    According to the Merck Agreement, the purpose of the agreement is to provide Merck with certain services including, but not limited to, logistics, inventory management, administrative, and financial services.

218.    Sections 2 through 3 detail the services the national wholesaler provided to Merck:

- Prepare and provide 852 data;
- Prepare and provide 867 data;
- Maintain target inventory levels;
- Maintain target service levels;
- Maintain target variability levels; and
- Reduce the number of order locations.

*Id.* at §§ II(A) – III(F).

219.    In exchange for providing these *bona fide* services, Merck agreed to compensate the national wholesaler with a performance-based fee ("Service Fee") ranging up to 92 basis points of quarterly sales. Merck Agreement §§ II(A) – III(F).  Specifically, the national wholesaler will receive:

- 10 basis points if it complies with the conditions in Paragraph one of the Merck Agreement. *Id.* at III(A).

- 45 basis points if the average Days of Supply for a month are less than twenty-one (21) days and no basis points if the average Days of Supply exceed twenty-five Days of Supply. *Id.* at III(B).

- 12 basis points if the Service Level is greater than 98.5% of the Unit Fill Rate. However, if the Service Level is under 97%, the wholesaler will not receive any basis points. *Id.* at III(C).

- 10 basis points if the national wholesaler has an average Absolute Demand Variability percentage less than or equal to 15%. If the average Absolute Demand Variability is greater than 25%, then the wholesaler will not receive any basis points. *Id.* at III(D).

- 10 basis points if the percentage of the 867 units sold and identified in detail is equal to or greater than 99% of the 852 units sold during the same month and no basis points if 867 units sold and identified in detail is less than 95% of the 852 units sold during the same month. *Id.* at III(E).

- 5 basis points if there is a reduction equal to or greater than 75% in the number of ordering and receiving locations and no basis points if the reduction in ordering and receiving locations is less than 50%. *Id.* at III(F).

220. Thus, assuming the national wholesaler satisfies all of the above performance requirements, it will receive a Service Fee of .92% multiplied by monthly sales. *Id.* at §§ II(A) – III(F).

221. However, this Service Fee will be reduced by Inventory Appreciation (i.e., off-invoice price increases). *Id.* at § V. Specifically:

> If the Days of Supply is greater than fifteen (15) Days on any NDC, then Merck will calculate the difference between the New Price and Old Price for each NDC affected by the price increase and multiply that difference by the number of units, rounded to the nearest whole unit, of that NDC in the Distributor's Aggregate Inventory that exceeds fifteen (15) Days of Supply as of the date of the price increase. The resulting dollar amounts will be subtracted from the quarterly Program fees for the quarter in which the price increase(s) occurred. If the dollar amount of the Inventory Appreciation Adjustment exceeds the quarterly Program fees, then the differential will carry forward and reduce any future quarterly Program fees until the Adjustment is fully utilized.

*Id.* (emphasis added).

222. Thus, Merck reduces the Service Fee by the amount of the Inventory Appreciation (i.e., off-invoice price increases). By retroactively increasing the price of its drugs, Merck realizes the benefit of this increased sales price, while, at the same time, failing to report this price increase in its AMP calculations. This failure causes Merck to materially underpay its Medicaid rebates.

223. Merck also acknowledges that its off-invoice price increases are so large that they not only have the potential to satisfy the entire Service Fee Payment, but require an additional contractual mechanism to ensure that the off-invoice price increases are carried forward to reduce future Service Fees until the full amount of the off-invoice price increase has been utilized. *Id.*

224. As discussed in detail above, *bona fide* service fees are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide. Given the *Streck Opinion* and the *bona fide* nature of the services the wholesaler provides to Merck, the express terms of the Merck Agreement indicate that Merck treats the Service Fees it pays as *bona fide*, thus "allowing" Merck to exclude those fees from its calculations of AMP. Therefore, by netting off-invoice price increases against the Service Fees, Merck improperly excludes price increases from its AMP calculations, in turn understates its AMP, and consequently underpays the rebates it owes to the Government Plaintiffs.

225. During the Relevant Time Period, Defendant Merck participated in the Medicaid Program and Merck's Relevant Drugs were paid for by all of the Government Plaintiffs. Further, the prices on Merck's drugs increased during the Relevant Time Period, often at a greater percentage than the CPI-U.

226. By understating its AMP calculations, Merck: (1) caused CMS to underreport the unit rebate amounts to the states, (2) underpaid its Basic and Additional Medicaid rebates, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, Merck violated Section 3729(a)(1)(A), (B) and (G) of the Federal False Claims Act and comparable sections of the State False Claims Acts.

55

### 6. __Santarus__

227.    Santarus is a Service Fee Defendant. See attached Exhibit P.

228.    Santarus and a national wholesaler executed a "Channel Services Agreement" ("Santarus Agreement"), effective around 2004, which will automatically renew for successive twelve (12) month terms. Santarus Agreement at § 10.16.

229.    According to the Santarus Agreement, the purpose of the agreement is "to define a mutually beneficial relationship between Santarus and [a national wholesaler] in order to achieve Santarus' goals of [an] efficient distribution channel for product delivery by means of the services furnished by [the national wholesaler]." *Id.* at p. 1.

230.    Section 5 details the services the national wholesaler provides to Santarus:

- Maintain target inventory service levels;
- Comply with the Base Agreement;
- Provide 852 data transactions on a daily basis; and
- Provide 867 data transactions on a weekly basis.

*Id.* at Exhibit A.

231.    In exchange for providing these services, Santarus agreed to compensate the national wholesaler with a "CSA Payment" of "up to five hundred (500) basis points or 5.00% of Purchases." *Id.* at § 4.5.

232.    Specifically, the CSA Payment is based on satisfying the following performance goals:

- For complying with the terms set forth in the Santarus Agreement, the national wholesaler will receive up to 150 basis points. *Id.* at § 4.5.1.

- For a Service Fill Rate of 98% or higher, the national wholesaler will receive 250 basis points. However, if the Service Fill Rate falls below 95%, the national wholesaler will not receive any basis points. *Id.* at § 4.5.2.

- For providing complete, accurate, and weekly 867 data submissions, the national wholesaler will receive up to 100 basis points. *Id.* at § 5.9.

233.    The CSA Payment "is determined quarterly by multiplying Purchases by the sum of the base payment plus service level payment plus the transparency payment minus any irreconcilable deductions minus any applicable inventory appreciation as discussed in section 4.4." *Id.* Section 4.4 states that "Santarus will reduce CSA Payment in the following quarter after any such price increase by the value of the inventory appreciation recognized upon a price increase taken." *Id.* at § 4.4.

234.    Exhibit A of the Santarus Agreement provides a detailed breakdown of the CSA Payment calculations. *Id.* at § 4.5. This breakdown clearly shows that "Inventory Appreciation" (i.e., an off-invoice price increase) is deducted from the CSA Payment (i.e., Service Fee). *Id.* at Exhibit A.

235.    Thus, Santarus reduces the CSA Payment by the amount of the Inventory Appreciation (i.e., off-invoice price increases). By retroactively increasing the price of its drugs, Santarus realizes the benefit of this increased sales price, while, at the same time, failing to report this price increase in its AMP calculations. This failure causes Santarus to materially underpay its Medicaid rebates.

236.    Specifically, the "Inventory Appreciation" clause in Exhibit A states:

> Santarus will reduce CSA Payment in the following quarter after such price increase by the value of the inventory appreciation recognized upon a price increase taken. The inventory appreciation will be calculated as the difference between (the Effective Inventory multiplied times New Price) minus (the Effective Inventory multiplied times the Old Price).

*Id.*

237.    Given this "Inventory Appreciation" clause, it is clear that Santarus hides off-invoice price increases in its CSA Payments.

238.     Further evincing the *bona fide* nature of the services is the fact that both parties agree that "the relationship between Santarus and [the national wholesaler] is that of an independent contractor." Santarus Agreement § 6. Thus, the agreement was negotiated at arm's length and for fair market value.

239.     As discussed in detail above, *bona fide* service fees are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide.   Given the *Streck Opinion* and the *bona fide* nature of the services the wholesaler provides to Santarus, the express terms of the Santarus Agreement indicate that Santarus treats the CSA Payments as *bona fide*, thus "allowing" Santarus to exclude those fees from its calculations of AMP.  Therefore, by netting off-invoice price increases against the CSA Payment, Santarus improperly excludes price increases from its AMP calculations, in turn understates its AMP, and consequently underpays the rebates it owes to the Government Plaintiffs.

240.     During the Relevant Time Period, Defendant Santarus participated in the Medicaid Program and Santarus' Relevant Drugs were paid for by all of the Government Plaintiffs.  Further, the prices on Santarus' drugs increased during the Relevant Time Period, often at a greater percentage than the CPI-U.

241.     By understating its AMP calculations, Santarus: (1) caused CMS to underreport the unit rebate amounts to the states, (2) underpaid its Basic and Additional Medicaid rebates, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states.  As a result of this fraudulent conduct, Santarus violated Section 3729(a)(1)(A), (B) and (G) of the Federal False Claims Act and comparable sections of the State False Claims Acts.

7.    **Watson**

242.    Watson is a Service Fee Defendant. See attached Exhibit S.

243.    Watson and a national wholesaler executed a "Distribution Services Agreement" ("Watson Agreement"), effective July 1, 2005 for a period of two (2) years, which will automatically renew for additional one-year terms. Watson Agreement at § 2.1.

244.    According to the Watson Agreement, the purpose of the agreement is for Watson to purchase logistics, administrative, financial, and inventory management services from the national wholesaler. *Id.* at p. 1.

245.    Section 2.1 details the "Base Distribution Services" the national wholesaler provides to Watson:

- Sophisticated ordering technology;
- Daily consolidated deliveries to providers;
- Emergency shipments to providers 24/7/365;
- Consolidated accounts receivable management;
- Contract and chargeback administration;
- Returns processing;
- Customer service support;
- Adequate working inventories to meet customer needs and service levels; and
- Licensed, environmentally controlled, PDMA compliant secure facilities.

*Id.* at § 2.1.

246.    In addition to these Base Distribution Services, the national wholesaler agreed to provide "Inventory Management Services" and "Data/Reporting Services." *Id.* at §§ 2.2, 2.3. The Inventory Management Services include maintaining target inventory, purchase limits, and ensuring minimal product shortages. The Data/Reporting Services include data reporting services and customer monitoring.

247.    In exchange for providing these Base Distribution Services, Inventory Management Services, and Data/Reporting Services, Watson agreed to compensate the national

59

wholesaler with a "Service Fee of 3.5%" that "will be calculated and paid quarterly based on the total volume of all Products purchased" by the national wholesaler. Watson Agreement at p. 8.

248.    According to Schedule A of the Watson Agreement, the Service Fee is broken down as follows:

- 25 basis points for Base Distribution Services in accordance with Section 2.1

- 50 basis points for providing a National Logistics Center in accordance with Section 2.6

- 100 basis points for providing Inventory Management Services in accordance with Section 2.2

- 100 basis points for providing Data/Reporting Services in accordance with Section 2.3

- 50 basis points for providing Service level attainment in accordance with Section 2.4

- 25 basis points for providing New Product Support in accordance with Section 2.5

*Id.*

249.    The 3.5% Service Fee is then reduced by "Service Fee Credits." *Id.* Specifically, the "Service Fee payable by [Watson] to [the national wholesaler] will be net of the value of the following items:

The increase in value of [the national wholesaler's] inventory as a result of the announcement of a New Price by [Watson] during any quarter. The increase in value will equal the difference between the New Price and Old Price for Products multiplied by [the national wholesaler]'s on hand inventory of such Product on the date of the announcement of the New Price.

*Id.*

250.    Thus, Watson reduces the Service Fee by the amount of the price increase (i.e., off-invoice price increases). By retroactively increasing the price of its drugs, Watson realizes

the benefit of this increased sales price, while, at the same time, failing to report this price increase in its AMP calculations. This failure causes Watson to materially underpay its Medicaid rebates.

251. The Base Distribution Services, Inventory Management Services, and Data/Reporting Services provided by the wholesaler to Watson are virtually identical to the services at issue in the *Streck Opinion*. According to the *Streck Opinion*, "there is no dispute" that the Service Fee Defendants "had service agreements for bona fide services." *Streck Opinion* at p. 32. Thus, given that the services described in the Watson Agreement are virtually identical to the *bona fide* services contracted for by the Service Fee Defendants in the related action, it is clear that the services contracted for by Watson are also *bona fide*.

252. Consistent with the above, Section 4.1 of the Watson Agreement describes the relationship between Watson and the national wholesaler as that of a "service buyer-seller." *Id.* at § 4.1. Thus, the agreement was negotiated at arm's length and for fair market value.

253. As discussed in detail above, *bona fide* service fees are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide. Given the *Streck Opinion* and the *bona fide* nature of the services the wholesaler provides to Watson, the express terms of the Watson Agreement indicate that Watson treats the Service Fees it pays as *bona fide*, thus "allowing" Watson to exclude those fees from its calculations of AMP. Therefore, by netting off-invoice price increases against the Service Fees, Watson improperly excludes price increases from its AMP calculations, in turn understates its AMP, and consequently underpays the rebates it owes to the Government Plaintiffs.

254. During the Relevant Time Period, Defendant Watson participated in the Medicaid Program and Watson's Relevant Drugs were paid for by all of the Government Plaintiffs.

Further, the prices on Watson's drugs increased during the Relevant Time Period, often at a greater percentage than the CPI-U.

255.    By understating its AMP calculations, Watson: (1) caused CMS to underreport the unit rebate amounts to the states, (2) underpaid its Basic and Additional Medicaid rebates, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states.  As a result of this fraudulent conduct, Watson violated Section 3729(a)(1)(A), (B) and (G) of the Federal False Claims Act and comparable sections of the State False Claims Acts.

**C.**    **Hybrid Defendants**

**1.**    **Astellas**

256.    Astellas is a Hybrid Defendant.  See attached Exhibit A.

257.    Astellas and a national wholesaler executed a "Core Services Agreement" ("Astellas Agreement"), effective April 1, 2005 through March 31, 2010.  Astellas Agreement § VIII(a).

258.    The purpose of the Astellas Agreement is to "renegotiate and define more precisely" the distribution and data services provided by the national wholesaler to Astellas.  *Id.* at p. 1.

259.    Section 2 details the "Core Services" the national wholesaler provided to Astellas:

- Contract administration;
- Chargeback procedures;
- Inventory and sales reports;
- Additional inventory data;
- Returns processing; and
- Inventory management.

*Id.* at § II.

260.    In exchange for providing these Core Services, Astellas agreed to compensate the

national wholesaler with a payment up to 1.75% of gross purchases:

> **Year One** - [The national wholesaler] will be paid Compensation of 1.25% of Gross Product Purchases by [the national wholesaler] for the period April 1, 2005 through March 31, 2006.
>
> **Year Two** - [The national wholesaler] will be paid Compensation of 1.5% of Gross Product Purchases by [the national wholesaler] for the period April 1, 2006 through March 31, 2007.
>
> **Year Three – Five** - [The national wholesaler] will be paid Compensation of 1.75% of Gross Product Purchases by [the national wholesaler] for the period April 1, 2007 through March 31, 2010.

*Id.* at Attachment C.

261.    The Astellas Agreement "permits" Astellas to account for its service fee payments

as either: (a) a discount that reduces AMP or (b) a service fee, which is used to conceal off-

invoice price increases. *Id.* at § IV (c).

262.    Specifically, under the Government Reporting section of the Astellas Agreement:

> Each party will be responsible for reporting the Compensation herein to Governmental Authorities as it deems appropriate under the applicable rules, laws, and regulations, including whether to report the Compensation as a price concession or as a service fee.

*Id.* (emphasis added).

263.    Thus, as detailed below, Astellas either improperly treated the service fees paid to

wholesalers as discounts or hid its off-invoice prices increases in the bona fide service fees (or

both). However, regardless of which scheme it executes, the result is the same—a fraudulent

understatement of AMP.

### a.    Astellas' Discount Scheme

264.    When Astellas treats service fees as discounts, it fraudulently understates AMP by

mischaracterizing *bona fide* service fees as "price concessions." *Id.* at § IV (c).

265.    The services provided by the wholesaler to Astellas are virtually identical to the services at issue in the *Streck Opinion*. Specifically, the Court in the *Streck Opinion* held that, in the face of "the change in the statutory and regulatory landscape in 2007," the required knowledge of falsity could be inferred by failing to classify these services as *bona fide*. *Streck Opinion* at p. 29.

266.    Further evincing the *bona fide* nature of the services is the fact that both Astellas and the national wholesaler agreed that "the parties to this CSA are independent contractors." Astellas Agreement at § IX (f). Thus, the agreement was negotiated at arm's length and for fair market value.

267.    Despite the clear regulatory, statutory, and industry guidance directing Astellas to classify payment for these services as *bona fide* service fees, Astellas fraudulently elected to classify payment for these services as "price concessions" and used these "price concessions" to reduce its AMP calculations. *Id.* at § IV (c).

268.    As discussed in detail above, *bona fide* service fees are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide. In defiance of the law, Astellas improperly classifies *bona fide* service fees as a "price concession" which causes it to understate its AMP, and, as a result, underpay Medicaid rebates it owes to the Government Plaintiffs.

### b.    Astellas' Service Fee Scheme

269.    When Astellas utilizes the Service Fee scheme, it similarly deflates its Medicaid rebate obligations.

270.    Astellas' Core Services Agreement allows the company to reduce its AMP calculations by concealing off-invoice price increases in its service fee payments. *Id.* at § IV(b).

These off-invoice price increases have nothing to do with services, but are netted against service fee payments to "allow" Astellas to avoid increases in AMP.

271. Specifically, Astellas "will receive credit towards the Compensation in the event of Price Appreciation on Aggregate Inventory after a Manufacturer price increase on the Products. If the amount of such credit exceeds the Compensation, [the national wholesaler] will pay Manufacturer the difference within forty-five (45) days after the end of the quarter." *Id.*

272. "Price Appreciation" is defined as "the difference between a New Price and an Old Price on Aggregate Inventory after a Manufacturer price increase." *Id.* at p. 2.

273. Thus, Astellas reduces the Compensation by the amount of the Price Appreciation (i.e., off-invoice price increases). By retroactively increasing the price of its drugs, Astellas realizes the benefit of this increased sales price, while, at the same time, failing to report this price increase in its AMP calculations. This failure causes Astellas to materially underpay its Medicaid rebates.

274. This Service Fee scheme contravenes statutory and industry guidance, because Astellas is including off-invoice price increases, which should be incorporated in the calculation of AMP, in the definition of *bona fide* service fee, which is explicitly excluded from AMP. This scheme permits Astellas to understate its AMP calculations and, as a result, materially underpay its Medicaid rebate obligations.

275. During the Relevant Time Period, Defendant Astellas participated in the Medicaid Program and Astellas' Relevant Drugs were paid for by all of the Government Plaintiffs.

276. By understating its AMP calculations, Astellas: (1) caused CMS to underreport the unit rebate amounts to the states, (2) underpaid its Basic and Additional Medicaid rebates, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal

government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, Astellas violated Section 3729(a)(1)(A), (B) and (G) of the Federal False Claims Act and comparable sections of the State False Claims Acts.

### 2. Berlex

277. Berlex is a Hybrid Defendant. See attached Exhibit B.

278. Berlex and a national wholesaler executed a "Wholesaler Service Agreement" ("Berlex Agreement"), effective July 1, 2005 until June 30, 2010, which automatically renews for two successive year periods. Berlex Agreement at § 5.1.

279. According to the Berlex Agreement, the purpose of the agreement is for the national wholesaler "to provide Berlex with certain additional services with respect to the distribution of Products." Berlex Agreement at p. 1.

280. Exhibit A details the Services the national wholesaler provides to Berlex:

- Maintain target inventory levels;
- Provide EDI 852 Product Activity Reports on a daily basis;
- Provide EDI 867 Product Activity Reports on a daily basis;
- Prepare and provide morgue reports;
- Prepare and provide Line Extension Reports;
- Maintain a 98% Customer Service Level;
- Provide new product launch support; and
- Maintain defined service standards.

Berlex Agreement, Exhibit A.

281. In exchange for providing these Services, "Berlex shall pay to Wholesaler a fee (the 'Service Fee') equal to 1.8% of Gross Sales." *Id.* at § 4.1. Both Berlex and the national wholesaler "agree that the Service Fee represents fair market value." *Id.*

282. Additionally, the national wholesaler "warrants to Berlex that it [] does not directly or implicitly pass on, in whole or in part, Service Fees to its customers." *Id.* at § 7.3(a).

283.    Berlex cannot dispute that the fees it paid for services are *bona fide* service fees. Under the Government Reporting section, the Berlex Agreement states the following:

> Berlex acknowledges that <u>Wholesaler's position is that the fees are a bona fide fee for service provided under this Agreement</u>.  If any third party payer, including Medicare or Medicaid, or the U.S. Department of Health and Human Services or a State health care program requests any information about the purchase price paid by Wholesaler for Products under the Purchase Terms and Conditions, Wholesaler shall provide such information and shall report the net Product purchase price and, to the extent required by law or as requested by such third party payer, any Service Fees received under this agreement.

*Id.* at § 7.3(d)(emphasis added).

284.    Consistent with the Hybrid Scheme, the Berlex Agreement "permits" Berlex to account for its service fee payments as either: (a) a discount that reduces AMP or (b) a service fee, which is used to conceal off-invoice price increases.  *Id.* at § 4.2.

285.    Specifically, under the Compensation section of the Berlex Agreement:

> The Service Fee earned by Wholesaler shall be payable by Berlex in the form of:
>
> (a)    a credit issued to Wholesaler which may be used by Wholesaler for the purchase of Products under the Purchase Terms and Conditions; and
>
> (b)    the appreciation recognizable by Wholesaler with respect to On-Hand Inventory and On-Order Inventory (to the extent not sold to Wholesaler at the increased price) at the time of a price increase taken by Berlex on a Product calculated by multiplying the number of units of Product which are the subject of the price increase in On-Hand Inventory and On-Order Inventory (as determined by the reference to the 852 Report for the business day immediately preceding the price increase) by the difference between the post-price increase WAC and the pre-price increase WAC (the "Inventory Appreciation Value") which is creditable against the Service Fee due as set forth in Section 4.3(a).

*Id.*

286.    Thus, as detailed below, Berlex either improperly treated the service fees paid to wholesalers as discounts and/or hid its off-invoice prices increases in the bona fide service fees. However, regardless of which scheme(s) were executed, the result is the same—a fraudulent understatement of AMP.

### a.   **Berlex's Discount Scheme**

287.   When Berlex treats service fees as discounts, it fraudulently understates AMP by mischaracterizing *bona fide* service fees as a "credit."

288.   Specifically, the Berlex Agreement states:

> Any credit issued to Wholesaler pursuant to paragraph (a) shall be nontransferable and shall be used by Wholesaler solely for future Purchases of Products.

*Id.* at § 4.3(c)(emphasis added).

289.   Thus, by requiring that the wholesaler use the "credit" as payment for "future Purchases of Products," Berlex acknowledges that it provides a discount on product purchases in an amount equal to the Service Fee.

290.   In addition to the wholesaler recognizing that the Service Fee is a *bona fide* fee for service, the agreement itself recites the elements necessary to define the Service Fee as a *bona fide* service fee. Specifically, the parties acknowledge that the service fees are for itemized services that are actually performed and that the fees for services constitute fair market value, which are not passed on. *Id.* at Exhibit A; *Id.* at § 4.1; *Id.* at § 7.3(a).

291.   Furthermore, the services provided by the wholesaler to Berlex are virtually identical to the services at issue in the *Streck Opinion.* Specifically, the Court in the *Streck Opinion* held that, in the face of "the change in the statutory and regulatory landscape in 2007," the required knowledge of falsity could be inferred by failing to classify these services as *bona fide. Streck Opinion* at p. 29.

292.   When employing the Discount Scheme, Berlex failed to classify these services as *bona fide*, despite the fact that it explicitly recognized each element necessary to define payment for these services as a *bona fide* fee for service.

68

293.    Despite the clear regulatory and statutory guidance directing Berlex to classify payment for these services as *bona fide* service fees, Berlex fraudulently elected to classify payment for these services as "credits" and used these "credits" to reduce its AMP calculations. Berlex Agreement at p. 3.

294.    As discussed in detail above, *bona fide* service fees are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide.  In blatant defiance of the law, Berlex improperly classifies *bona fide* service fees as "credits," which causes it to understate its AMP, and, as a result, underpay Medicaid rebates it owes to the Government Plaintiffs.

### b.    Berlex's Service Fee Scheme

295.    Alternatively, or in conjunction with, the Discount Scheme, Berlex retains the option to utilize the Service Fee scheme to deflate its Medicaid rebate obligations.

296.    The Berlex Agreement allows the company  to  reduce its AMP calculations by concealing off-invoice price increases in its service fee payments.

297.    Specifically, in accord with the Berlex Agreement, the Service Fee can be paid in "the form of" a price increase (i.e., an off-invoice price increase). *Id.* at § 4.2(b). This payment is calculated as follows:

(i)     the Service Fee earned for such calendar quarter (subject to Section 3.2(a)); less

(ii)    the aggregate Inventory Appreciation earned by Wholesaler in the applicable calendar quarter, if any; less

(iii)   except to the extent Berlex elects to have any Carryover Service Fee paid pursuant to clause (b) below, any Carryover Service Fee, if any (as hereinafter defined; less

(iv)    any credit or amount due to Berlex pursuant to Section 3.2(b).

*Id.* at § 4.3(a).

298. Thus, Berlex reduces the Service Fee by the amount of the Inventory Appreciation (i.e., off-invoice price increases). By retroactively increasing the price of its drugs, Berlex realizes the financial benefit of this increased sales price, while, at the same time, failing to report this price increase in its AMP calculations. This failure causes Berlex to materially underpay its Medicaid rebates.

299. The "Carryover Service Fee" further clarifies that off-invoice price increases are used as a means to satisfy Services Fees and, thereby, avoid increases in AMP. Specifically, if the sum of items (ii) through (iv) in Section 4.3(a) of the Berlex Agreement "exceed the Service Fee earned for such calendar quarter, the difference ("Carryover Service Fee") shall be credited against the Service Fee payable by Berlex in the subsequent calendar quarter." *Id.* at § 4.3(b). Essentially, Berlex acknowledges that its off-invoice price increases are so large that they not only have the potential to satisfy the entire Service Fee, but require an additional mechanism— the Carryover Service Fee—to allow Berlex to capture the full value of its off-invoice price increases.

300. These services, according to CMS, are *bona fide* services because they provide "value to the manufacturer that [is] associated with the efficient distribution of drugs" and represent fair market value. 71 Fed. Reg. at 69667-9.

301. As discussed in detail above, *bona fide* service fees are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide. By virtue of the *bona fide* nature of the services the wholesaler provides to Berlex and the express terms of the Berlex Agreement, it is apparent that Berlex treats the Service Fees it pays as *bona fide*, thus "allowing" Berlex to exclude those fees from its calculations of AMP. Therefore, by netting off-invoice price increases against the Service Fees,

Berlex improperly excludes price increases from its AMP calculations, in turn understates its AMP, and consequently underpays the rebates it owes to the Government Plaintiffs.

302.    During the Relevant Time Period, Defendant Berlex participated in the Medicaid Program and Berlex's Relevant Drugs were paid for by all of the Government Plaintiffs.

303.    By understating its AMP calculations, Berlex: (1) caused CMS to underreport the unit rebate amounts to the states, (2) underpaid its Basic and Additional Medicaid rebates, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states.  As a result of this fraudulent conduct, Berlex violated Section 3729(a)(1)(A), (B) and (G) of the Federal False Claims Act and comparable sections of the State False Claims Acts.

### 3.    Organon

304.    Organon is a Hybrid Defendant.  See attached Exhibits M and N.

305.    Organon and a national wholesaler executed two separate agreements: (1) the "Wholesaler Services and Inventory Management Agreement" ("Organon IMA"), effective July 1, 2005 for a term of five years and (2) the "Distribution Services Agreement" ("Organon DSA"), effective July 1, 2005 for a term of five years.    Organon IMA § IV (A); Organon DSA § 3.1.

306.    The Organon IMA utilizes the Discount Scheme whereas the Organon DSA utilizes the Service Fee Scheme.

### a.    Organon's Discount Scheme

307.    The purpose of the Organon IMA is to detail the distribution services provided by the national wholesaler and to establish payment for providing such services. *Id.* at p. 1.

308.    Section 2 details the services provided by the national wholesaler to Organon:

71

- Pick, pack, and ship Organon's product to Wholesaler's customers upon their order for same;
- Sophisticated ordering technology;
- Daily consolidated deliveries to providers;
- Emergency shipments to providers 24/7/365;
- Consolidated accounts receivable management;
- Contract and Chargeback administration;
- Returns and Recall processing;
- Customer Service support;
- Adequate working inventories to meet customer needs; and
- Licensed, environmentally controlled, PDMA compliant, secure facilities.

*Id.* at § II(A).

309. As consideration for these services, Organon agreed to pay the national wholesaler a Service Fee "equal to 150 basis points on its Purchases." *Id.* at § III(A).

310. Specifically, Organon states that it "is willing to meet competitive practices by paying Wholesaler Basis Points on Wholesaler's Purchases of Organon's Products, according to the terms of [the Organon IMA]." Organon IMA at p. 1. Essentially, Organon multiplies the wholesaler's purchases by 1.5% and then deducts this figure from the wholesaler's purchases. This process allows Organon to provide an effective discount of 1.5% on all purchases by the national wholesaler and, more importantly for Organon, to reduce its AMP by 1.5%.

311. The services provided by the wholesaler to Organon are virtually identical to the services at issue in the *Streck Opinion*. Specifically, the Court in the *Streck Opinion* held that, in the face of "the change in the statutory and regulatory landscape in 2007," the required knowledge of falsity could be inferred by failing to classify these services as bona fide. *Streck Opinion* at p. 29.

312. Under the Organon IMA, the wholesaler agrees to provide inventory management services, administrative services, distribution services, and data services. These services, according to CMS, are *bona fide* services because they provide "value to the manufacturer that

[is] associated with the efficient distribution of drugs" and represent fair market value. 71 Fed. Reg. at 69667-9.

313.    Despite the regulatory and statutory guidance directing Organon to classify payment for these services as *bona fide* service fees, Organon elects to classify payment for these services as discounts to reduce its AMP calculations.

314.    As discussed in detail above, *bona fide* service fees are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide.  In blatant defiance of the law, Organon improperly classifies *bona fide* service fees as discounts, which causes it to understate its AMP, and, as a result, underpay Medicaid rebates it owes to the Government Plaintiffs.

### b.    Organon's Service Fee Scheme

315.    The purpose of the Organon DSA is to detail the services Organon "wishes to purchase" from the national wholesaler, which include, but are not limited to "logistics and inventory management services, administrative services, and financial services." *Id.* at p. 1.

316.    Section 2 details the services the national wholesaler provides to Organon:

- Maintain Aggregate Inventory Levels of no less than 21 days;
- Provide detailed forecasts, which include: product sales by location of Distribution Center, NDC number of product, quantity of sales forecast by units and dollars; and
- Provide guaranteed support for new product launches, which include:
   - Stocking distribution centers with quantities determined by Organon; and
   - Providing daily sales out reports for the first 60 days of product launch.

*Id.* at §§ 2.2–2.6.

317.    In exchange for providing these services, Organon "agree[d] to compensate [the national wholesaler] for each of the services" with a Service Fee up to 1.05%. *Id.*; *Id.* at

Schedule A. This Service Fee "will be calculated and paid quarterly based on the total volume of all Products purchased by the [national wholesaler]." *Id.* at Schedule A. Specifically, for years 1–3 the Service Fee will be 1.0% and for years 4–5 the Service Fee will be 1.05%. *Id.*

318.    However, Organon "will receive credit toward [the] Service Fee for the following items:

a.    Price Appreciation on Aggregate Inventory after a Customer pricing action.

b.    Margin earned on quarterly promotions, deals, off-invoice allowances, or any other method, excluding those that are intended for [the national wholesaler's] Providers.

*Id.*

319.    Thus, Organon reduces the Service Fee by the amount of the Price Appreciation (i.e., off-invoice price increases). By retroactively increasing the price of its drugs, Organon realizes the benefit of this increased sales price, while, at the same time, failing to report this price increase in its AMP calculations. This failure causes Organon to materially underpay its Medicaid rebates.

320.    Consistent with the above, Section 4.1 of the Organon DSA describes the relationship between Organon and the national wholesaler as that of a "service buyer-seller." Thus, the agreement was negotiated at arm's length and for fair market value.

321.    As discussed in detail above, *bona fide* service fees are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide. Given the *Streck Opinion* and the *bona fide* nature of the services the wholesaler provides to Organon, the express terms of the Organon DSA indicate that Organon treats the Service Fees it pays as *bona fide*, thus "allowing" Organon to exclude those fees from its calculations of AMP. Therefore, by netting off-invoice price increases against the Service Fees, Organon improperly excludes price increases from its AMP calculations, in turn

74

understates its AMP, and consequently underpays the rebates it owes to the Government Plaintiffs.

322.   During the Relevant Time Period, Defendant Organon participated in the Medicaid Program and Organon's Relevant Drugs were paid for by all of the Government Plaintiffs.  Further, the prices on Organon's drugs increased during the Relevant Time Period, often at a greater percentage than the CPI-U.

323.   During the Relevant Time Period, Defendant Organon participated in the Medicaid Program and Organon's Relevant Drugs were paid for by all of the Government Plaintiffs.

324.   By understating its AMP calculations, Organon: (1) caused CMS to underreport the unit rebate amounts to the states, (2) underpaid its Basic and Additional Medicaid rebates, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states.  As a result of this fraudulent conduct, Organon violated Section 3729(a)(1)(A), (B) and (G) of the Federal False Claims Act and comparable sections of the State False Claims Acts.

## IX.   CONCLUSION

325.   As fully detailed above, Defendants knowingly reported falsely deflated AMPs for their Relevant Drugs.  This caused CMS to inaccurately calculate URAs.  The States then used inaccurate URAs to invoice Defendants for the rebates Defendants owed.  Defendants thus unlawfully underpaid their rebates as a consequence of their own false reporting, the States expended more of their own funds, and the States sought more in federal matching funds through their quarterly requests for Medicaid payments on CMS Form-64.  Consequently, the Defendants defrauded the Government Plaintiffs.

## COUNT I

### False Claims Act
### 31 U.S.C. §§3729(a)(1)(A) and (a)(1)(B)
### (Against All Defendants)

326.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

327.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq., as amended.

328.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States Government for payment or approval, within the meaning of 31 U.S.C. §3729(a)(1)(A).

329.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim, within the meaning of 31 U.S.C. §3729(a)(1)(B).

330.    The United States, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

331.    By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

332.    Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT II

### False Claims Act
### 31 U.S.C. §3729(a)(1)(G)
### (Against All Defendants)

333.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

334.    This is a claim for penalties and treble damages under the Federal False Claims Act.

335.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government, within the meaning of 31 U.S.C. §3729(a)(1)(G).

336.    As a result, monies were lost to the United States through the non-payment or non-transmittal of money or property owed to the United States by the Defendants, and other costs were sustained by the United States.

337.    By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

338.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every false record or statement knowingly made, used, or caused to be made or used to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

## COUNT III

### California False Claims Act
### Cal Gov't. Code §12651(a)(1)-(2), (7)
### (Against All Defendants)

339.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

340.    This is a claim for treble damages and penalties under the California False Claims Act.

341.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

342.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the California State Government to approve and pay such false and fraudulent claims.

343.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the California State Government.

344.    The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

345.    By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

346.    Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT IV

### Colorado Medicaid False Claims Act
### C.R.S. §25.5-4-303.5 et seq.

347.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

348.    This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

349.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

350.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Colorado State Government to approve and pay such false and fraudulent claims.

351.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Colorado State Government.

352.    The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

353.    By reason of the Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

354.    Additionally, the Colorado State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT V

### Connecticut False Claims Act
### Conn. Gen. Stat. § 17b-301b
### (Against All Defendants)

355.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

356.    This is a claim for treble damages and penalties under the Connecticut False Claims Act.

357.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

358.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Connecticut State Government to approve and pay such false and fraudulent claims.

359.    The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

360.    By reason of the Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

361.    Additionally, the Connecticut State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT VI

### Delaware False Claims And Reporting Act
### 6 Del C. §1201(a)(1)-(2), (7)
### (Against All Defendants)

362.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

363.    This is a claim for treble damages and penalties under the Delaware False Claims And Reporting Act.

364.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

365.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Delaware State Government to approve and pay such false and fraudulent claims.

366.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Delaware State Government.

367.    The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

368.    By reason of the Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

369.    Additionally, the Delaware State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT VII

### Florida False Claims Act
### Fla. Stat. Ann. §68.082(2)(a)-(b), (g)
### (Against All Defendants)

370.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

371.    This is a claim for treble damages and penalties under the Florida False Claims Act.

372.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

373.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Florida State Government to approve and pay such false and fraudulent claims.

374.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Florida State Government.

375.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

376.    By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

377.    Additionally, the Florida State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT VIII

### Georgia False Medicaid Claims Act
### Ga. Code Ann. §49-4-168.1(1)-(2), (7)
### (Against All Defendants)

378.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

379.    This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

380.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

381.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to get the Georgia State Government to approve and pay such false and fraudulent claims.

382.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Georgia State Government.

383.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

384.    By reason of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

385.    Additionally, the Georgia State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

83

## COUNT IX

### Hawaii False Claims Act
### Haw. Rev. Stat. §661-21(a)(1)-(2), (7)
### (Against All Defendants)

386.  Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

387.  This is a claim for treble damages and penalties under the Hawaii False Claims Act.

388.  By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

389.  By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Hawaii State Government to approve and pay such false and fraudulent claims.

390.  By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Hawaii State Government.

391.  The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

392.  By reason of the Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

393.  Additionally, the Hawaii State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT X

### Illinois Whistleblower Reward And Protection Act
### 740 Ill. Comp. Stat. §175/3(a)(1)-(2), (7)
### (Against All Defendants)

394.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

395.    This is a claim for treble damages and penalties under the Illinois Whistleblower Reward And Protection Act.

396.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

397.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

398.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Illinois State Government.

399.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

400.    By reason of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

401.    Additionally, the Illinois State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XI

### Indiana False Claims and Whistleblower Protection Act
### IC 5-11-5.5-2(b)(2), (6)
### (Against All Defendants)

402.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

403.     This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

404.     By virtue of the acts described above, Defendants knowingly made or used false records and statements to obtain payment or approval of a false claim from the Indiana State Government.

405.     By virtue of the acts described above, Defendants knowingly made or used false records or statements to avoid an obligation to pay or transmit property to the Indiana State Government.

406.     The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

407.     By reason of the Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

408.     Additionally, the Indiana State Government is entitled to a penalty of at least $5,000 for each and every violation alleged herein.

### Count XII
### Iowa False Claims Act
### Iowa Code Ann. § 685.2(1)(A), (B), (G)

409.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

86

410.    This is a claim for treble damages and penalties under the Iowa False Claims Act.

411.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

412.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

413.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Iowa State Government.

414.    The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

415.    By reason of the Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

416.    Additionally, the Iowa State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XIII

### Louisiana Medical Assistance Programs Integrity Law
### La. Rev. Stat. § 46:438.3(A)-(C)
### (Against All Defendants)

417.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

87

418.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

419.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government.

420.    By virtue of the acts described above, Defendants knowingly engaged in misrepresentation or made, used, or caused to be made or used false records and statements, to obtain payment for false and fraudulent claims from the Louisiana State Government.

421.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Louisiana State Government.

422.    The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

423.    By reason of the Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

424.    Additionally, the Louisiana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XIV**
**The Maryland False Health Claims Act**
**Md. Code Ann., Health-Gen. §§ 2-602(A)(1), (2)**

425.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

426.    This is a claim for treble damages and penalties under the Maryland False Health Claims Act.

88

427. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

428. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

429. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Maryland State Government.

430. The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

431. By reason of the Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

432. Additionally, the Maryland State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XV

### Massachusetts False Claims Law
### Mass. Gen. Laws ch. 12 §5B(1)-(2), (8)
### (Against All Defendants)

433. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

434. This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

89

435.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

436.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

437.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Massachusetts State Government.

438.    The Massachusetts State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

439.    By reason of the Defendants' acts, the State of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

440.    Additionally, the Massachusetts State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### COUNT XVI

### Michigan Medicaid False Claims Act
#### §400.603(1)-(2)
#### (Against All Defendants)

441.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

90

442. This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

443. By virtue of the acts described above, Defendants knowingly made or caused to be made a false statement or false representation of material fact in an application for Medicaid benefits to the Michigan State Government.

444. By virtue of the acts described above, Defendants knowingly made or caused to be made a false statement or false representation of material fact for use in determining rights to a Medicaid benefit.

445. The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

446. By reason of the Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

447. Additionally, the Michigan State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## Count XVII

### Minnesota False Claims Act
### Minn. Stat. §15c.02 et seq.

448. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

449. This is a claim for treble damages and penalties under the Minnesota False Claims Act.

450.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

451.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Minnesota State Government to approve and pay such false and fraudulent claims.

452.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Minnesota State Government.

453.    The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

454.    By reason of the Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

455.    Additionally, the Minnesota State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

### COUNT XVIII

#### Montana False Claims Act
#### Mont. Code Ann. 17-8-403(1)(a)-(b), (g)
#### (Against All Defendants)

456.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

457.     This is a claim for treble damages and penalties under the Montana False Claims Act.

458.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

459.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Montana State Government to approve and pay such false and fraudulent claims.

460.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Montana State Government.

461.     The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

462.     By reason of the Defendants' acts, the State of Montana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

463.     Additionally, the Montana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### COUNT XIX

**Nevada Submission of False Claims
to State or Local Government Act
Nev. Rev. Stat. Ann. §357.040(1)(a)-(b), (g)
(Against All Defendants)**

464.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

93

465. This is a claim for treble damages and penalties under the Nevada Submission of False Claims to State or Local Government Act.

466. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

467. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

468. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Nevada State Government.

469. The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

470. By reason of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

471. Additionally, the Nevada State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XX

### New Jersey False Claims Act
### N.J. Stat. §2A:32C-3(a)-(b), (g)
### (Against All Defendants)

472. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

473. This is a claim for treble damages and penalties under the New Jersey False Claims Act.

474. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

475. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the New Jersey State Government to approve and pay such false and fraudulent claims.

476. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the New Jersey State Government.

477. The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

478. By reason of the Defendants' acts, the New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

479. Additionally, the New Jersey State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XXI

### New Mexico Medicaid False Claims Act
### N.M. Stat. Ann. § 27-14-3(a)(1)-(2), (7)
### (Against All Defendants)

480.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

481.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

482.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

483.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

484.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the New Mexico State Government.

485.    The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

486.    By reason of the Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

487.    Additionally, the New Mexico State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXII

### New York False Claims Act
### NY CLS St. Fin. §189(a)-(b), (g)
### (Against All Defendants)

488.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

489.    This is a claim for treble damages and penalties under the New York False Claims Act.

490.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

491.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the New York State Government to approve and pay such false and fraudulent claims.

492.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the New York State Government.

493.    The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

494. By reason of the Defendants' acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

495. Additionally, the New York State Government is entitled to the maximum penalty of $12,000 for each and every violation alleged herein.

## COUNT XXIII

### North Carolina False Claims Act
### 2009-554 N.C. Sess. Laws §1-607(a)(1)-(2), (7)
### (Against All Defendants)

496. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

497. This is a claim for treble damages and penalties under the North Carolina False Claims Act.

498. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

499. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the North Carolina State Government to approve and pay such false and fraudulent claims.

500. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the North Carolina State Government.

501. The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

502.     By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

503.     Additionally, the North Carolina State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XXIV

### Oklahoma Medicaid False Claims Act
### Okla. Stat. tit. 63, §5053.1B (1)-(2), (7)
### (Against All Defendants)

504.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

505.     This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

506.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

507.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Oklahoma State Government to approve and pay such false and fraudulent claims.

508.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Oklahoma State Government.

509.    The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

510.    By reason of the Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

511.    Additionally, the Oklahoma State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXV

### Rhode Island State False Claims Act
### R.I. Gen. Laws §9-1.1-3(1)-(2), (7)
### (Against All Defendants)

512.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

513.    This is a claim for treble damages and penalties under the Rhode Island State False Claims Act.

514.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

515.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Rhode Island State Government to approve and pay such false and fraudulent claims.

100

516.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Rhode Island State Government.

517.    The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

518.    By reason of the Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

519.    Additionally, the Rhode Island State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXVI

### Tennessee False Claims Act and Medicaid False Claims Act
### Tenn. Code Ann. §§ 4-18-103(a)(1)-(2), (7)
### and 71-5-181(a)(1)(A), (B) and (D)
### (Against All Defendants)

520.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

521.    This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Law.

522.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

523. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

524. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Tennessee State Government.

525. The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

526. By reason of the Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

527. Additionally, the Tennessee State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXVII

### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code Ann. §36.002(4)(B), (12)
### (Against All Defendants)

528. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

529. This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act.

530. By virtue of the acts described above, Defendants knowingly made, caused to be made, induced or sought to induce the making of a false statement or misrepresentation of

material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program.

531.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Texas State Government.

532.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

533.    By reason of the Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

534.    Additionally, the Texas State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXVIII

### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §8.01-216.3(a)(1)-(2), (7)
### (Against All Defendants)

535.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

536.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

537.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval.

538. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Virginia State Government to approve and pay such false and fraudulent claims.

539. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Virginia State Government.

540. The Virginia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

541. By reason of the Defendants' acts, the State of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

542. Additionally, the Virginia State Government is entitled to the maximum penalty $11,000 for each and every violation alleged herein.

## COUNT XXIX

### Washington Health Care False Claim Act
### Wash. Rev. Code §§ 48.80.030(1), (2), (3)

543. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

544. This is a claim for treble damages and penalties under the Washington Health Care False Claims Act.

545. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

546. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Washington State Government to approve and pay such false and fraudulent claims.

547. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Washington State Government.

548. The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

549. By reason of the Defendants' acts, the State of Washington has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

550. Additionally, the Washington State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XXX

### Wisconsin False Claims For Medical Assistance Act
### Wis. Stat. §20.931(2)(a)-(b), (g)
### (Against All Defendants)

551. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

552. This is a claim for treble damages and penalties under the Wisconsin False Claims for Medical Assistance Act.

553. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

554. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Wisconsin State Government to approve and pay such false and fraudulent claims.

555. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Wisconsin State Government.

556. The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

557. By reason of the Defendants' acts, the State of Wisconsin has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

558. Additionally, the Wisconsin State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**COUNT XXXI**
**District of Columbia False Claims Act**
**D.C. Code Ann. §2-308.14(a)(1)-(2), (7)**
**(Against All Defendants)**

559. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

560.     This is a claim for treble damages and penalties under the District of Columbia False Claims Act.

561.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

562.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the District of Columbia Government to approve and pay such false and fraudulent claims.

563.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the District of Columbia Government.

564.     The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

565.     By reason of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

566.     Additionally, the District of Columbia Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against the Defendants as follows:

A.     that Defendants cease and desist from violating 31 U.S.C. §3729 *et seq.*, and the counterpart provisions of the state statutes set forth above;

B.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. §3729;

C.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Cal. Govt. Code §1651(a);

D.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Colorado has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of the Act;

E.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Connecticut has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Conn. Gen. Stat. § 17b-301b;

F.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Delaware has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of 6 Del. C. §1201(a);

G.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Fla. Stat. Ann. §68.082(2);

H.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Ga. Code Ann. §49-4-168.1.

I.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Hawaii has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Haw. Rev. Stat. §661-21(a);

J.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of 740 Ill. Comp. Stat. §175/3(a);

K.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' actions, plus a civil penalty of at least $5,000 for each violation of IC 5-11-55;

L.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Iowa has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Act;

M.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of La. Rev. Stat. §437 et. seq.;

N.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Maryland has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Act;

O.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Massachusetts has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Mass. Gen. L. Ch. 12 §5B;

P.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Michigan has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of MI Public Act 337;

Q.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Minnesota has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of the Act;

R.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Montana has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Mont. Stat. Ann. 17-8-401;

S.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Nevada has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Nev. Rev. Stat. Ann. §357.040(1);

T.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Jersey has sustained because of Defendants' actions, plus a civil penalty of $11, 000 for each violation of N.J. Stat. §2A:32C-3;

U.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Mexico has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of N.M. Stat. Ann. §27-2F-4;

V.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New York has sustained because of Defendants' actions, plus a civil penalty of $12,000 for each violation of NY CLS St. Fin. §189;

W.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of North Carolina has sustained because of Defendants'

110

actions, plus a civil penalty or $11,000 for each violation of 2009-554 N.C. Sess. Laws §1-607(a);

X.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Oklahoma has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Okla. Stat. tit. 63, §5053.1B;

Y.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Rhode Island has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of R.I. Gen. Laws §9-1.1-3;

Z.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Tenn. Code Ann. §§4-18-103(a) and 71-5-182(a)(1);

AA.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Tex. Hum. Res. Code Ann. §36.002;

BB.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Virginia has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Va. Code Ann. §8.01-216.3(a);

CC.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Washington has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of the Act;

DD.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Wisconsin has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Wis. Stat. §20.931(2);

EE.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the District of Columbia has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of D.C. Code Ann. §2-308.14(a);

FF.    that Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act, and the equivalent provisions of the state statutes set forth above;

GG.    that Relator be awarded all costs of this action, including attorneys' fees and expenses; and

HH.    that Relator recovers such other relief as the Court deems just and proper.

II.    that Relator recovers such other relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff Relator demands a trial by jury.


Dated  November 24, 2014               **BEHN & WYETZNER, CHARTERED**


                                       _____
                                       Michael Behn
                                       ARDC No. 6209610
                                       828 Davis Street, Suite 303
                                       Evanston, Illinois 60201
                                       Tel: (312)-629-0000
                                       mbehn@behnwyetzner.com

**BERGER & MONTAGUE, P.C.**
Todd S. Collins
Daniel R. Miller
Joy Clairmont
Benjamin A. Waters
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: tcollins@bm.net
dmiller@bm.net
jclairmont@bm.net
bwaters@bm.net

**MARTIN LAW P.C.**
Jackson Martin
1934 Old Gallows Rd.
Suite 350
Tysons Corner, Virginia 22182
Tel: (202) 909-3455
jackson@martinlawpc.com

**FARUQI & FARUQI, LLP**
T. Talyana Bromberg
David P. Dean
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Telephone: 215-277-5770
Facsimile: 215-277-5771
Email: tbromberg@faruqilaw.com
ddean@faruqilaw.com

*Counsel for Relator Ronald J. Streck*

# EXHIBIT A

# Core Services Agreement

This Core Services Agreement ("CSA") is entered into between ████████████, a wholesale pharmaceutical distributor, and **Astellas Pharma US, Inc.** (formerly Fujisawa Healthcare, Inc.) ("Manufacturer"), a pharmaceutical seller.

## RECITALS

WHEREAS, ██████ purchases from Manufacturer and distributes the Products described on Attachment A hereto ("Products") pursuant to a Wholesale Service Agreement dated January 1, 1997 between the parties, amended as of June 14, 2005 ("Wholesale Service Agreement"); and

WHEREAS, pursuant to an Inventory Management Agreement between the parties dated March 7, 2002 ("IMA") ██████ performs certain inventory management services in connection with the Products for which it receives compensation from Manufacturer, as more fully described therein; and

WHEREAS, ██████ also performs for the benefit of Manufacturer certain other services in connection with the distribution of the Products; and

WHEREAS, ██████ also has expertise in collecting and disseminating data respecting distribution and sales of pharmaceutical products, which data Manufacturer deems is necessary and useful to Manufacturer's business and which Manufacturer desires to acquire from ██████ as part of the Core Services hereunder; and

WHEREAS, the parties now wish to renegotiate and define more precisely the amount and manner of payment of the consideration to be received by ██████ for its performance of the aforementioned services and to set forth other terms and conditions relating thereto.

Now, therefore, ██████ and Manufacturer agree as follows:

I.  **Definitions**

Capitalized terms used herein shall have the following meanings:

"Aggregate Inventory" means, at any given time, the total of the Products in units that ██████ has on hand at all of its storage and/or distribution facilities and that ██████ has on order from Manufacturer.

"Governmental Authority" means Centers for Medicare and Medicaid ("CMS"), the U.S. Office of Inspector General ("OIG") and any other competent federal, state or local governmental authority with jurisdiction over the manufacture, distribution, marketing and sale of the Products in the United States.

"Gross Product Purchases" means the sum of all invoiced Product purchases, including brokerage (cross-dock and drop-ship) volume prior to any prompt pay or off-invoice discount that may be offered on an ongoing basis or from time-to-time.

"New Price" means the wholesale acquisition cost ("WAC") charged by Manufacturer after the effective date and time of a price change instituted by Manufacturer at any time following the Effective Date of this Agreement

"Old Price" means the WAC charged by Manufacturer immediately preceding the institution of a New Price

"Products" means all ethical pharmaceutical products that bear Manufacturer's label and packaging, whether currently or at any time in the future, which Manufacturer sells to wholesale customers in the United States excluding all dosage forms and strengths of VESIcare® (solifenacin) A list of Manufacturer's current Products is attached as Attachment A to this Agreement

"Product Family" means all strengths, sizes, and forms of an FDA-approved pharmaceutical product

"Price Appreciation" means the difference between a New Price and an Old Price) on Aggregate Inventory after a Manufacturer price increase

"Saleable Product" means Product that has been returned by a customer ▇▇▇ in original unopened packaging and: (i) is not defective or damaged, (ii) has sufficient unexpired dating according to ▇▇▇ policies, procedures and guidelines, and (iii) is acceptable for re-sale in accordance with ▇▇▇ policies and procedures as well as applicable rules, laws and regulations

II.     **Obligations of** ▇▇▇

a     ▇▇▇ agrees to provide the following Core Services ("Core Services") to Manufacturer

i  Contract Administration and Chargeback Procedures ▇▇▇ will recognize and administer those contracts between Manufacturer and customers of ▇▇▇ ("Manufacturer Contracts") pursuant to which Manufacturer and such customers have established prices at which such customers may purchase Products ▇▇▇ will administer Manufacturer Contracts in accordance with Manufacturer's current Standard Chargeback Procedures (attached hereto as Attachment B) as same may be amended from time to time by Manufacturer  In addition, ▇▇▇ shall work with Manufacturer to resolve any discrepancies arising from chargeback submissions within thirty (30) days

ii  Inventory and Sales Reports ▇▇▇ will provide Manufacturer within three (3) business days from the close of each week, a weekly detail of Aggregate

Inventory and ▮▮▮▮ sales to its customers via electronic data interchange ("EDI") standard reports 852 and 867, respectively, in a format reasonably acceptable to Manufacturer ("852/867 Reports"). All such reports shall include such information for each Product NDC code as reasonably requested by Manufacturer, including but not limited to the following:

*Weekly 852 867*

    -On hand inventory level by distribution center
    -On order inventory level by distribution center
    -Sales out by distribution center
    -Intra-divisional transfers by distribution center
    -Monthly summary report of sales out provided through EDI 867 report
    -Quarterly forecasted demand report by Product, this report will be
        provided in an Excel spreadsheet format

▮▮▮▮ may, due to contractual requirements, be required to block certain data in the 867 Reports (or in any other information provided to Manufacturer) that discloses customer identity. This may include customer name, street address, and DEA number, and any other data that would identify a customer.

Within thirty (30) days after entering into this CSA the parties will examine and test the capability of their respective EDI systems and complete implementation of a mutually agreeable system whereby transfers of information can be made effectively on a consistent basis. In the event that critical internal support systems and electronic communication links including EDI, are not available for five (5) business days, the parties will cooperate to promptly implement substitute procedures to document the information customarily sent by EDI and prevent interruptions to each other's business.

iii. Additional Sales Data ▮▮▮▮ will provide daily sales out data for the first sixty (60) days after Manufacturer launches a new Product. Such will be in a form reasonably acceptable to Manufacturer and will be distributed at intervals agreed upon by the parties.

*New Product 60 days*

iv. Additional Inventory Data ▮▮▮▮ will monitor customers' ordering patterns to prevent speculative buying activity and timely transmit data relating thereto to Manufacturer. Such data shall be in a form reasonably acceptable to Manufacturer and shall be distributed at intervals agreed upon by the parties. If the parties determine that a customer is speculating, ▮▮▮▮ will implement additional steps as directed by Manufacturer to limit customer purchases to reasonable levels.

v. Returns Processing ▮▮▮▮ will accept returns of Saleable Product from customers and place in inventory for re-sale in accordance with all applicable rules, laws and regulations as well as in accordance with ▮▮▮▮ Returned Goods Policy in effect from time to time. Returns by ▮▮▮▮ to Manufacturer

*Returns*

of Product that has greater than six (6) months' dating will be credited to ▮▮▮▮ at the invoiced price less the Compensation described in Section III below.

*2-4 wks*
*DON*
*at Product*
*Family*
*level.*

vi. Inventory Management

(1) Inventory Levels. During the term of this Agreement, ▮▮▮▮ shall maintain Aggregate Inventory levels of no greater than two (2) to four (4) weeks on all Products at the Product Family level.

(2) Product Availability. ▮▮▮▮ and Manufacturer will jointly use best efforts to minimize Product shortages and maximize Product availability as follows: ▮▮▮▮ will institute an automated balancing system on the Products in order to optimize the use of existing inventories across the entire ▮▮▮▮ network, including brokerage. During backorder situations and limited Product availability and upon Manufacturer's request, ▮▮▮▮ will implement more frequent order and receiving cycles to help reduce inventory requirements.

b. Warranty and Representation. ▮▮▮▮ warrants and represents that the Core Services will be performed: (i) in a timely, competent and efficient manner; (ii) using its best efforts and in accordance with industry standards; (iii) in accordance with applicable rules, laws and regulations; and (iv) in accordance with the terms and conditions of this CSA.

c. Other Services. Services that are not Core Services ("Other Services"), are not included in this CSA and will be priced individually and separate from this CSA. Other Services include the following: single point distribution through ▮▮▮▮ National Logistics Center ("NLC") or Strategic Redistribution Center (which is currently provided by ▮▮▮▮ pursuant to an amendment to the Wholesale Service Agreement), NLC product backhaul, promotional marketing services, new product launches (except for the daily sales reporting described in Section II.a.i), and all other services not defined as Core Services in Section II.a. above.

III. **Obligations of Manufacturer**

In consideration of the Core Services to be provided pursuant to this CSA, Manufacturer will pay the Compensation to ▮▮▮▮ as determined in accordance with Attachment C ("Compensation"). The parties understand and acknowledge that no Compensation is being paid hereunder for referring, recommending, or managing the selection or purchase of Manufacturer's Products.

IV. **Additional Compensation Terms and Conditions; Records and Governmental Disclosures**

a. Compensation Calculation. The Compensation will be calculated and paid quarterly based on the total volume of Gross Product Purchases by ▮▮▮▮ from

4

Manufacturer during that quarter valued at the Manufacturer's list price at the time the Product was purchased. Manufacturer will pay such amounts no later than forty-five (45) days after the end of each calendar quarter. All such amounts will be paid to ███ in the form of a credit memo. For purposes of this CSA a "calendar quarter" shall mean the following consecutive three calendar month periods: January 1 – March 31, April 1 – June 30, July 1 – September 30 and October 1 – December 31.

b. Manufacturer Credits: The Manufacturer will receive credits towards the Compensation in the event of Price Appreciation on Aggregate Inventory after a Manufacturer price increase on the Products. If the amount of such credit exceeds the Compensation, ███ will pay Manufacturer the difference within forty-five (45) days after the end of the quarter.

c. Government Reporting: Each party will be responsible for reporting the Compensation herein to Governmental Authorities as it deems appropriate under applicable rules, laws, and regulations, including whether to report the Compensation as a price concession or as a service fee. If and as required by applicable laws, rules and regulations, ███ shall provide any Governmental Authority information regarding the purchase price paid by ███ for Products and information regarding the Compensation received by ███ under this CSA. In addition, should a Governmental Authority request ███ to disclose the price of a Product, ███ shall include in such disclosure its entitlement to and receipt of the Compensation under this CSA as required by applicable law.

d. Books and Records: ███ will maintain all books and records pertaining to the transactions herein for a minimum of three (3) years after the termination or expiration of this CSA, or such longer period as may be required by applicable rules, laws and/or regulations. Under conditions of confidentiality as set forth in Section V c, ███ will make all such books and records available upon request of a Governmental Authority and as required by applicable law.

V.   **Confidentiality and Disclosure**

a. This CSA and all information which is provided by each party to the other party pursuant to this CSA are confidential. Subject to Section V c, each party agrees to maintain all such information as confidential and not to disclose to any third party any such information unless such party obtains a written release from the other party. Each party further agrees to limit access to such information to only those of its and its affiliates' officers, employees, agents, representatives and contractors who reasonably need to know such information and who are under obligations of nonuse and nondisclosure no less restrictive than those set forth herein. However, information generated, compiled, or stored by ███ reflecting its resale of Products to its customers does not constitute Manufacturer's confidential information and shall not be subject to the non-use and non-disclosure provisions herein. The obligations of nonuse and nondisclosure shall expire upon the latter to occur of (i) three (3) years after

expiration or termination of this CSA; or (ii) any term required under applicable rules, laws and/or regulations.

b. The conditions of nonuse and nondisclosure shall not apply to any information that:

(i) is or becomes part of the public domain through no fault of the receiving party;

(ii) is information which was rightfully received before or after disclosure hereunder from a third party not in violation of any non-disclosure obligation owed to the disclosing party, as evidenced by written records of the receiving party ; or

(iii) is independently developed by the receiving party as evidenced by its written records.

c. Nothing herein shall prevent a party's disclosure of confidential information hereunder in the event disclosure is compelled by law, regulation, court order, or other request of a Governmental Authority (under Section IV.c. or otherwise), provided that the party so compelled to disclose will provide prompt notice to the party whose confidential information is to be disclosed, and will give such other party adequate opportunity to seek a protective order or otherwise seek whatever legal relief or protections it deems desirable or appropriate to protect the confidential information.

## VI.    Rights to Use Data

███████ warrants and represents that it has full right, title and interest in and to all data, reports and other information provided to Manufacturer under this CSA and the use of same by Manufacturer will not violate or infringe the rights of any third party.

## VII.   Indemnification

a. ███████ will defend, indemnify and hold harmless Manufacturer , its subsidiaries, affiliates, directors, officers, shareholders, employees, agents, successors and assigns from any and all claims, demands, costs, expenses (including without limitation reasonable attorneys' fees) liabilities and/or losses related to: (i) the negligence or willful misconduct of ███████ its affiliates, and/or their respective employees, agents, representatives and contractors in performance under this CSA; or (ii) breach of the terms and/or conditions of this Agreement by ███████ and/or its employees, agents, representatives and contractors.

b. Manufacturer will defend, indemnify and hold harmless ███████ its subsidiaries, affiliates, directors, officers, shareholders, employees, agents, successors and assigns from any and all claims, demands, costs, expenses (including without limitation reasonable attorneys' fees) liabilities and/or losses related to: (i) the negligence or willful misconduct of Manufacturer, its affiliates, and/or their respective employees, agents, representatives and contractors in performance

6

under this CSA; or (ii) breach of the terms and/or conditions of this Agreement by Manufacturer and/or its employees, agents, representatives and contractors.

c. Any claim for indemnification hereunder shall be conditioned on the following obligations of the party seeking indemnification: (i) timely notice to the indemnifying party of the claim for which indemnification is sought; (ii) full cooperation with the indemnifying party, at the indemnifying party's expense, in the defense of the claim; and (iii) agreement not to compromise or otherwise settle such claim without the indemnifying party's prior written consent.

## VIII. Effective Date

a. This CSA shall become effective as of April 1, 2005 and, unless earlier terminated in accordance with Sections VIII.b., IX. a. or IX .h., shall expire on March 31, 2010.

b. Either party may terminate this CSA in the event of a breach by the other party where such breach has not been cured within sixty (60) days' written notice of the occurrence of such breach.

## IX. General

a. If any one of the provisions of this CSA is declared to be illegal, invalid or unenforceable, such provisions shall be severed from this CSA, and the other provisions shall remain in full force and effect. Notwithstanding the foregoing, if such determination of illegality, invalidity or unenforceability renders the performance of this CSA to be impossible absent such illegal, invalid or unenforceable provision, then this CSA shall terminate immediately. Furthermore, in the event that any act of law or decision of governmental authority renders the performance of this CSA to be commercially impracticable for either party, then such party may terminate this CSA immediately upon notice to the other party.

b. This CSA constitutes the entire agreement between the parties respecting the subject matter herein and supersedes all prior contracts, agreements and understandings between the parties, whether oral or written, respecting the subject matter herein. This CSA may not be amended except in a writing signed by authorized representatives of the parties.

c. The IMA is hereby terminated and superseded by the terms and conditions hereof. As of the Effective Date, the Wholesale Service Agreement is hereby amended to delete all references any activity or function constituting, in whole or in part, the Core Services, and this CSA shall supercede the Wholesale Service Agreement as it relates to the Core Services. To the extent the parties decide to separately amend the Wholesale Service Agreement to delete any Core Services referenced therein or otherwise address any unique issue related to the Core Services in the context of the Wholesale Service Agreement, such

amendment shall be construed to be consistent with this Section IX.c and the parties express understanding that all Core Services shall be performed under and solely governed by this CSA as of the Effective Date. Except as stated in this Section IX.c: (1) all other terms of the Wholesale Service Agreement shall remain unchanged and in full force and effect, and (2) this CSA shall not alter or change any right or obligation under any transaction arising under or related to the Wholesale Service Agreement prior to the Effective Date.

d. This CSA will be governed by and construed in accordance with the laws of Illinois, without regard to or application of conflict of law, rules or principles.

e. In no event shall either party be liable to the other for any special, consequential, incidental or indirect damages, however caused, on any theory of liability and whether or not a party has been advised of the possibility of such damages.

f. The parties to this CSA are independent contractors. Accordingly, this CSA does not constitute a partnership or other joint venture between the parties and neither party shall be deemed to be an agent or representative of the other.

g. The failure of either party to enforce at any time or for any period of time any one or more of the provisions hereof shall not be construed to be a waiver of such provisions or of the right of such party thereafter to enforce each such provision.

h. Except for the obligation to pay amounts due under this CSA, neither party will be liable to the other party for any failure or delay in performance caused by reasons beyond such party's reasonable control, including but not limited to acts of God, war, riot, acts of terrorism, fire, shortage of materials or transportation, strikes or acts of civil or military authorities, provided such party gives prompt written notice thereof to the other party. Should a *force majeure* event cause a party to be unable to fulfill its obligations hereunder for a period of six (6) months or more, then either party may terminate this CSA upon thirty (30) days' notice.

i. Neither party shall be entitled to assign this Agreement or any of its rights and obligations hereunder without the express written consent of the other party hereto, which consent shall not be unreasonably withheld, provided, however that either party may assign this Agreement and/or its rights and obligations hereunder without the consent of the other party to: (1) any affiliate; (2) an assignee or successor in interest (by merger, operation of law or otherwise) or (3) a purchaser of all or substantially all of such party's business.

j. Any right or obligation of Manufacturer hereunder may be exercised or performed by any entity owned by or under common control with Manufacturer.

8

. Any right or obligation of ████ hereunder may be exercised or performed by any entity owned by or under common control with ███████████

k. All notices to either party (each a "Notice") shall be in writing, shall refer specifically to this CSA and shall be hand delivered or sent by express courier service, costs prepaid, or by facsimile to the respective addresses specified below (or to such other address as may be specified by Notice to the other party):

If to ████

████████████████

If to Manufacturer: Astellas Pharma US, Inc.
Three Parkway North
Deerfield, IL 60025
Attention: Senior Vice President,
Sales and Marketing
Facsimile No. 847 317-8221

With a copy to: General Counsel
Astellas US LLC
Three Parkway North
Deerfield, IL 60015
Facsimile No. 847 317-7288

l. All electronic transmissions made pursuant to this CSA shall be deemed by the parties to be the same as written communication for all purposes, and for all applications of law and statutes, including but not limited to, the Statue of Frauds under any applicable Uniform Commercial Code.

[SIGNATURE PAGE FOLLOWS]

9

For: ASTELLAS PHARMA US, INC.

By: _Th. Nishimura_

Name: _Makoto Nishimura, Ph.D._
(Print or Type)

Title: _President and CEO_

Date: _9-30-05_

For ▮▮▮▮▮▮▮▮▮▮▮▮▮:

By: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Name: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
(Print or Type)

Title: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Date: ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



**astellas**
Leading Light for Life

Astellas Pharma US, Inc.
Trade Relations
Three Parkway North
Deerfield, Illinois 60015
Tel (800) 888-7704
www.us.astellas.com

**PRODUCT LIST**
**OLESALE ACQUISITION COST (WAC)**
**8/14/05**

| II # | NDC # | PRODUCT DESCRIPTION | ESTABLISHED NAME | WAC/EA | WAC/PK | MIN ORD QTY | CASE QTY |
|------|-------|---------------------|------------------|--------|--------|-------------|----------|
| 12 | 0469-8234-12 | ADENOCARD ANSYR SYRINGE 3MG/ML 2ML PLASTIC | adenosine injection | $32.75 | $327.50 | 10 | 50 |
| 14 | 0469-8234-14 | ADENOCARD ANSYR SYRINGE 3MG/ML 4ML PLASTIC | adenosine injection | $62.13 | $621.30 | 10 | 50 |
| 0 | 0469-0871-20 | ADENOSCAN 3MG/ML 20ML VIAL | adenosine injection | $139.88 | $1,398.80 | 10 | 100 |
| 0 | 0469-0871-30 | ADENOSCAN 3MG/ML 30ML VIAL | adenosine injection | $201.11 | $2,011.10 | 10 | 100 |
| 30 | 0469-3051-30 | AMBISOME 50MG 20ML VIAL | (amphotericin B) liposome for injection | $157.00 | $1,570.00 | 10 | 70 |
| 15 | 0469-5101-15 | ARISTOCORT A CREAM 0.025% 15GM TUBE | triamcinolone acetonide with Aquatain | $8.40 | $50.40 | 6 | 144 |
| 60 | 0469-5101-60 | ARISTOCORT A CREAM 0.025% 60GM TUBE | triamcinolone acetonide with Aquatain | $20.70 | $248.40 | 12 | 144 |
| 15 | 0469-5102-15 | ARISTOCORT A CREAM 0.1% 15GM TUBE | triamcinolone acetonide with Aquatain | $10.68 | $64.08 | 6 | 144 |
| 60 | 0469-5102-60 | ARISTOCORT A CREAM 0.1% 60GM TUBE | triamcinolone acetonide with Aquatain | $27.30 | $327.60 | 12 | 144 |
| 15 | 0469-5104-15 | ARISTOCORT A CREAM 0.5% 15GM TUBE | triamcinolone acetonide with Aquatain | $29.30 | $175.80 | 6 | 144 |
| 15 | 0469-5105-15 | ARISTOCORT A OINTMENT 0.1% 15GM TUBE* | triamcinolone acetonide with Aquatain | $10.68 | $64.08 | 6 | 144 |
| 60 | 0469-5105-60 | ARISTOCORT A OINTMENT 0.1% 60GM TUBE* | triamcinolone acetonide with Aquatain | $27.30 | $327.60 | 12 | 144 |
| 71 | 0469-5124-71 | ARISTOCORT TABLETS 4MG 100S BOTTLE | triamcinolone | $118.27 | $118.27 | 1 | 144 |
| 30 | 0469-5124-30 | ARISTOCORT TABLETS 4MG 30S BOTTLE | triamcinolone | $37.34 | $37.34 | 1 | 144 |
| 01 | 0469-7271-01 | CEFIZOX ADD-VANTAGE 1GM/15ML VIAL | ceftizoxime sodium | $10.40 | $104.00 | 10 | 100 |
| 02 | 0469-7272-02 | CEFIZOX ADD-VANTAGE 2GM/15ML VIAL | ceftizoxime sodium | $18.53 | $185.30 | 10 | 100 |
| 01 | 0469-7251-01 | CEFIZOX 1GM 20ML SD VIAL | ceftizoxime sodium | $9.49 | $94.90 | 10 | 100 |
| 02 | 0469-7253-02 | CEFIZOX 2GM 20ML SD VIAL | ceftizoxime sodium | $17.62 | $176.20 | 10 | 100 |
| 50 | 0469-7255-50 | CEFIZOX 10GM/100ML PHCY BULK PACK VIAL | ceftizoxime sodium | $87.04 | $870.37 | 10 | 40 |
| 01 | 0469-7252-01 | CEFIZOX 1GM/100ML PIGGYBACK VIAL | ceftizoxime sodium | $10.246 | $102.46 | 10 | 40 |
| 02 | 0469-7254-02 | CEFIZOX 2GM/100ML PIGGYBACK VIAL | ceftizoxime sodium | $19.21 | $192.08 | 10 | 40 |
| 01 | 0469-7220-01 | CEFIZOX 1GM/50ML SD GALAXY PLASTIC CONTAINER | ceftizoxime sodium | $11.65 | $279.60 | 24 | N/A |
| 02 | 0469-7221-02 | CEFIZOX 2GM/50ML SD GALAXY PLASTIC CONTAINER | ceftizoxime sodium | $19.78 | $474.72 | 24 | N/A |
| 15 | 0469-7054-15 | CYCLOCORT CREAM 0.1% 15GM TUBE | amcinonide with Aquatain | $16.46 | $98.76 | 6 | 144 |
| 30 | 0469-7054-30 | CYCLOCORT CREAM 0.1% 30GM TUBE | amcinonide with Aquatain | $24.54 | $147.24 | 6 | 144 |
| 60 | 0469-7054-60 | CYCLOCORT CREAM 0.1% 60GM TUBE | amcinonide with Aquatain | $41.22 | $494.64 | 12 | 144 |
| 20 | 0469-7404-20 | CYCLOCORT LOTION 0.1% 20ML BTL | amcinonide with Aquatain | $19.06 | $228.72 | 12 | 144 |
| 60 | 0469-7404-60 | CYCLOCORT LOTION 0.1% 60ML BTL | amcinonide with Aquatain | $37.70 | $452.40 | 12 | 72 |
| 15 | 0469-7115-15 | CYCLOCORT OINTMENT 0.1% 15GM TUBE | amcinonide | $16.46 | $98.76 | 6 | 144 |
| 30 | 0469-7115-30 | CYCLOCORT OINTMENT 0.1% 30GM TUBE | amcinonide | $24.54 | $147.24 | 6 | 144 |
| 60 | 0469-7115-60 | CYCLOCORT OINTMENT 0.1% 60GM TUBE | amcinonide | $41.22 | $494.64 | 12 | 144 |
| 0 | 0469-325-10 | MYCAMINE INJ 50MG VIAL | micafungin | $93.50 | $935.00 | 10 | 360 |
| 01 | 0469-3016-01 | PROGRAF 5MG 1ML AMPULE | tacrolimus injection | $132.00 | $1,320.00 | 10 | 500 |
| 73 | 0469-0607-73 | PROGRAF CAPS 0.5MG 100PL ASTIG BOTTLE | tacrolimus capsules | $181.62 | $1,816.20 | 10 | 100 |
| 73 | 0469-0617-73 | PROGRAF CAPS 1MG 100/PLASTIC BOTTLE | tacrolimus capsules | $331.00 | $3,310.00 | 10 | 100 |
| 73 | 0469-0657-73 | PROGRAF CAPS 5MG 100/PLASTIC BOTTLE | tacrolimus capsules | $1,645.00 | $16,450.00 | 10 | 100 |
| 11 | 0469-0617-11 | PROGRAF CAPS 1MG 10X10 BP PLASTIC | tacrolimus capsules | $331.00 | $331.00 | 1 | 100 |
| 11 | 0469-0657-11 | PROGRAF CAPS 5MG 10X10 BP PLASTIC | tacrolimus capsules | $1,645.00 | $1,645.00 | 1 | 100 |
| 30 | 0469-5201-30 | PROTOPIC OINTMENT 0.03% 30GM TUBE | tacrolimus ointment | $54.99 | $659.88 | 12 | 144 |
| 60 | 0469-5201-60 | PROTOPIC OINTMENT 0.03% 60GM TUBE | tacrolimus ointment | $109.99 | $1,319.88 | 12 | 144 |
| | 0469-5201-11 | PROTOPIC OINTMENT 0.03% 100GM TUBE | tacrolimus ointment | $169.12 | $1,014.72 | 6 | 72 |
| | 0469-5202-30 | PROTOPIC OINTMENT 0.1% 30GM TUBE | tacrolimus ointment | $58.78 | $705.36 | 12 | 144 |
| 60 | 0469-5202-60 | PROTOPIC OINTMENT 0.1% 60GM TUBE | tacrolimus ointment | $117.51 | $1,410.84 | 12 | 144 |
| 11 | 0469-5202-11 | PROTOPIC OINTMENT 0.1% 100GM TUBE | tacrolimus ointment | $181.17 | $1,087.02 | 6 | 72 |

*Pricing subject to change without notice.*

# EXHIBIT B

## FUJISAWA HEALTHCARE, INC.
## CHARGEBACK PROCEDURES

Fujisawa Healthcare, Inc. (AFHI=) authorized wholesalers will recognize and administer those contracts entered into by FHI and its customers that enable FHI customers to purchase certain FHI products, subject to the continued validity of such contracts and in accordance with applicable law and this policy. FHI will process chargebacks and issue credits it owes to wholesaler within seven (7) days following receipt of wholesaler's chargeback submission. Legitimate chargeback reconciliation issues will be resolved as soon as practicable with each party responding to the other within 60 days following receipt of documentation supporting those items open to reconciliation.

a. **Participating Institutions or Purchase Group.** Any FHI customer that has a current direct purchase contract with FHI (whether individually or through a group purchasing organization) will be encouraged by FHI to purchase through a wholesaler as a prime vendor. FHI shall inform each applicable wholesaler of the terms, pricing, and other relevant details of its contract with the customer. At the request of a wholesaler, FHI will quote a price on any of its products to that wholesaler so that the wholesaler may bid that price to an end user customer on behalf of FHI.

b. **Chargebacks.** Wholesalers will submit to FHI a monthly or more frequent report of all contract sales to approved FHI customers. The report shall include at least the following information as to each sale made to a FHI customer during the month:

    (1)    Wholesaler's debit memo number
    (2)    Wholesaler's name and DEA number
    (3)    FHI customer's name and DEA number
    (4)    FHI's contract number
    (5)    Wholesaler's invoice number
    (6)    Wholesaler's invoice date
    (7)    Product's NDC number
    (8)    Units shipped (returned)
    (9)    Wholesaler's unit cost
    (10)    FHI's contract unit cost
    (11)    Extended chargeback amount
    (12)    Total chargeback amount
    (13)    HIN (Health Industry Number)

Wholesaler's sales reports must be received by FHI within ninety (90) days of the sales transaction dates in order to be eligible for issuance of a credit memo.

c. **Issuance of Credit.** Upon its receipt and approval of a wholesaler's report, FHI shall issue a credit memo to the wholesaler equal to the difference between the wholesaler acquisition cost on the date invoiced and the price agreed upon between FHI and FHI's customer. Such credit shall be applied against subsequent purchases by the wholesaler pursuant to its service agreement with FHI. Credits may not be assigned or transferred by any wholesaler to any third party, and no cash payments will be made on account of any such credit. Wholesalers shall not deduct the credit amount prior to receipt of chargeback credit from FHI. FHI shall have the right to deny wholesalers chargeback credits for any reason whatsoever, including but not limited to failure on the part of a wholesaler to maintain a current payment account with FHI or determination by FHI that a wholesaler did not acquire the product for which it has made a chargeback submission directly from FHI.

d. **Own Use.** Any product purchased by a FHI customer at contract bid prices shall be for the FHI customer's "own use" as that term is defined by the United States Supreme Court in Abbott Laboratories, et al. v. Portland

Retail Druggists Association, Inc., 425 U.S. 1 (1976). FHI reserves all rights and legal remedies, including the right to seek contribution to a judgment, in the event that products sold at contract bid prices are distributed by wholesalers with knowledge that the FHI customer is purchasing the products contrary to the "own use" requirements contained in this Section.

e. **Time Limitation.** Wholesalers must submit chargebacks on sales to FHI customers within ninety (90) days following the date of sale to the FHI customer. FHI reserves the right to deny any chargebacks submitted later than ninety (90) days following the date of sale. Corrections and adjustments to chargebacks submitted will be reconsidered provided they are submitted within ninety (90) days of FHI's denial date. Any chargeback re-submissions by a wholesaler must be provided no later than twenty four (24) months following the date of the original chargeback submission. FHI shall have the right to charge a wholesaler for the cost of researching any re-submissions that are provided more than twelve (12) months following the date of the original chargeback submission. Wholesalers are prohibited from deducting any re-submission credit amounts prior to approval and receipt of a chargeback credit from FHI.

f. **Negative Chargebacks.** Should a wholesaler issue a credit to a FHI customer related to a prior sale of product(s) under contract (for which a wholesaler previously billed and collected a chargeback from FHI), the chargeback will be reversed and remitted to FHI in accordance with the following terms and conditions:

> (1) Wholesaler must receive back from the customer certifiably merchantable product (i.e., the wholesaler must be able to return the item to its inventory for resale in the ordinary course of its business without special preparation, testing, handling or expense and the wholesaler must be able to certify that the returned product was stored under controlled conditions that satisfy the product labeling requirements for temperature, humidity and exposure to light)

> (2) The customer's return of the product must be due to an order or other error (i.e., item or quantity shipped did not match the item or quantity ordered)

Wholesalers are required to submit to FHI a monthly or more frequent report of all negative chargebacks, regardless of quantity or minimal dollar credit. The report shall include at least the information outlined in Section b. above.

g. **FHI Chargeback Audits.** FHI shall have the right to audit a wholesaler's compliance with this policy and related chargeback matters (including compliance with the negative chargeback policy detailed above) subject to the following terms and conditions:

> (1) Chargeback audits will be limited to twenty four (24) months of historical information as of the date such audit begins.

> (2) Wholesalers shall have a reciprocal twenty four (24) month period to reconcile any differences that may arise with FHI related to chargeback issues (including submission and other errors and regardless of whether such issues arise as part of a FHI chargeback audit).

> (3) FHI shall notify the appropriate wholesaler personnel of its intent to perform an audit no less than thirty (30) business days prior to beginning the audit, specifying the location to be audited and the time period to be covered. In the event that such timing is expected to create undue disruption in Wholesaler's business, Wholesalers shall have the right to delay the start of the audit for up to thirty (30) additional days. Wholesalers shall designate the appropriate contact person within its organization who will be authorized to receive notice of an audit and grant the necessary permission to proceed.

> (4) Audits must be performed by bona fide, permanent employees of FHI, subject to a confidentiality agreement acceptable to and executed by both parties, prior to beginning the audit.

> (5) Audits shall be performed at the wholesaler site that is being audited, or such alternate sites where appropriate records and data are located as wholesaler may designate.

(6) Audits shall be performed during the normal, customary office hours of the Wholesaler site that is being audited

(7) The existing accounting records and data of the Wholesaler site being audited will be made available for audit, except, unless specifically requested by FHI no less than thirty (30) days prior to the scheduled audit, electronic data will not be specially created for the audit. Wholesaler will provide FHI auditors with access to FHI physical inventory in its possession at the Wholesaler site being audited for the sole purpose of conducting the audit.

(8) Any Supplier claims arising from an audit must be supported by specific audit results related to specific transactions. Extrapolation of results from one period to another will not be accepted.

(9) Any FHI claims arising from an audit must be submitted to Wholesaler within forty-five (45) days of completing the audit. All claims must be accompanied by specific supporting details of the transactions that comprise the claim. Wholesaler shall then have forty-five (45) days to review the claim and advise FHI of either acceptance or disagreement.

h. **Cash Discounts.** Wholesalers shall be entitled to cash discounts based on the gross invoice price of all goods purchased from FHI, regardless of whether a chargeback is ultimately claimed by the wholesaler.

i. **Advance Chargebacks.** FHI shall provide wholesalers with an advance chargeback to cover the carrying costs involved in the chargeback process, subject to the following terms and conditions:

(1) The advance chargeback will be based on the frequency with which wholesalers submit chargebacks and the average amount of chargebacks issued during the previous five month period (taking into account business trends and credit issues relevant to each wholesaler). For example, a wholesaler that submits chargebacks every week will receive an advance chargeback equal to the average weekly chargeback submission by that wholesaler over the previous five months.

(2) On a semi-annual basis, FHI will adjust the advance chargeback level based on the previous five-month submissions taking into account current business trends and credit issues relevant to a given wholesaler

(3) Immediate deductions of chargebacks and deductions of chargeback discrepancies will not be allowed. FHI will provide a discrepancy report to each wholesaler, along with the credit for the original submission. Wholesalers will re-submit for additional credits if appropriate.

**Attachment C**

## ██████ *Core Services Agreement*
## *Compensation Schedule*

1. **Year One** – ██████ will be paid  Compensation of  1.25% of Gross Product Purchases by ██████ for the period April 1, 2005 through March 31, 2006.

2. **Year Two** – ██████ will be paid  Compensation of 1.5% of Gross Product Purchases by ██████ for the period April 1, 2006 through March 31, 2007.

3. <u>**Year Three - Five**</u> – ██████ will be paid  Compensation of 1.75 % of Gross Product Purchases by ██████ for the period April 1, 2007 through March 31, 2010

astellas
Leading Light for Life

Astellas Pharma US, Inc.
Trade Relations
Three Parkway North
Deerfield, Illinois 60015
Tel (800) 888-7704
www.us.astellas.com

# PRODUCT LIST
## WHOLESALE ACQUISITION COST (WAC)
f 3/01/06 (Pricing subject to change without notice.)

| astellas # | NDC # | PRODUCT DESCRIPTION | ESTABLISHED NAME | WAC/EA | WAC/PK | MIN ORD QTY | CASE QTY |
|---|---|---|---|---|---|---|---|
| 1412 | 0469-8234-12 | ADENOCARD ANSYR SYRINGE 3MG/ML 2ML PLASTIC | adenosine injection | $32.75 | $327.50 | 10 | 50 |
| 1414 | 0469-8234-14 | ADENOCARD ANSYR SYRINGE 3MG/ML 4ML PLASTIC | adenosine injection | $62.13 | $621.30 | 10 | 50 |
| 120 | 0469-0871-20 | ADENOSCAN 3MG/ML 20ML VIAL | adenosine injection | $139.88 | $1,398.80 | 10 | 100 |
| 130 | 0469-0871-30 | ADENOSCAN 3MG/ML 30ML VIAL | adenosine injection | $201.11 | $2,011.10 | 10 | 100 |
| 5130 | 0469-3051-30 | AMBISOME 50MG 20ML VIAL | (amphotericin B) liposome for injection | $157.00 | $1,570.00 | 10 | 70 |
| 1115 | 0469-5101-15 | ARISTOCORT A CREAM 0 025% 15GM TUBE | triamcinolone acetonide with Aquatain | $8.40 | $50.40 | 6 | 144 |
| 1160 | 0469-5101-60 | ARISTOCORT A CREAM 0 025% 60GM TUBE | triamcinolone acetonide with Aquatain | $20.70 | $248.40 | 12 | 144 |
| 1215 | 0469-5102-15 | ARISTOCORT A CREAM 0 1% 15GM TUBE | triamcinolone acetonide with Aquatain | $10.68 | $64.08 | 6 | 144 |
| 1260 | 0469-5102-60 | ARISTOCORT A CREAM 0 1% 60GM TUBE | triamcinolone acetonide with Aquatain | $27.30 | $327.60 | 12 | 144 |
| 1415 | 0469-5104-15 | ARISTOCORT A CREAM 0 5% 15GM TUBE | triamcinolone acetonide with Aquatain | $29.30 | $175.80 | 6 | 144 |
| 1515 | 0469-5105-15 | ARISTOCORT A OINTMENT 0 1% 15GM TUBE* | triamcinolone acetonide with Aquatain | $10.68 | $64.08 | 6 | 144 |
| 1560 | 0469-5105-60 | ARISTOCORT A OINTMENT 0 1% 60GM TUBE* | triamcinolone acetonide with Aquatain | $27.30 | $327.60 | 12 | 144 |
| 1471 | 0469-5124-71 | ARISTOCORT TABLETS 4MG 100S BOTTLE | triamcinolone | $118.27 | $118.27 | 1 | 144 |
| 1430 | 0469-5124-30 | ARISTOCORT TABLETS 4MG 30S BOTTLE | triamcinolone | $37.34 | $37.34 | 1 | 144 |
| 101 | 0469-7271-01 | CEFIZOX ADD-VANTAGE 1GM/15ML VIAL | ceftizoxime sodium | $10.40 | $104.00 | 10 | 100 |
| 202 | 0469-7272-02 | CEFIZOX ADD-VANTAGE 2GM/15ML VIAL | ceftizoxime sodium | $18.53 | $185.30 | 10 | 100 |
| 110* | 0469-7251-01 | CEFIZOX 1GM 20ML SD VIAL | ceftizoxime sodium | $9.49 | $94.90 | 10 | 100 |
| 3. | 0469-7253-02 | CEFIZOX 2GM 20ML SD VIAL | ceftizoxime sodium | $17.62 | $176.20 | 10 | 100 |
| | 0469-7255-10 | CEFIZOX 10GM/100ML PHCY BULK PACK VIAL | ceftizoxime sodium | $87.04 | $870.37 | 10 | 40 |
| | 0469-7252-01 | CEFIZOX 1GM/100ML PIGGYBACK VIAL | ceftizoxime sodium | $10.246 | $102.46 | 10 | 40 |
| 402 | 0469-7254-02 | CEFIZOX 2GM/100ML PIGGYBACK VIAL | ceftizoxime sodium | $19.21 | $192.06 | 10 | 40 |
| 001 | 0469-7220-01 | CEFIZOX 1GM/50ML SD GALAXY PLASTIC CONTAINER | ceftizoxime sodium | $11.65 | $279.60 | 24 | N/A |
| 102 | 0469-7221-02 | CEFIZOX 2GM/50ML SD GALAXY PLASTIC CONTAINER | ceftizoxime sodium | $19.78 | $474.72 | 24 | N/A |
| 415 | 0469-7054-15 | CYCLOCORT CREAM 0 1% 15GM TUBE | amcinonide with Aquatain | $16.46 | $98.76 | 6 | 144 |
| 430 | 0469-7054-30 | CYCLOCORT CREAM 0 1% 30GM TUBE | amcinonide with Aquatain | $24.54 | $147.24 | 6 | 144 |
| 460 | 0469-7054-60 | CYCLOCORT CREAM 0 1% 60GM TUBE | amcinonide with Aquatain | $41.22 | $494.64 | 12 | 144 |
| 420 | 0469-7404-20 | CYCLOCORT LOTION 0 1% 20ML BTL | amcinonide with Aquatain | $19.06 | $228.72 | 12 | 144 |
| 460 | 0469-7404-60 | CYCLOCORT LOTION 0 1% 60ML BTL | amcinonide with Aquatain | $37.70 | $452.40 | 12 | 72 |
| 515 | 0469-7115-15 | CYCLOCORT OINTMENT 0 1% 15GM TUBE | amcinonide | $16.46 | $98.76 | 6 | 144 |
| 530 | 0469-7115-30 | CYCLOCORT OINTMENT 0 1% 30GM TUBE | amcinonide | $24.54 | $147.24 | 6 | 144 |
| 560 | 0469-7115-60 | CYCLOCORT OINTMENT 0 1% 60GM TUBE | amcinonide | $41.22 | $494.64 | 12 | 144 |
| 010 | 0469-3250-10 | MYCAMINE 50MG 10 ML VIAL | micafungin sodium | $93.50 | $935.00 | 10 | 360 |
| 601 | 0469-3016-01 | PROGRAF 5MG 1ML AMPULE | tacrolimus injection | $136.62 | $1,366.20 | 10 | 500 |
| 1773 | 0469-0607-73 | PROGRAF CAPS 0.5MG 100/PLASTIC BOTTLE | tacrolimus capsules | $181.62 | $1,816.20 | 10 | 100 |
| 773 | 0469-0617-73 | PROGRAF CAPS 1MG 100/PLASTIC BOTTLE | tacrolimus capsules | $342.59 | $3,425.90 | 10 | 100 |
| 5773 | 0469-0657-73 | PROGRAF CAPS 5MG 100/PLASTIC BOTTLE | tacrolimus capsules | $1,702.58 | $17,025.80 | 10 | 100 |
| 711 | 0469-0617-11 | PROGRAF CAPS 1MG 10X10 BP PLASTIC | tacrolimus capsules | $342.59 | $342.59 | 1 | 100 |
| 711 | 0469-0657-11 | PROGRAF CAPS 5MG 10X10 BP PLASTIC | tacrolimus capsules | $1,702.58 | $1,702.58 | 1 | 100 |
| 130 | 0469-5201-30 | PROTOPIC OINTMENT 0 03% 30GM TUBE | tacrolimus ointment | $57.74 | $692.88 | 12 | 144 |
| 160 | 0469-5201-60 | PROTOPIC OINTMENT 0 03% 60GM TUBE | tacrolimus ointment | $115.49 | $1,385.88 | 12 | 144 |
| 111 | 0469-5201-11 | PROTOPIC OINTMENT 0 03% 100GM TUBE | tacrolimus ointment | $177.58 | $1,065.48 | 6 | 72 |
| 230 | 0469-5202-30 | PROTOPIC OINTMENT 0 1% 30GM TUBE | tacrolimus ointment | $61.72 | $740.64 | 12 | 144 |
| 2. | 0469-5202-60 | PROTOPIC OINTMENT 0 1% 60GM TUBE | tacrolimus ointment | $123.45 | $1,481.40 | 12 | 144 |
| | 0469-5202-11 | PROTOPIC OINTMENT 0 1% 100GM TUBE | tacrolimus ointment | $190.23 | $1,141.38 | 6 | 72 |
| 104 | 0469-0601-04 | VAPRISOL IV AMPULES 20MG/4ML AMPULE | conivaptan hydrochloride injection | $315.00 | $3,150.00 | 10 | 300 |

* Temporarily Discontinued

**Flomax®:** Flomax® is marketed by Boehringer Ingelheim and Astellas; available thru BI [1-800-243-0127]

**Valtrex®:** Valtrex® is marketed by Glaxo Smith Kline (GSK); available thru GSK [1-888-825-5249 or us.gsk.com]

**VESIcare™:** VESIcare™ is marketed by GSK and Astellas, available thru GSK [1-888-825-5249 or us.gsk.com]