## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, THE STATE OF CALIFORNIA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF FLORIDA, THE STATE OF GEORGIA, THE STATE OF HAWAII, THE STATE OF ILLINOIS, THE STATE OF INDIANA, THE STATE OF IOWA, THE STATE OF LOUISIANA, THE STATE OF MARYLAND, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MICHIGAN, THE STATE OF MINNESOTA, THE STATE OF MONTANA, THE STATE OF NEVADA, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OKLAHOMA, THE STATE OF RHODE ISLAND, THE STATE OF TENNESSEE, THE STATE OF TEXAS, THE COMMONWEALTH OF VIRGINIA, THE STATE OF WASHINGTON, THE STATE OF WISCONSIN, AND THE DISTRICT OF COLUMBIA, *ex rel*. RONALD J. STRECK<br><br>      Plaintiffs,<br><br>      v.<br><br>ASTELLAS PHARMA US, INC. and ELI LILLY AND COMPANY<br><br>      Defendants. | CIVIL ACTION NO.: 1:14-cv-09412<br><br>**RELATOR'S AMENDED COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3729 *ET SEQ*. AND SUPPLEMENTAL STATE FALSE CLAIMS ACTS**<br><br>**JURY TRIAL DEMANDED** |

1.     Ronald Streck ("Relator") brings this action on behalf of the United States, the State of California, the State of Colorado, the State of Connecticut, the State of Delaware, the State of Florida, the State of Georgia, the State of Hawaii, the State of Illinois, the State of Iowa, the State of Indiana, the State of Louisiana, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the State of Minnesota, the State of Montana, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of New York, the State of North Carolina, the State of Oklahoma, the State of Rhode Island, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, the State of Washington, the State of Wisconsin and the District of Columbia (collectively the "Plaintiff States"), for violations of the Federal False Claims Act, 31 U.S.C. §§3729 *et seq.*, as well as for violations of the following state false claims acts: The California False Claims Act, Cal. Gov't Code §§12650 *et seq.*; The Colorado Medicaid False Claims Act, § 25.5-4-304, *et seq.*; The Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b; The District of Columbia False Claims Act, D.C. Code Ann. §§2-308.03 *et seq.*; The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§1201 *et seq.*; The Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*; The Georgia False Medicaid Claims Act, Ga. Code Ann. §§49-4-168 *et seq.*; The Hawaii False Claims Act, Haw. Rev. Stat. §§661-21 *et seq.*; The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. Ann. §§175/1 *et seq.*; The Indiana False Claims and Whistleblower Protection Act, Indiana Code §5-11-5.5; The Iowa False Claims Act, §685.1, *et seq.*; The Louisiana Medical Assistance Programs Integrity Law, La. R.S. 46:437.1 *et seq.*; The Maryland False Health Claims Act, § 2-601, *et seq.*; The Massachusetts False Claims Act, Mass. Ann. Laws. Ch. 12, §§5A *et seq.*; The Michigan Medicaid False Claims Act, MCLS §§400.601 *et seq.*; Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*; Montana False Claims Act, Mont. Code Anno. §§17-8-401 et *seq.*; The Nevada

1

Case: 1:14-cv-09412 Document #: 77 Filed: 09/07/18 Page 3 of 73 PageID #:727


False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; The New Jersey False Claims Act, N.J. Stat. §2A:32C-1 *et seq.*; The New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 *et seq.*; The New York False Claims Act, NY CLS St. Fin. §§187 *et seq.*; The North Carolina False Claims Act, 2009-554 N.C. Sess. Laws §§1-605 *et seq.*; The Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§5053 *et seq.*; The Rhode Island False Claims Act, R.I. Gen. Laws §§9-1.1-1 *et seq.*; The Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-171 *et seq.*; The Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001 *et seq.*; The Virginia Fraud Against Taxpayers Act, Va. Code §§8.01-216.1 *et seq.*; The Washington Medicaid Fraud False Claims Act, RCW 74.09.201 *et seq.*; and the Wisconsin False Claims for Medical Assistance Act, Wis. Stats. §§20.931 (hereinafter referred to as the "State False Claims Acts") to recover all damages, civil penalties and all other recoveries provided for under the Federal False Claims Act and the State False Claims Acts against the following defendants, and their affiliates, subsidiaries, agents, successors and assigns: Astellas Pharma US, Inc. ("Astellas") and Eli Lilly and Company ("Lilly," and collectively with Astellas, "Defendants").

I.  **PROCEDURAL HISTORY**

1.      Relator Ronald Streck previously filed a related action, *United States et al. ex rel. Streck v. Allergan, Inc. et al.*, Civ. A. No. 08-5135, in the District Court for the Eastern District of Pennsylvania on October 28, 2008.  ECF No. 1 in No. 08-5135 (E.D. Pa.).  The defendants in the related action at one time included Astellas and Lilly.

2.      On May 10, 2011, the related action was unsealed.   ECF No. 42 in No. 08-5135 (E.D. Pa.).

3.      Astellas and Lilly were dismissed without prejudice by the Court in an Order dated September 29, 2011.  ECF No. 74 in No. 08-5135 (E.D. Pa.) Thus, the claims against Astellas and Lilly are no longer pending in the related action.

4.      Relator filed the instant case on November 24, 2014.  ECF No. 1.   The government plaintiffs investigated the case, under seal, for over three years.

5.      In January 2018, the United States filed a "Notice of Non-Intervention" regarding Lilly wherein the government advised the Court that it "is not intervening at this time but will continue its investigation" of the allegations against Lilly.  ECF No. 17 at 2.  In that Notice, the United States noted its "understanding that the relator intends to proceed with the action."  *Id*.  In that regard, the United States referred the Court to 31 U.S.C. § 3730(b)(1), observing that this section of the law "allows the relator to maintain the action in the name of the United States." *Id*.

6.      Shortly thereafter, the states named as plaintiffs filed a similar notice which stated that "they are not intervening at this time but will continue their investigations" of Relator's allegations against Lilly.  ECF No. 19 at 2.

7.      As of the filing of this amended complaint, it is Relator's understanding that the government investigations of Lilly's conduct are continuing.

8.      Regarding Astellas, the states of New York and North Carolina advised the Court in the same filing that they are not intervening at this time, and they will continue their investigation into the allegations against Astellas.  *Id*. at 3.

9.      As of the filing of this amended complaint, it is Relator's understanding that this investigation of the allegations against Astellas is continuing.

3

II.    **SUMMARY**

10.    Congress established the Medicaid Drug Rebate Program to ensure that Medicaid, the government health care program for the indigent, would enjoy the same discounts on the price of prescription drugs as other large public and private purchasers.  Congress therefore decided to "establish a rebate mechanism in order to give Medicaid the benefit of the best price for which a manufacturer sells a prescription drug to any public or private purchaser."  H.R. Rep. No. 101-881, at 96 (1990), *reprinted in* 1990 U.S.C.C.A.N., 2017, 2108.

11.    To ensure that state Medicaid programs receive the best or lowest possible price for pharmaceuticals, the Social Security Act requires manufacturers whose products are sold to Medicaid beneficiaries to execute a rebate agreement with the federal government. 42 U.S.C. § 1396r-8(a)(1).  Under this agreement, manufacturers pay rebates to state Medicaid programs.  *Id.* The amounts of the rebates are based on the Average Manufacturer's Price ("AMP"), which is self-reported and quantified by the manufacturers themselves.

12.    AMPs are reported by manufacturers to the Centers for Medicaid and Medicare Services ("CMS").  Since Medicaid rebates depend entirely on pricing data that the pharmaceutical manufacturers self-report to CMS, the accuracy of the data is critical.

13.    Generally, the higher the AMP reported by a manufacturer, the greater the rebate owed by the manufacturer to Medicaid.  The necessity of paying rebates incentivizes unscrupulous manufacturers to underreport their reported AMPs.

14.    Defendants knowingly reported materially inaccurate AMPs to CMS and thereby defrauded the federal and state governments ("Government Plaintiffs").

15.    Pharmaceutical manufacturers and the pharmaceutical industry's wholesalers govern their business relationship through service agreements ("Service Agreements").

16.     In exchange for the Service Fee, the wholesaler provides certain services to the manufacturer.  While the Service Agreements at issue herein differ in certain particulars, the primary services addressed in the Service Agreements are similar and include distribution services (buying, storing, packing, and shipping drugs), inventory management services (maintaining an adequate supply of the manufacturer's drugs in inventory, without "over-purchasing" drugs), and data reporting services (providing detailed daily, weekly or monthly reports of sales and inventory data).

17.     Defendants used these Service Agreements to artificially lower their reported AMPs, which enabled them, in violation of law, to materially underpay rebates to the state Medicaid programs.

18.     Lilly executed its fraud through the "Service Fee Scheme" and Astellas executed its fraud through the "Discount Scheme."

19.     Through these schemes, Lilly and Astellas knowingly reported materially deflated AMPs for the drugs governed by the Service Agreements (the "Relevant Drugs").  By purposely understating their AMPs, Lilly and Astellas paid less than they owed to the Government Plaintiffs.

20.     <u>Lilly's Service Fee Scheme</u> – As discussed in great detail below, manufacturers must include all price increases in AMP, regardless of when those price increases occur.  Price increases cause AMP to rise, resulting in higher rebate obligations for manufacturers.

21.     However, payments by manufacturers to wholesalers for bona fide services are *excluded* from AMP.  Thus, to the extent a manufacturer can disguise a price increase by hiding it within its own self-serving contractual definition of "Service Fee," the price increase will not

cause the manufacturer's reported AMP – and its consequent rebate obligations to the Government Plaintiffs – to rise.

22.     Lilly's Service Agreements accomplished this through so-called "price appreciation" clauses.  These clauses provide that when Lilly *increased* its prices on a particular drug, the Service Fee owed by the Lilly to the wholesaler was *lowered* by the amount of the wholesaler's units in inventory (of that drug), multiplied by the amount of the price increase. Thus, when Lilly raised the price of a drug, that price increase applied retroactively to the wholesaler's inventory, even though the wholesaler previously purchased that inventory at a lower price.

23.     Through the "price appreciation" artifice, Lilly disguised the revenue it received from its own price increase as a Service Fee.  Specifically, Lilly retroactively raised the price of its products and then reduced the Service Fee by the amount of the price increase, dollar for dollar.  But Lilly did not include this additional revenue in AMP.

24.     Under the Medicaid Drug Rebate Program, Lilly was required to include all price increases in its calculations of AMP.  In violation of this obligation, Lilly disguised post-initial-sale price increases by including them in its self-serving definition of Service Fee.  This led to a reduction in the Service Fee by the amount of the price increase, rather than an increase in AMP by the amount of the price increase, thus providing Lilly with a convenient, but illegal, method to exclude price increases from its AMP calculations.

25.     Astellas' Discount Scheme – In calculating AMP, manufacturers must include in AMP (i.e., subtract from AMP) all discounts they offer to wholesalers and other purchasers.  42 U.S.C. §1396r-8(k)(1); 42 C.F.R. § 447.504; *Medicaid Rebate Agreement*, 56 FR 7049, at §1(a)

(Feb. 21, 1991). The practical effect of including a discount in AMP is to *lower* AMP by the amount of the discount.

26.     Astellas executed Service Agreements with certain wholesalers.  For reasons which are discussed in more detail below, each of the services provided under the contracts had value to Astellas.  That is to say, in the absence of a wholesaler to perform these services, Astellas would have to pay a third party to perform the services (or perform those services on its own at a substantial cost to the company).  Moreover, payment for the services was negotiated at fair market value, and the payments Astellas made to wholesalers were not passed on to downstream customers.   As such, the Service Fees paid by Astellas were bona fide service fees. By law, bona fide service fees are excluded from – i.e., are not part of – the calculation of AMP.

27.     Notwithstanding the bona fide nature of the Service Fees they paid, Astellas fraudulently characterized its payments to wholesalers as discounts, instead of what they actually were: fees for services rendered.  Since discounts, by law, are included in the calculation of AMP (i.e., are subtracted from AMP), this knowing mischaracterization of the fees paid to wholesalers as discounts reduced Astellas' reported AMPs by the amount of the discount.  Consequently, by improperly treating bona fide service fees as discounts, Astellas fraudulently understated its rebate obligations to the Government Plaintiffs.

III.     **JURISDICTION AND VENUE**

28.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1345, 28 U.S.C. §1367, and 31 U.S.C. §3732.

29.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §3732(a).

30.     Venue is proper in the Northern District of Illinois pursuant to 31 U.S.C. § 3732(a), because Defendants transact business in this District.

7

IV.    **PARTIES**

31.    Relator Ronald J. Streck is a plaintiff in this action.

32.    Relator is a lawyer and pharmacist.  He acquired the information and evidence contained in this complaint through his own investigation.

33.     Relator worked in the pharmaceutical industry for more than 40 years in various capacities, including sales, regulatory affairs and association management.

34.    More specifically, Relator served eleven years (from approximately 1992 –2003) as the president and chief executive officer of the Healthcare Distribution Management Association, representing drug wholesaler members, and then worked for six years (approximately 2003 – 2009) as the president and chief executive officer of Rx Distribution Network ("the Network"), representing a group of regional drug wholesalers.

35.    In his capacity as CEO of the Network, Relator negotiated the terms of agreements between pharmaceutical manufacturers and the wholesalers the Network represented, including the types of agreements at issue in this *qui tam* action.

36.    Through his work, Relator became thoroughly familiar with the Service Agreements that manufacturers, including Defendants, execute with wholesalers.

37.    As noted in more detail below, Relator was involved in the marketplace as it relates to this case for decades.  Relator can state that the economic interests of distributors and pharmaceutical manufacturers – as sellers of services and buyers of services, respectively – are in direct conflict.  The sellers of the services (distributors/wholesalers) are financially motivated to receive as much money as possible for their work, and the buyers of the services (manufacturers) are motivated to pay as little money as possible to receive the benefit of the distributors' efforts.  Thus, Service Agreements are negotiated at arms' length, and at fair market value.

38.     Relator investigated Service Agreements for many years. Through his investigation, Relator discovered that Defendants use Service Agreements to misreport pricing data to government programs and thereby defraud the government.

39.     During his investigation, Relator obtained hundreds of pages of confidential Service Agreements between wholesalers and manufacturers, including Service Agreements involving Lilly and Astellas.

40.     Prior to the unsealing of the related action on May 10, 2011, Relator provided the information and evidence he uncovered to the government, including the quoted portions of the Lilly Agreement and Lilly Amendment (as defined below) and the quoted portions of the Astellas Agreement (also as defined below).

41.     The United States is a plaintiff in this action. Throughout the time period relevant to this complaint, the United States Department of Health and Human Services and the Centers for Medicare & Medicaid Services ("CMS") were agencies of the United States and their activities, operations and contracts were paid from United States funds.

42.     The following states were also defrauded through these schemes: California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, Wisconsin, and the District of Columbia ("Plaintiff States"). The Plaintiff States are plaintiffs in this action. Throughout the time period relevant to this complaint, Defendants' Relevant Drugs were provided to Medicaid recipients in each of the Plaintiff States, and those prescriptions were paid for in part by the Plaintiff States' respective Medicaid programs.

9

43.     Defendant Astellas Pharma US, Inc., formerly Fujisawa Healthcare, Inc., is headquartered at Three Parkway North, Deerfield, Illinois 60015.  During the time period relevant to this complaint, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

44.     Defendant Eli Lilly and Company is an Indiana corporation, headquartered at Lilly Corporate Center, Indianapolis, Indiana 46285.  During the time period relevant to this complaint, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

## V.     THE FEDERAL AND STATE FALSE CLAIMS ACTS

45.     The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States for treble damages and a civil monetary penalty. 31 U.S.C. § 3729(a)(1)(A)-(B).[1]

46.     The FCA further provides that any person who has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property is liable to the United States for treble damages and a civil penalty. 31 U.S.C. § 3729(a)(1)(D).

---

[1] Prior to the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Public Law 111-21 (enacted May 20, 2009), Section 3729(a)(1)(A) was Section 3729(a)(1), which imposed liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval."

47.     The FCA further provides that any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States for treble damages and a civil penalty. 31 U.S.C. § 3729(a)(1)(G).[2]

48.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).  Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

49.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

50.     Each of the Plaintiff States has individually enacted a False Claims Act.  Each of those Acts is modeled after the Federal FCA, and each contains provisions similar to those quoted above.  Relator asserts claims under the State FCAs for the State portion of Medicaid false claims detailed in this amended complaint.

## VI.     THE MEDICAID DRUG REBATE PROGRAM

51.     Lilly and Astellas violated the FCA and the State FCAs through separate pricing schemes involving sales of their prescription drugs.  To comprehend the schemes, it is necessary to understand the Medicaid Program, and the Medicaid Drug Rebate Program.

52.     The Medicaid Program provides government health insurance for the poor.

---

[2] Prior to FERA, Section 3729(a)(1)(G) was formerly Section 3729(a)(7), which imposed liability on any person who "knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."

53. To curb mounting Medicaid drug expenditures, Congress created the Medicaid Drug Rebate Program ("Rebate Program"). The Rebate Program was designed as a "mechanism to give Medicaid the benefit of the best price for which a manufacturer sells a prescription drug." H.R. Rep. No. 101-881, at 96 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2017, 2108.

54. Under the Rebate Program, manufacturers whose products are sold to Medicaid beneficiaries must execute a rebate agreement ("Rebate Agreement") with the Secretary of Health and Human Services. *Medicaid Program; Drug Rebate Agreement* 56 FR 7049 (Feb. 21, 1991); 42 U.S.C. § 1396r-8(a)(1).

55. Under the Rebate Program and Rebate Agreement, manufacturers pay a rebate to each individual state's Medicaid program for all outpatient pharmaceuticals paid for by that state's Medicaid program. That is, Medicaid reimburses retail pharmacies for the cost of prescriptions and then, under the terms of the Rebate Program, the state Medicaid programs receive rebates from manufacturers.

56. This process is designed to give Medicaid the benefit of the lowest price at which a manufacturer sold a drug to any commercial customers.

57. Medicaid is a jointly-funded federal-state program. 42 U.S.C. §1396b(a)(1); 42 U.S.C. §1396r-8(b)(1)(B). The amount paid by the federal government is known as the Federal Matching Assistance Percentage ("FMAP").

58. Each state's request for money from the federal government and the corresponding FMAP is submitted to CMS on Form CMS-64. An exemplar of Form CMS-64 is attached as **Exhibit 1**, and is incorporated herein by reference.

59. This form includes exact dollar figures reflecting the "Drug Rebate Offset" as well as a "Medicaid Drug Rebate Schedule." The amount received by a state in Medicaid

rebates is considered a reduction in the total amount expended under the state's Medicaid plan. Therefore, the less any individual state receives in Medicaid rebates, the greater the total amount expended by the state, and the more the federal government must correspondingly pay to the state to meet the federal government's share of the joint costs.

60.     More specifically, each quarter, state Medicaid programs report to CMS their utilization data – the quantity of each drug paid for by each state Medicaid program during that quarter. 42 U.S.C. §1396r-8(b)(2).

61.     Each quarter, manufacturers – including Lilly and Astellas – self-report to CMS the AMPs of their drugs for that quarter.  *Id.* §1396r-8(b)(3).  Since Medicaid rebates depend entirely on pricing data that the pharmaceutical manufacturers generate and provide to CMS, the accuracy of the data is critical.[3]

62.     Relying on the accuracy of the data provided by manufacturers, CMS calculates the unit rebate amount ("URA"), which the states then use to invoice each manufacturer for the rebate it owes.

63.     The amount of the rebate on a generic drug is calculated as the product of: (1) the total number of each dosage form and strength paid for during the rebate period and (2) 11% of the AMP for the rebate period (or, from Jan. 1, 2010 to present, 13% of the AMP for the rebate period.  *See Patient Protection and Affordable Care Act*, Pub. Law No. 111-148, §2501(a) and (b); 42 U.S.C. §1396r-8(c)(3).

---

[3] *OIG Compliance Guidance For Pharmaceutical Manufacturers*, 68 Fed Reg. 23731, 23733-34 (May 5, 2003) ("Given the importance of the Medicaid Rebate Program . . . pharmaceutical manufacturers are responsible for ensuring the integrity of data they generate that is used for government reimbursement purposes.").

64.     For a brand-name drug, the total amount owed by a manufacturer in rebates is the sum of its two principal components: (1) the Basic Unit Rebate Amount ("Basic Rebate") and (2) the Additional Unit Rebate ("Additional Rebate"). 42 U.S.C. §1396r-8(c)(1).

65.     The Basic Rebate for brand drugs is equal to the product of: (1) the total number of each dosage form and strength paid for during the rebate period and (2) the greater of (a) the difference between AMP and the Best Price ("BP")[4] for the dosage form and strength of the drug, or (b) 15.1% of the AMP for the rebate period (or, from Jan. 1, 2010 to the present, 23.1% of the AMP for the rebate period). *See* The Patient Protection and Affordable Care Act, Pub. Law No. 111-148, §2501(a) and (b); 42 U.S.C. §1396r-8(c)(1).

66.     When the percentage increase in AMP for a dosage form and strength of a drug exceeds the percentage increase in the Urban Consumer Price Index ("CPI") since the initial sale of the drug, the manufacturer owes an Additional Rebate.[5]   This additional rebate has the potential to equal or, prior to 2009, exceed AMP.

67.     During the time period relevant to this complaint, pharmaceutical prices for drugs have risen annually at a pace which far exceeds increases in the CPI.  Consequently, nearly every one of Defendants' price increases during the same period exceeded the growth in the CPI.

---

[4] Specifically, Best Price is "the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States."  *See* 42 U.S.C. §1396r-8(c)(1)(C)(i).  Best Price includes all discounts, rebates, or other price concessions. *See* 42 U.S.C. §1396r-8(c)(1)(C)(ii).

[5] *See* 42 U.S.C. §1396r-8(c)(2) (describing the calculation of additional rebate as the amount by which the AMP "for the dosage form and strength of the drug for the period exceeds the [AMP] for … the calendar quarter beginning July 1, 1990 … increased by the percentage by which the consumer price index for all urban consumers for the month in which the rebate period begins exceeds such index for September 1990").

## VII.  THE LEGAL DEFINITION OF AMP AS RELATED TO PRICE INCREASES

68.  AMP is defined by statute, regulation, and the Medicaid Rebate Agreement signed by both Astellas and Lilly.

69.  As relevant here, since 1991, the statutory definition of AMP is the "average price paid to the manufacturer for the drug in the United States by wholesalers." 42 U.S.C. §1396r-8(k)(1)(A).

70.  Consistent with that definition, the Medicaid Rebate Agreement (which was executed by both Astellas and Lilly) states that AMP is "the average unit price paid to the Manufacturer for the drug . . . by wholesalers." *Medicaid Rebate Agreement*, 56 FR 7049, at §1(a) (Feb. 21, 1991).

71.  AMP must be calculated cumulatively.  Specifically, per the regulations applicable to AMP, "[t]he manufacturer must adjust the AMP for a rebate period if cumulative discounts, rebates, or other arrangements subsequently adjust the prices actually realized, to the extent that such cumulative discounts, rebates, or other arrangements are not excluded from the determination of AMP by statute or regulation." 42 C.F.R. § 447.504(f)(3) (emphasis added).

72.  Similarly, the Medicaid Rebate Agreement contractually requires manufacturers to revise AMP for previous quarters if "other arrangements subsequently adjust the prices actually realized." *Medicaid Rebate Agreement*, 56 FR 7049, at §1(a) (Feb. 21, 1991).

73.  Consistent with that requirement, manufacturers "must report to CMS revisions to AMP . . . for a period not to exceed 12 quarters from the quarter in which the data were due." 42 C.F.R. § 447.510(b).

74.  Consequently, as a matter of statute, regulation and contract, manufacturers must calculate (as an initial matter and by subsequent revision if necessary) AMP on a cumulative basis.  Thus, the law is clear: all price increases, regardless of when they occur, must be included

in AMP, because such price increases affect the "price paid to the manufacturer for the drug." 42 U.S.C. §1396r-8(k)(1)(A).

75.     Finally, to the extent a manufacturer believes there is ambiguity in determining its Medicaid rebate obligations, the Rebate Agreement specifically directs the manufacturer as follows: "ambiguities shall be interpreted in the manner which best effectuates the statutory scheme." *Medicaid Rebate Agreement*, 56 FR 7049, at §IX(e) (Feb. 21, 1991). As noted, the Medicaid rebate statute was specifically enacted to ensure that Medicaid paid the lowest prices for prescription drugs. *See also Streck I, United States Statement of Interest,* at 5-6, n.2, ECF No. 171 in No. 08-5135 (E.D. Pa.) (The statutory scheme "is intended to reduce costs by requiring that Medicaid receive the benefit of the prices offered by manufacturers to their customers") (attached as **Exhibit 2**).

## VIII.   MANUFACTURER/DISTRIBTUOR SERVICE AGREEMENTS

76.     Defendants and the pharmaceutical industry's distributors executed contracts governing their transactions. Those contracts are known as distribution services agreements ("Service Agreements"). Service Agreements obligate manufacturers to pay a fee to distributors in exchange for services the distributors provide to the manufacturers (the "Service Fee"). The Service Fee is typically a set percentage of the distributors' gross purchases of the manufacturers' products. For example, if a distributor's Service Fee is 2% of gross purchases, and gross purchases for a given quarter are $100, the Service Fee owed by the manufacturer to the distributor is $2.

77.     In exchange for the Service Fee, the distributor provides services to the manufacturer. While the Service Agreements at issue in this case have slight differences, the primary services addressed in the various Service Agreements are similar and include

distribution services (buying, storing, packing and shipping drugs), inventory management services (maintaining an adequate supply of the manufacturer's drugs in inventory), and data reporting services (providing detailed daily, weekly or monthly reports of sales and inventory data).

## IX. LILLY'S SERVICE FEE SCHEME

### A. Lilly Raised Prices But Excluded That Additional Revenue From AMP, Resulting In False AMP Reports

78.     Lilly sold its drugs to distributors at certain prices, and submitted invoices to its distributors for those sales.

79.     After those initial sales, Lilly raised its prices, and required distributors to pay Lilly the new, higher price.  However, Lilly did not invoice distributors for these sales.  More importantly for purposes of this lawsuit, ***Lilly did not add the additional revenue from the price increase to the AMPs that Lilly self–reported to Medicaid,*** despite unambiguous legal and contractual requirements to do so.

80.     Lilly failed to include revenue from post-initial-sale price increases in its AMPs from 2005 through the present (hereinafter "Lilly's Relevant Time Period").

81.     A simple example illustrates the fraud.  Assume Lilly sold a package of its drug Zyprexa to a distributor for $100.  Then, while the package of Zyprexa was in the distributor's inventory, Lilly raised the price of Zyprexa to $101, and required the distributor to pay the Lilly the additional $1. Since AMP is cumulative, the correct AMP in this example is $101 ($100 + $1 = $101).   Under Lilly's scheme, the company ignored its legal obligation to adjust their previously reported AMPs.  In our example, Lilly would have (falsely) reported an AMP of $100.  This led Lilly to pay less in Medicaid rebates, thereby defrauding Medicaid of millions of dollars.

17

82.     While the above example is a hypothetical, the fraud is very real.

83.     Lilly participated in the Medicaid Program and Lilly's Relevant Drugs were paid for by all of the Government Plaintiffs during Lilly's Relevant Time Period. From 2008 through 2010 alone, Medicaid reimbursed approximately $3,931,286,609 for Lilly's drugs.

84.     By way of illustration, one of Lilly's drugs – Zyprexa Oral Tablet 20 MG – had approximately $638,079,817 in Medicaid utilization from 2008 – 2010.  *See* **Exhibit 3** (national and state Medicaid utilization for this product).

85.     The prices of Lilly's drug products increased regularly during the Relevant Time Period.  Again by way of illustration, the price of Zyprexa Oral Tablet 20 mg increased a total of 32.4% from 2008-2010, with price increases occurring on the following dates: 7/24/2008 ($696.75); 12/11/2008 ($731.85); 8/25/2009 ($780.00); 3/2/2010 ($842.40); and 12/2/2010 ($922.56). *See* **Exhibit 4**.

86.     By contrast, the CPI for 2008 – 2010 rose less than 4.3 % over that same period. *See* **Exhibit 5**.

87.     Each time Lilly increased the price on Zyprexa Oral Tablet 20 mg, Lilly received revenue from distributors for Zyprexa on hand and on order (i.e., revenue for Zyprexa in the distributors' inventory, and Zyprexa the distributor had ordered from Lilly).

88.     Lilly failed to add that revenue to its AMP calculations during Lilly's Relevant Time Period, thereby understating its AMPs.

89.     By understating its AMP calculations, Lilly: (1) reported false AMPs to CMS, (2) caused CMS to underreport the unit rebate amounts to the states, (3) underpaid its Basic and Additional Medicaid rebates, (4) caused the states to receive less in rebates than they were entitled to, (5) caused the states to submit inflated CMS Form 64's to CMS, and (6) caused the

federal government to pay more than it should have in FMAP funds to the states due to the inflated Form 64's.

90. The actual damages to the government from this scheme are based on the reimbursement for all Lilly drugs which flowed through all of Lilly's Service Agreements during Lilly's Relevant Time Period, *except for* any damages which resulted from claims precluded by the applicable statutes of limitation in the federal FCA and the State FCA's.

**B.  The Artifice Lilly Utilized To Exclude Revenue From Post-Initial-Sale Price Increases**

91.    Since Service Fees are paid **_by_** the manufacturer for services rendered, they are not part of AMP, which is statutorily defined as the "price paid **_to_** the manufacturer for the drug." 42 U.S.C. §1396r-8(k)(1)(A) (emphasis added).  Put differently, money paid as a result of price increases flows one direction (from the distributor to the manufacturer), while Service Fees flow the opposite direction (from the manufacturer to the distributor). Thus, Service Fees have nothing to do with AMP.  In the language of the Medicaid Drug Rebate Program, "AMP excludes . . . [b]ona fide service fees."  42 C.F.R. § 447.504(h)(19).

92.    Lilly considered its Service Fee payments to distributors under Service Agreements to be bona fide service fees.  Thus, Lilly excluded its Service Fee payments from its AMP calculations.

93.    But Lilly used those Service Fee payments to hide the revenue it pocketed from post-initial-sale price increases.  Lilly executed this fraud through its bogus and self-serving definition of its bona fide service fee payments.  Specifically, Lilly self-defined revenue from post-initial-sale price increases as part of the bona fide service fees it paid to distributors.  To accomplish this, Lilly created from thin air an artifice known as a price appreciation credit ("PAC"), which Lilly inserted into its Service Agreements with drug distributors.

19

94.     These clauses provide that when Lilly *increases* its prices on a particular drug, the self-defined "Distribution Fee" owed by Lilly to the distributor is *lowered* by the amount of the distributor's units in inventory (of that drug), multiplied by the amount of the price increase.

95.     The mathematical effect of a "price appreciation credit" is that the distributor retroactively pays the manufacturer for the price increase, dollar for dollar.  When viewed in this manner, the math tells the truth: revenue obtained through a price increase and pocketed by the manufacturer is part of "price" and is not part of the Service Fee paid by that same manufacturer to a distributor for services rendered.

**C.  An Exemplar Contract Shows How Lilly's Price Appreciation Clauses Functioned**

96.     On December 9, 2002, Lilly – through its President of U.S. Operations – executed an "Inventory Management Program Agreement Addendum to Warehousing and Distribution Service Agreement" ("Lilly Agreement") with a national wholesaler.  **Exhibit 6** at 1.  The Lilly Agreement – which was retroactively effective to July 1, 2002 – covered the following Lilly drug products: Evista, Humalog, Humulin, Prozac Weekly, Sarafem, and Zyprexa.

97.     The Lilly Agreement was amended on January 1, 2005 by the "3rd Amendment to Warehousing and Distribution Service Agreement" ("Lilly Amendment"), which extended the term of the Lilly Agreement through December 31, 2009.  **Exhibit 7** at § 3.

98.     One focus of the Lilly Amendment was to clearly define the compensation the wholesaler will receive for providing various distribution services.  Specifically, the wholesaler agreed to provide Lilly with the following services:

- To maintain inventory levels (total of on hand and on order) of Lilly's Products of no more than three (3) weeks of Normal Requirements (as defined in the agreement); if the wholesaler's inventory exceeds 3 weeks or Normal Requirements, Lilly is entitled to a credit against the Distribution Fee (as defined in the agreement) for each day the wholesaler is out of compliance;

- To use best efforts to fill customer orders at a ninety-eight (98%), or greater, Average Weighted Service Level[6] during each calendar month; if the wholesaler's Average Weighted Service Level falls below 98%, Lilly is entitled to a credit against the Distribution Fee for each day the wholesaler is out of compliance;

- To provide Lilly, on a daily basis, with EDI 852 Data for all of the national wholesaler's facilities that purchase and/or warehouse pharmaceutical products, including all inventory quantities, all "on order" quantities, daily sales, weekly customer sales, and demand per week; if the wholesaler is more than seven days late providing this 852 data, Lilly is entitled to a credit against the Distribution Fee for each day the wholesaler is out of compliance;

- To provide Lilly, on the last business day of each week, with EDI 867 Data for all of the national wholesaler's facilities that purchase and/or warehouse pharmaceutical products, including shipping addresses, DEA numbers, NDC codes, and weekly sales; if the wholesaler is more than seven days late providing this 852 data, Lilly is entitled to a credit against the Distribution Fee for each day the wholesaler is out of compliance; and

- To provide Lilly with the national wholesaler's Average Service Levels on a weekly basis for each of the wholesaler's distribution centers across the country, together with a "company roll up" of these service levels.

*Id.* at §§ 1-2.

99. In exchange for providing these services, Lilly agreed to pay the wholesaler a Service Fee (which the Lilly Amendment called a "Distribution Fee") as follows:

| Date | Basis Points |
|---|---|
| January 1, 2005 – December 31, 2005 | 90 |
| January 1, 2006 – December 31, 2006 | 98 |
| January 1, 2007 – December 31, 2007 | 105 |
| January 1, 2008 – December 31, 2009 | 108 |

*Id.* at § 3.

100. This Service Fee is paid on a quarterly basis. *Id.* The Service Fee is "calculated by multiplying Lilly's quarterly sales of Products and including crossdock and drop shipments,

---

[6] Average Weighted Service Level is defined in the Lilly Amendment as "the percentage of total customer orders received in a period that have been filled during that same period adjusted for any Lilly back order and/or ability to supply." **Exhibit 3** at § 1.9.

invoiced to the [national wholesaler], less Products returned by the [national wholesaler] during the same quarter, by the appropriate Distribution Fee percentage." *Id.*

101. In other words, the Service Fee is a percentage of net sales.

102. The Lilly Amendment also contained a "price appreciation" clause. This clause provides that when Lilly increases its prices after the initial sale, the money owed by Lilly to the wholesaler as a Service Fee is *lowered* by the amount of the wholesaler's units in inventory, multiplied by the amount of the price increase. *Id.*

103. The language of Lilly's price appreciation clause is quoted below:

> Wholesaler shall receive the Distribution Fee through a combination of (1) the value of any price increase by Lilly during the quarter for Products in Wholesaler's inventory ("Price Increase Value") and (2) a payment or credit by Lilly. The Price Increase Value for a Product shall be calculated by multiplying the price increase for the Product by the amount of inventory of such Product Wholesaler has on the date of the price increase.

*Id.*

104. No invoices are sent from Lilly to the wholesaler for these post-initial-sale price increases. Instead, Lilly simply reduces the amount of money it owed to the wholesaler (in the form of a Service Fee) by the amount of the price increase on inventory. Thus, by operation of the price appreciation provision, Lilly buried its off-invoice price increases via its bogus accounting for Service Fees.

**D. How Lilly Knowingly Conflated Multiple Revenue Streams And Multiple Transactions To Fraudulently Exclude Revenue From AMP**

105. Lilly's fraud was accomplished by conflating two opposite-facing revenue streams and three transactions into one revenue stream and one transaction.

**Transaction 1.** In the Zyprexa example transaction outlined previously, the first revenue stream flows from the distributor to Lilly and consists of the initial sale/payment of $100, as depicted below in green:

## Transaction 1 – Initial Sale



**Transaction 2.** The second transaction also flows from the distributor to Lilly and consists of payment on a price increase on inventory (in our example, a $1 price increase), depicted below in green:

## Transaction 2 – $1 Price Increase



**Transaction 3.** The third transaction went in the opposite direction, i.e., from Lilly to the distributor. The transaction in this opposite-facing revenue stream is the service fee payment (in our example, a $2 service fee) and is depicted below in red:

## Transaction 3 – Payment Of Bona Fide Service Fee



As noted, Lilly considered such payments for services rendered to be bona fide service fees which Lilly excluded from AMP.

Lilly's conflation of the two opposite-facing revenue streams and three transactions in our example is depicted below:



**Transaction 4 – Defendants Unilaterally Say That a Price Increase Is a Service Fee And Exclude The Price Increase From AMP**

106.    Thus, Lilly engaged in a contractual game of three card monte. Lilly called a price increase a "service fee" by conflating multiple transactions and opposite-flowing revenue streams via a single contract.

107.    But saying something doesn't make it so. The law is clear: price = price. Lilly's position that revenue from a "price increase" is not part of the "price paid" is absurd when you look at the transactions separately.

108.    In sum, and evidencing its scienter, Lilly carefully knitted together several disparate transactions – initial sales to distributors, subsequent price increases, and service fees paid by manufacturers – into a single transaction which netted revenues in one revenue stream against those generated in another. Put differently, Lilly devised a clever scheme to avoid a clear principle that could be understood by a child in first grade: a "price increase" is part of the "price paid."

X. **THE LEGAL DEFINITION OF AMP AS IT RELATES TO ASTELLA'S DISCOUNT SCHEME**

109. As noted, pharmaceutical manufacturers (including Defendants) entered into Service Agreements with various wholesalers.

110. In return for services rendered, those manufacturers (including Defendants) paid Service Fees to the wholesalers.

A. **AMP Treatment of Bona Fide Service Fees From 2007 – 2010**

111. From 2007 – 2010, applicable regulations provided guidance to manufacturers (including Defendants) regarding such payments. Specifically, CMS promulgated regulations effective October 1, 2007 that stated what was already clear: service fees paid ***by*** a manufacturer have no effect on the price paid ***to*** the manufacture for the drug. 72 Fed. Reg. 39142 (July 17, 2007) (codified at 42 C.F.R. § 447.504(h)(19)) ("2007 AMP Regulation") ("AMP excludes . . . [b]ona fide service fees").

112. The 2007 AMP Regulation defined "*bona fide* service fee" as follows:

> [A] fee paid by a manufacturer to an entity, that represents fair market value for a *bona fide*, itemized service actually performed on behalf of the manufacturer that the manufacturer would otherwise perform (or contract for) in the absence of the service arrangement, and that is not passed on in whole or in part to a client or customer of an entity, whether or not the entity takes title to the drug.

72 Fed. Reg. 39142, 39182 (codified at 42 C.F.R. § 447.502).

B. **AMP Treatment of Bona Fide Service Fees From 2010 – Present**

113. Through the Affordable Care Act (passed on March 23, 2010 with an effective date of October 1, 2010), Congress made it even more clear that fees paid by manufacturers to wholesalers for inventory management and distribution services were not to be factored into AMP by literally saying that:

> (i) In general. – The average manufacturer price for a covered outpatient drug shall exclude –

26

(II) *bona fide* service fees paid by manufacturers to wholesalers or retail community pharmacies, including (but not limited to) ***distribution service fees, inventory management fees***, product stocking allowances, and fees associated with administrative service agreements and patient care programs (such as medication compliance programs and patient education programs);

42 U.S.C. § 1396r-8(k)(1)(B)(i)(II) (emphasis added) (the "2010 AMP Statute").[7]

114. In 2016, CMS enacted regulations affirming the mandate of the 2010 AMP Statute. *See Medicaid Program; Covered Outpatient Drugs*, 81 Fed. Reg. 5170 (Feb. 1, 2016).

## XI.   THE *STRECK I* OPINION

115. The government plaintiffs in *Streck I* initially declined to intervene against all defendants. ECF Nos. 55-57 in No. 08-5135 (E.D. Pa.). Relator Streck proceeded to litigation on a declined basis pursuant to 31 U.S.C. § 3730(c)(3) ("If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action").

116. Defendants filed motions to dismiss. ECF No. 140 in No. 08-5135 (E.D. Pa.). District Judge Eduardo Robreno ruled on the motions in July 2012, and held that Relator's case should proceed against the certain defendants engaged in the Discount Scheme (the "Discount Defendants") for all false claims presented after January 1, 2007.[8] *U.S. ex rel. Streck v. Allergan, Inc.,* 894 F. Supp. 2d 584 (E.D. Pa. 2012), *aff'd sub nom. U.S. v. Allergan, Inc.,* 2018

---

[7] This Congressional action strengthened the instant case against Astellas, because distribution fees and inventory management fees were specifically addressed and were specifically excluded from AMP. In other words, Astellas was expressly told by Congress via statute that it cannot subtract inventory management fees and distribution service fees from AMP, because those fees are specifically excluded from AMP calculations.

[8] With regard to the Service Fee Defendants, Judge Robreno dismissed those claims and rejected Relator's argument that these defendants had knowingly underreported the AMPs for their drugs by failing to factor retroactive price increases into AMP. *Id.* at 600. The Third Circuit affirmed the dismissal. *U.S. v. Allergan, Inc.,* 2018 WL 3949031 (3d Cir. Aug. 16, 2018) (petition for panel rehearing and rehearing en banc pending). Relator has filed a petition for rehearing *en banc*. As of the filing of this amended complaint, that petition remains pending.

WL 3949031 (3d Cir. Aug. 16, 2018) (petition for panel rehearing and rehearing en banc pending).[9]

117.    Judge Robreno's holding with regard to the Discount Defendants was based on the contractual language in the Service Agreements the Discount Defendants entered with distributors. *Id*.

118.    The contractual language found in the Astellas Agreement cited below is virtually identical to the language in the contracts analyzed by Judge Robreno in *Streck I*.

119.    In *Streck I*, the Court found that Relator Streck pled sufficient evidence to show that the Discount Defendants were "at least reckless" for classifying bona fide service fees as discounts. *Id*. at 592.    The bona fide services that the Discount Defendants in *Streck I* fraudulently mischaracterized included:

1. Distribution;
2. Data reporting;
3. Inventory management;
4. Chargeback administration;
5. Returns processing;
6. 852 data Inventory Reports; and
7. 867 data Inventory Reports.

*Id*. at 589.

## XII.    ASTELLAS'S DISCOUNT SCHEME

### A.  Astellas's Service Fee Payments Are Bona Fide Service Fees

---

[9] The cases against each of the four Discount Defendants in *Streck I* proceeded to discovery and were later settled.  The government plaintiffs later intervened in the cases against several of the Discount Defendants.  ECF Nos. 333, 340 in No. 08-5135 (E.D. Pa.).  Collectively, all four cases were settled for more than $60 million. *See* DEP'T OF JUSTICE, AstraZeneca and Cephalon to Pay $46.5 Million and $7.5 Million, Respectively, for Allegedly Underpaying Rebates Owed Under Medicaid Drug Rebate Program (July 6. 2015), available at https://www.justice.gov/opa/pr/astrazeneca-and-cephalon-pay-465-million-and-75-million-respectively-allegedly-underpaying (incorporated herein by reference).

120.     Astellas and a national wholesaler executed a "Core Services Agreement" ("Astellas Agreement"), effective April 1, 2005 through March 31, 2010.  **Exhibit 8** at § VIII(a).

121.     The purpose of the Astellas Agreement is to "renegotiate and define more precisely" the distribution and data services provided by the national wholesaler to Astellas.  *Id.* at 1.

122.     The drugs covered by the agreement include:

- Adenocard
- Adenoscan
- Ambisome
- Amevive
- Aristocort
- Cefizox
- Cyclocort
- Mycamine
- Prograf
- Protopic
- Vaprisol

123.     In addition to distribution services, Section 2 of the Astellas Agreement details the other "Core Services" the national wholesaler provided to Astellas:

- Contract administration;
- Chargeback administration;
- Inventory and sales reports (852 and 867 reports);
- Additional inventory data related to newly launched products;
- Returns processing; and
- Inventory management.

*Id.* at § II.

124.     Each of these services have real value to Astellas.  That is to say, in the absence of wholesalers to perform these services, Astellas would have to pay third parties to perform the services (or perform those services on its own at a substantial internal cost).

125.     Distribution services, including emergency delivery services, are valuable to Astellas.  If wholesalers did not provide distribution services to Astellas, the company would be required to pay a third party logistics company – *e.g.*, FedEx – to pick up, pack, and ship its products.  These costs can be particularly high when emergency delivery is needed on a 24/7/365 basis.

126.     The 852 reports are valuable to Astellas.  Among other things, they permit Astellas to use a series of numeric metrics to make critical decisions regarding when and how much of its products need to be manufactured.  If the wholesalers did not provide 852 data to Astellas, the company would be required to pay a third party for this information, including aggregate sales data, inventory levels (on-hand and on-order), demand forecasts, "morgue inventory" (returned goods), special needs forecasts for particular events, units ordered by customers, and orders filled.

127.     The 867 reports are valuable to Astellas.  Among other things, they permit Astellas to understand who its customers are (including its "problem" customers who return an undue amount of products), and, conversely, to see which potential customers are *not* buying from Astellas (and, this, who the manufacturer should target for marketing/sales).  If the wholesalers did not provide 867 data to Astellas, the company would be required to pay a third party for this information.

128.     Inventory management services are valuable to Astellas.  By requiring wholesalers to maintain an adequate supply of its drugs in inventory, without "over-purchasing" drugs in anticipation of a price increase (also known as "speculative buying"), Astellas is able to retain profits from price increases which would otherwise inure to wholesalers.  Additionally, by requiring wholesalers to use and maintain environmentally-controlled storage facilities for

inventory, Astellas avoids the cost and expense of paying a third party to store its products in such an environment.

129.     In exchange for these services, Astellas agreed to compensate the national wholesaler with a payment up to 1.75% of gross purchases. *Id.* at Attachment C.

130.     As noted, the services provided by the wholesaler to Astellas are virtually identical to the services pled in the operative complaint in *Streck I*,[10] and the services which were analyzed by the district court in the *Streck I* opinion. *Streck I*, 894 F.Supp.2d a 589 (citing services such as distribution, [sales] data reporting, inventory management, and chargeback processing). Examining payments for such services, the Court in *Streck I* held that, in the face of "the change in the statutory and regulatory landscape in 2007," the required knowledge of falsity could be inferred by failing to classify payments for such services as bona fide. *Id.* at 598 (citing payments for services including distribution, customer service reports, data reporting, and inventory management as the type of service fees that were bona fide and excluded from AMP).

131.     Nonetheless, the Astellas Agreement "permits" Astellas to account for payments for these same services as discounts that reduces AMP, should Astellas choose to do so. **Exhibit 7** at § IV (c). Specifically, under the "Government Reporting" section of the Astellas Agreement:

> Each party will be responsible for reporting the Compensation herein to Governmental Authorities as it deems appropriate under the applicable rules, laws, and regulations, underlying whether to report the Compensation as a price concession or as a service fee.

---

[10] The operative complaint in Streck I is attached as **Exhibit 9** (excluding exhibits) and is incorporated herein by reference.

*Id.* (emphasis added).[11]

132.    And Astellas did, in fact, choose to classify payments for these services as "price concessions," and did in fact used these "price concessions" to reduce its AMPs from 2005 through at least 2017.

133.    Put differently, each time Astellas subtracted the Service Fees from its AMP calculations, Astellas generated a false AMP.

134.    Thus, for each financial quarter from 2005 through 2017 (hereinafter Astellas's Relevant Time Period"), Astellas reported false AMPs to CMS.

135.    CMS – relying on the AMP data submitted by Astellas – used these false AMPs to calculated an illegally deflated URA (Unit Rebate Amount), which by the process described above, led the 50 States and the District of Columbia (collectively, the "States") to receive less in rebates from Astellas than the law required.

136.    These false submissions by Astellas throughout Astellas's Relevant Time Period violated the False Claims Acts of the Plaintiff States.

137.    Based on the false AMPs Astellas knowingly submitted to the States, the States subsequently submitted false/inflated CMS Form 64's to the United States, which was then itself defrauded by the false AMPs knowingly submitted to the State Plaintiffs by Astellas.  These

---

[11]  On behalf of Astellas, Yoshihiko Hatanaka executed a functionally equivalent Service Agreement with a wholesaler on June 15, 2006 that was effective through June 30, 2009. Pursuant to the agreement, the wholesaler agreed to provide, *inter alia*, the following services to Astellas: contract administration and charge back procedures, inventory and sales reporting [852 and 867 data], customer monitoring requirements, returns processing, and inventory management.  The drugs covered by the agreement are also similar and include Adenocard, Adenoscan, Ambisome, Amevive, Cefizox, Mycamine, Prograf, Protopic, and Vaprisol.  Finally, on the issue of fair market value, the agreement specifically states that "the parties acknowledge and agree that the compensation hereunder constitutes fair market value for services performed."

false submissions were caused by Astellas, and Astellas thereby violated the federal False Claims Act throughout Astellas's Relevant Time Period.

138.    In sum, by understating its AMP calculations, Astellas: (1) reported false AMPs to CMS, (2) caused CMS to underreport the unit rebate amounts to the states, (3) underpaid its Basic and Additional Medicaid rebates, (4) caused the states to receive less in rebates than they were entitled to, (5) caused the states to submit inflated CMS Form 64's to CMS, and (6) caused the federal government to pay more than it should have in FMAP funds to the states due to the inflated Form 64's.

139.    The actual damages to the government from this scheme are based on the reimbursement for all Astellas drugs which flowed through all of Astellas's Service Agreements from 2005 – 2017, **except for** any damages which resulted from claims precluded by the applicable statutes of limitation in the federal FCA and the State FCA's.

140.    Even for just a subset of those drugs (Adenoscan, Ambisome, Amevive, Mycamine, Prograf, and Protopic) for a subset of that time (2008 – 2010) the Medicaid reimbursement values are substantial, as depicted below:

| Adenoscan | |
|---|---|
| **Year** | **Medicaid Dollars Reimbursed** |
| 2008 | $1,848,946.33 |
| 2009 | $1,962,885.81 |
| 2010 | $1,349,234.70 |
| **Total** | **$5,161,066.84** |

| Ambisome | |
|---|---|
| **Year** | **Medicaid Dollars Reimbursed** |
| 2008 | $2,563,886.23 |
| 2009 | $2,684,098.60 |
| 2010 | $2,730,596.44 |
| **Total** | **$7,978,581.27** |

33

| Amevive | |
|---|---|
| Year | Medicaid Dollars Reimbursed |
| 2008 | $76,371.28 |
| 2009 | $124,570.41 |
| 2010 | $303,962.75 |
| **Total** | **$504,904.44** |

| Mycamine | |
|---|---|
| Year | Medicaid Dollars Reimbursed |
| 2008 | $1,389,850.60 |
| 2009 | $2,016,049.50 |
| 2010 | $2,935,834.24 |
| **Total** | **$6,341,734.34** |

| Prograf | |
|---|---|
| Year | Medicaid Dollars Reimbursed |
| 2008 | $82,977,749.28 |
| 2009 | $85,498,276.61 |
| 2010 | $61,950,864.18 |
| **Total** | **$230,426,890.07** |

| Protopic | |
|---|---|
| Year | Medicaid Dollars Reimbursed |
| 2008 | $11,873,214.87 |
| 2009 | $13,997,621.96 |
| 2010 | $15,326,738.21 |
| **Total** | **$41,197,575.04** |

## COUNT I

### False Claims Act
### 31 U.S.C. §§3729(a)(1)(A) and (a)(1)(B)
**(Against All Defendants)**

141.　Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

142.　This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, *et seq.*, as amended.

143.　By virtue of the acts described above, Defendants knowingly caused to be presented false or fraudulent claims to officers, employees or agents of the United States Government for payment or approval, within the meaning of 31 U.S.C. §3729(a)(1)(A).

144.　By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim, within the meaning of 31 U.S.C. §3729(a)(1)(B).

145.　The United States, unaware of the actual falsity of the records, statements and claims caused to be made by the Defendants, paid claims that would not be paid but for Defendants' unlawful conduct.

146.　By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

147.　Additionally, the United States is entitled to a civil penalty for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT II

### False Claims Act
### 31 U.S.C. §3729(a)(1)(D)
**(Against All Defendants)**

148.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

149.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, *et seq.*, as amended.

150.     By virtue of the acts described above, Defendants knowingly had possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivered, or caused to be delivered, less than all of that money or property, within the meaning of 31 U.S.C. §3729(a)(1)(D).

151.     As a result, monies were lost to the United States through the non-payment or non-transmittal of money or property legally owed to the United States by the Defendants, and other costs were sustained by the United States.

152.     By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

153.     Additionally, the United States is entitled to a civil penalty for each and every false record or statement knowingly made, used, or caused to be made or used to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

## COUNT III

### False Claims Act
### 31 U.S.C. §3729(a)(1)(G)
### (Against All Defendants)

154.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

155.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, *et seq*., as amended.

156.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government, within the meaning of 31 U.S.C. §3729(a)(1)(G).

157.    As a result, monies were lost to the United States through the non-payment or non-transmittal of money or property owed to the United States by the Defendants, and other costs were sustained by the United States.

158.    By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

159.    Additionally, the United States is entitled to a civil penalty for each and every false record or statement knowingly made, used, or caused to be made or used to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

## COUNT IV

### California False Claims Act
### Cal Gov't. Code §12651(a)(1)-(2), (7)
**(Against All Defendants)**

160.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

161.    This is a claim for treble damages and penalties under the California False Claims Act.

162.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

163.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the California State Government to approve and pay such false and fraudulent claims.

164.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the California State Government.

165.    The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

166.    By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

167.    Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT V

### Colorado Medicaid False Claims Act
### C.R.S. §25.5-4-303.5 et seq.

168. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

169. This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

170. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

171. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Colorado State Government to approve and pay such false and fraudulent claims.

172. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Colorado State Government.

173. The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

174. By reason of the Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

175. Additionally, the Colorado State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT VI

## Connecticut False Claims Act
## Conn. Gen. Stat. § 17b-301b
### (Against All Defendants)

176. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

177. This is a claim for treble damages and penalties under the Connecticut False Claims Act.

178. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

179. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Connecticut State Government to approve and pay such false and fraudulent claims.

180. The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

181. By reason of the Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

182. Additionally, the Connecticut State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT VII

### Delaware False Claims And Reporting Act
### 6 Del C. §1201(a)(1)-(2), (7)
### (Against All Defendants)

183.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

184.     This is a claim for treble damages and penalties under the Delaware False Claims And Reporting Act.

185.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

186.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Delaware State Government to approve and pay such false and fraudulent claims.

187.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Delaware State Government.

188.     The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

189.     By reason of the Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

190.     Additionally, the Delaware State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT VIII

### Florida False Claims Act
### Fla. Stat. Ann. §68.082(2)(a)-(b), (g)
### (Against All Defendants)

191.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

192.    This is a claim for treble damages and penalties under the Florida False Claims Act.

193.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

194.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Florida State Government to approve and pay such false and fraudulent claims.

195.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Florida State Government.

196.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

197.    By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

198.    Additionally, the Florida State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT IX

## Georgia False Medicaid Claims Act
## Ga. Code Ann. §49-4-168.1(1)-(2), (7)
### (Against All Defendants)

199.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

200.    This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

201.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

202.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to get the Georgia State Government to approve and pay such false and fraudulent claims.

203.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Georgia State Government.

204.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

205.    By reason of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

206.    Additionally, the Georgia State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT X

### Hawaii False Claims Act
### Haw. Rev. Stat. §661-21(a)(1)-(2), (7)
### (Against All Defendants)

207. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

208. This is a claim for treble damages and penalties under the Hawaii False Claims Act.

209. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

210. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Hawaii State Government to approve and pay such false and fraudulent claims.

211. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Hawaii State Government.

212. The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

213. By reason of the Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

214. Additionally, the Hawaii State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XI

### Illinois Whistleblower Reward And Protection Act
### 740 Ill. Comp. Stat. §175/3(a)(1)-(2), (7)
### (Against All Defendants)

215.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

216.     This is a claim for treble damages and penalties under the Illinois Whistleblower Reward And Protection Act.

217.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

218.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

219.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Illinois State Government.

220.     The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

221.     By reason of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

222.     Additionally, the Illinois State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**COUNT XII**

**Indiana False Claims and Whistleblower Protection Act**
**IC 5-11-5.5-2(b)(2), (6)**
**(Against All Defendants)**

223.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

224.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

225.    By virtue of the acts described above, Defendants knowingly made or used false records and statements to obtain payment or approval of a false claim from the Indiana State Government.

226.    By virtue of the acts described above, Defendants knowingly made or used false records or statements to avoid an obligation to pay or transmit property to the Indiana State Government.

227.    The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

228.    By reason of the Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

229.    Additionally, the Indiana State Government is entitled to a penalty of at least $5,000 for each and every violation alleged herein.

**Count XIII**
**Iowa False Claims Act**
**Iowa Code § 685.2(1)(A), (B), (G)**

230.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

231.     This is a claim for treble damages and penalties under the Iowa False Claims Act.

232.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

233.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

234.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Iowa State Government.

235.     The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

236.     By reason of the Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

237.     Additionally, the Iowa State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XIV

### Louisiana Medical Assistance Programs Integrity Law
### La. Rev. Stat. § 46:438.3(A)-(C)
### (Against All Defendants)

238.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

239.     This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

47

240.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government.

241.     By virtue of the acts described above, Defendants knowingly engaged in misrepresentation or made, used, or caused to be made or used false records and statements, to obtain payment for false and fraudulent claims from the Louisiana State Government.

242.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Louisiana State Government.

243.     The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

244.     By reason of the Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

245.     Additionally, the Louisiana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XV**
**The Maryland False Health Claims Act**
**Md. Code Ann., Health-Gen. §§ 2-602(A)(1), (2)**

246.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

247.     This is a claim for treble damages and penalties under the Maryland False Health Claims Act.

248.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

249.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

250.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Maryland State Government.

251.    The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

252.    By reason of the Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

253.    Additionally, the Maryland State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XVI

### Massachusetts False Claims Law
### Mass. Gen. Laws ch. 12 §5B(1)-(2), (8)
### (Against All Defendants)

254.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

255.    This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

256.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

257.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

258.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Massachusetts State Government.

259.     The Massachusetts State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

260.     By reason of the Defendants' acts, the State of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

261.     Additionally, the Massachusetts State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XVII

### Michigan Medicaid False Claims Act
### §400.603(1)-(2)
### (Against All Defendants)

262.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

263.     This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

264. By virtue of the acts described above, Defendants knowingly made or caused to be made a false statement or false representation of material fact in an application for Medicaid benefits to the Michigan State Government.

265. By virtue of the acts described above, Defendants knowingly made or caused to be made a false statement or false representation of material fact for use in determining rights to a Medicaid benefit.

266. The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

267. By reason of the Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

268. Additionally, the Michigan State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## Count XVIII

### Minnesota False Claims Act
### Minn. Stat. §15c.02 et seq.

269. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

270. This is a claim for treble damages and penalties under the Minnesota False Claims Act.

271. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

272.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Minnesota State Government to approve and pay such false and fraudulent claims.

273.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Minnesota State Government.

274.    The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

275.    By reason of the Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

276.    Additionally, the Minnesota State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XIX

### Montana False Claims Act
### Mont. Code Ann. 17-8-403(1)(a)-(b), (g)
#### (Against All Defendants)

277.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

278.    This is a claim for treble damages and penalties under the Montana False Claims Act.

279.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

280. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Montana State Government to approve and pay such false and fraudulent claims.

281. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Montana State Government.

282. The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

283. By reason of the Defendants' acts, the State of Montana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

284. Additionally, the Montana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XX

### Nevada Submission of False Claims
### to State or Local Government Act
### Nev. Rev. Stat. Ann. §357.040(1)(a)-(b), (g)
### (Against All Defendants)

285. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

286. This is a claim for treble damages and penalties under the Nevada Submission of False Claims to State or Local Government Act.

287. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

288.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

289.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Nevada State Government.

290.    The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

291.    By reason of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

292.    Additionally, the Nevada State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXI

### New Jersey False Claims Act
### N.J. Stat. §2A:32C-3(a)-(b), (g)
### (Against All Defendants)

293.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

294.    This is a claim for treble damages and penalties under the New Jersey False Claims Act.

295.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

296.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the New Jersey State Government to approve and pay such false and fraudulent claims.

297.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the New Jersey State Government.

298.    The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

299.    By reason of the Defendants' acts, the New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

300.    Additionally, the New Jersey State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XXII

### New Mexico Medicaid False Claims Act
### N.M. Stat. Ann. § 27-14-3(a)(1)-(2), (7)
### (Against All Defendants)

301.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

302.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

303.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

304.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

305.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the New Mexico State Government.

306.    The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

307.    By reason of the Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

308.    Additionally, the New Mexico State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**COUNT XXIII**

**New York False Claims Act**
**NY CLS St. Fin. §189(a)-(b), (g)**
**(Against All Defendants)**

309.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

310.    This is a claim for treble damages and penalties under the New York False Claims Act.

311.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

312. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the New York State Government to approve and pay such false and fraudulent claims.

313. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the New York State Government.

314. The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

315. By reason of the Defendants' acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

316. Additionally, the New York State Government is entitled to the maximum penalty of $12,000 for each and every violation alleged herein.

## COUNT XXIV

### North Carolina False Claims Act
### 2009-554 N.C. Sess. Laws §1-607(a)(1)-(2), (7)
### (Against All Defendants)

317. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

318. This is a claim for treble damages and penalties under the North Carolina False Claims Act.

319. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

320. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the North Carolina State Government to approve and pay such false and fraudulent claims.

321. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the North Carolina State Government.

322. The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

323. By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

324. Additionally, the North Carolina State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XXV

### Oklahoma Medicaid False Claims Act
### Okla. Stat. tit. 63, §5053.1B (1)-(2), (7)
(Against All Defendants)

325. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

326. This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

58

327.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

328.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Oklahoma State Government to approve and pay such false and fraudulent claims.

329.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Oklahoma State Government.

330.    The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

331.    By reason of the Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

332.    Additionally, the Oklahoma State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXVI

### Rhode Island State False Claims Act
### R.I. Gen. Laws §9-1.1-3(1)-(2), (7)
**(Against All Defendants)**

333.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

334.     This is a claim for treble damages and penalties under the Rhode Island State False Claims Act.

335.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

336.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Rhode Island State Government to approve and pay such false and fraudulent claims.

337.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Rhode Island State Government.

338.     The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

339.     By reason of the Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

340.     Additionally, the Rhode Island State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXVII

### Tennessee False Claims Act and Medicaid False Claims Act
### Tenn. Code Ann. §§ 4-18-103(a)(1)-(2), (7)
### and 71-5-181(a)(1)(A), (B) and (D)
### (Against All Defendants)

341.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

342.     This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Law.

343.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

344.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

345.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Tennessee State Government.

346.     The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

347.     By reason of the Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

61

348.     Additionally, the Tennessee State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXVIII

### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code Ann. §36.002(4)(B), (12)
### (Against All Defendants)

349.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

350.     This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act.

351.     By virtue of the acts described above, Defendants knowingly made, caused to be made, induced or sought to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program.

352.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Texas State Government.

353.     The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

354.     By reason of the Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

355.     Additionally, the Texas State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXIX

### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §8.01-216.3(a)(1)-(2), (7)
**(Against All Defendants)**

356.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

357.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

358.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval.

359.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Virginia State Government to approve and pay such false and fraudulent claims.

360.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Virginia State Government.

361.    The Virginia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

362.    By reason of the Defendants' acts, the State of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

363.    Additionally, the Virginia State Government is entitled to the maximum penalty $11,000 for each and every violation alleged herein.

## COUNT XXX

### Washington Health Care False Claim Act
### Wash. Rev. Code §§ 48.80.030(1), (2), (3)

364.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

365.     This is a claim for treble damages and penalties under the Washington Health Care False Claims Act.

366.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

367.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Washington State Government to approve and pay such false and fraudulent claims.

368.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Washington State Government.

369.     The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

370.     By reason of the Defendants' acts, the State of Washington has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

371.     Additionally, the Washington State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XXXI

### Wisconsin False Claims For Medical Assistance Act
### Wis. Stat. §20.931(2)(a)-(b), (g)
### (Against All Defendants)

372.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

373.    This is a claim for treble damages and penalties under the Wisconsin False Claims for Medical Assistance Act.

374.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

375.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Wisconsin State Government to approve and pay such false and fraudulent claims.

376.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Wisconsin State Government.

377.    The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

378.    By reason of the Defendants' acts, the State of Wisconsin has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

379.    Additionally, the Wisconsin State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**COUNT XXXII**
**District of Columbia False Claims Act**
**D.C. Code Ann. §2-308.14(a)(1)-(2), (7)**
**(Against All Defendants)**

380.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

381.    This is a claim for treble damages and penalties under the District of Columbia False Claims Act.

382.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

383.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the District of Columbia Government to approve and pay such false and fraudulent claims.

384.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the District of Columbia Government.

385.    The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

386.    By reason of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

387.    Additionally, the District of Columbia Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator prays for judgment against the Defendants as follows:

A.    that Defendants cease and desist from violating 31 U.S.C. §3729 *et seq*., and the counterpart provisions of the state statutes set forth above;

B.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty for each violation of 31 U.S.C. §3729;

C.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus a civil penalty for each violation of Cal. Govt. Code §1651(a);

D.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Colorado has sustained because of Defendants' actions, plus a civil penalty for each violation of the Act;

E.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Connecticut has sustained because of Defendants' actions, plus a civil penalty for each violation of Conn. Gen. Stat. § 17b-301b;

F.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Delaware has sustained because of Defendants' actions, plus a civil penalty for each violation of 6 Del. C. §1201(a);

**G.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty for each violation of Fla. Stat. §68.082(2);

**H.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendants' actions, plus a civil penalty for each violation of Ga. Code Ann. §49-4-168.1.

**I.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Hawaii has sustained because of Defendants' actions, plus a civil penalty for each violation of Haw. Rev. Stat. §661-21(a);

**J.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants' actions, plus a civil penalty for each violation of 740 Ill. Comp. Stat. §175/3(a);

**K.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' actions, plus a civil penalty of at least $5,000 for each violation of IC 5-11-55;

**L.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Iowa has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Act;

**M.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained because of Defendants' actions, plus a civil penalty for each violation of La. Rev. Stat. §437;

N.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Maryland has sustained because of Defendants' actions, plus a civil penalty for each violation of the Act;

O.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Massachusetts has sustained because of Defendants' actions, plus a civil penalty for each violation of Mass. Gen. L. Ch. 12 §5B;

P.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Michigan has sustained because of Defendants' actions, plus a civil penalty for each violation of MI Public Act 337;

Q.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Minnesota has sustained because of Defendants' actions, plus a civil penalty for each violation of the Act;

R.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Montana sustained because of Defendants' actions, plus a civil penalty for each violation of Mont. Stat. 17-8-401;

S.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Nevada has sustained because of Defendants' actions, plus a civil penalty for each violation of Nev. Rev. Stat. §357.040(1);

T.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Jersey has sustained because of Defendants' actions, plus a civil penalty \ for each violation of N.J. Stat. §2A:32C-3;

**U.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Mexico has sustained because of Defendants' actions, plus a civil penalty  for each violation of N.M. Stat. Ann. §27-2F-4;

**V.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New York has sustained because of Defendants' actions, plus a civil penalty for each violation of NY St. Fin. Law §189;

**W.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of North Carolina has sustained because of Defendants' actions, plus a civil penalty for each violation of 2009-554 N.C. Sess. Laws §1-607(a);

**X.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Oklahoma has sustained because of Defendants' actions, plus a civil penalty for each violation of Okla. Stat. tit. 63, §5053.1B;

**Y.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Rhode Island has sustained because of Defendants' actions, plus a civil penalty for each violation of R.I. Gen. Laws §9-1.1-3;

**Z.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained because of Defendants' actions, plus a civil penalty for each violation of Tenn. Code §§4-18-103(a) and 71-5-182(a)(1);

**AA.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Tex. Hum. Res. Code Ann. §36.002;

**BB.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Virginia has sustained because of Defendants' actions, plus a civil penalty for each violation of Va. Code Ann. §8.01-216.3(a);

**CC.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Washington has sustained because of Defendants' actions, plus a civil penalty for each violation of the Act;

**DD.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Wisconsin has sustained because of Defendants' actions, plus a civil penalty for each violation of Wis. Stat. §20.931(2);

**EE.**     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the District of Columbia has sustained because of Defendants' actions, plus a civil penalty for each violation of D.C. Code Ann. §2-308.14(a);

**FF.**     that Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act and the equivalent provisions of the state statutes set forth above;

**GG.**     that Relator be awarded all costs of this action, including attorneys' fees and expenses; and

**HH.**     that Relator recovers such other relief as the Court deems just and proper.

**II.**     that Relator recovers such other relief as the Court deems just and proper.

## JURY DEMAND

Relator demands a trial by jury.

Dated  September 7, 2018             **BEHN & WYETZNER, CHARTERED**

*Michael I. Behn*

Michael I. Behn
Daniel Hergott
17 North State St., Suite 1600
Chicago, Illinois 60602
Tel: (312)-629-0000
Email: mbehn@behnwyetzner.com
ARDC No.: 6209610

**BERGER & MONTAGUE, P.C.**
Todd S. Collins
Daniel R. Miller
Joy Clairmont
Benjamin A. Waters
1622 Locust Street
Philadelphia, PA  19103
Tel: (215) 875-3000
Email: tcollins@bm.net
dmiller@bm.net
jclairmont@bm.net
bwaters@bm.net

**MARTIN LAW** P.**C.**
Jackson Martin
1934 Old Gallows Rd.
Suite 350
Tysons Corner, Virginia 22182
Tel: (202) 909-3455
jackson@martinlawpc.com

**FARUQI & FARUQI, LLP**
T. Talyana Bromberg
David P. Dean
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Telephone: 215-277-5770
Facsimile: 215-277-5771
Email:  tbromberg@faruqilaw.com
ddean@faruqilaw.com

*Counsel for Relator Ronald J. Streck*