UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* RONALD J. STRECK, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 14 C 9412 |
| v. | ) ) | Judge Leinenweber |
| TAKEDA PHARMACEUTICALS AMERICA, INC., et al., | ) ) ) | |
| Defendants. | ) ) ) | |

**THE UNITED STATES' STATEMENT OF INTEREST REGARDING ISSUES RAISED IN DEFENDANTS' MOTION TO DISMISS RELATOR'S AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.     BACKGROUND .................................................................................................................... 2

II.    ARGUMENT ........................................................................................................................ 6

       A.    This Court Should Not Follow the Erroneous Analysis in
           the Third Circuit's Non-Precedential Opinion in Streck I ........................................ 6

           1.    The FCA "Knowledge" Element Focuses on the Defendant's
                 Actual State of Mind at the Time of the Alleged Misconduct ...................... 6

           2.    The Hypothetical Interpretation of AMP Posited by
                 the District Court in *Streck I* was not Reasonable ....................................... 10

       B.    The Government Has Neither Approved Of Nor Acquiesced
           In Defendants' MDRP Price Reporting Practices ........................................................ 15

       C.    If the Court Dismisses Relator's Amended Complaint, It Should
           Do So Narrowly, and Without Prejudice to the United States and the States ........ 17

III.   CONCLUSION .................................................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

*Halo Elec., Inc. v. Pulse Elec., Inc.*,
        136 S. Ct. 1923 (2016) ............................................................................................. 8

*United States ex rel. Chandler v. Cook Cnty*,
        277 F.3d 969 (7th Cir. 2002 ................................................................................... 16

*United States ex rel. Donegan v. Anesthesia Assoc. of Kansas City*,
        833 F.3d 874 (8th Cir. 2016) ................................................................................... 9

*United States ex rel. Durcholz v. FKW, Inc.*,
        189 F.3d 542 (7th Cir. 1999) ................................................................................. 17

*United States ex rel. Hunt v. Cochise Consultancy, Inc.*,
        887 F.3d 1081 (11th Cir. 2018) ............................................................................. 16

*United States ex rel. Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*,
        276 F.3d 1032 (8th Cir. 2002) ............................................................................. 7, 9

*United States ex rel. Oliver v. Parsons Co.*,
        195 F.3d 457 (9th Cir. 1999) ............................................................................... 7, 9

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
        857 F.3d 1148 (11th Cir. 2017) ........................................................................... 8, 9

*United States ex rel. Streck v. Allergan, Inc.*,
        894 F.Supp.2d 584 (E.D. Pa. 2012) ................................................................... 14, 19

*United States ex rel. Streck v. Allergan, Inc., et al.*,
        No. 17-1014 (3rd Cir. Aug. 16, 2018) ........................................................... *passim*

*United States ex rel. Williams v. Bell Helicopter Textron Inc.*,
        417 F.3d 450 (5th Cir. 2005) ............................................................................. 16, 18

*United States ex rel. Yannacopoulos v. General Dynamics*,
        652 F.3d 818 (7th Cir. 2011) ................................................................................. 10

*United States v. Bollinger*,
        775 F.3d 255 (5th Cir. 2014) ................................................................................. 16

*United States v. Kellogg Brown & Root Services, Inc.*,
  2014 WL 1282275 (C.D. Ill. Mar. 31, 2014) .................................................... 10

**Statutes, Regulations, and Rules**

28 U.S.C. § 517 ................................................................................................. 1

31 U.S.C. §§ 3729-3733 .................................................................................... 1

31 U.S.C. § 3729(a)(1)(A)-(B) .......................................................................... 8

31 U.S.C. § 3729(b) (2006) ................................................................................7

31 U.S.C. § 3729(b)(1) (2010) ............................................................................7

31 U.S.C. § 3730(d) .......................................................................................... 1

42 U.S.C. § 1396r-8 ......................................................................................... 2

42 C.F.R. § 447.502 (2007) ............................................................................ 12

42 C.F.R. § 447.504(f)(3) (2016) .....................................................................12

42 C.F.R. § 447.504(i)(3) (2007) ................................................................ 12, 13

42 C.F.R. § 447.510(b)(2) and (d)(2) ............................................................. 12

Medicaid Program; Covered Outpatient Drugs, 77 Fed. Reg. 5318 (Feb. 2, 2012). .............. 13, 17

Medicaid Program; Covered Outpatient Drugs, 81 Fed. Reg. 5170 (Feb. 1, 2016) .................... 14

Medicaid Program; Drug Rebate Agreement, 56 Fed. Reg. 7049 (Feb. 21, 1991) ........ 2, 6, 10, 13

Medicaid Program; Prescription Drugs, 71 Fed. Reg. 77164 (Dec. 22, 2006) ........................... 15

Medicaid Program; Prescription Drugs, 72 Fed. Reg. 39142 (July 17, 2007) .............................. 15

Medicaid Program; Withdrawal of Determination of Average Manufacturer Price,
  Multiple Source Drug Definition, and Upper Limits for Multiple Source Drugs,
  75 Fed. Reg. 69,591 (Nov. 15, 2010) ........................................................................ 12

Third Circuit Internal Operating Procedure 5.2 (2018) ............................................... 19

Third Circuit Internal Operating Procedure 5.3 (2018) ............................................... 19

iv

**Other Authorities**

Medicaid Drug Rebate Program Release No. 2 (Aug. 9, 1991) ..................................................... 11

Medicaid Drug Rebate Program Release No. 14 (Dec. 21, 1994) ............................................... 11

S. Rep. No. 99-345, at 7, *reprinted in* 1986 U.S.C.C.A.N. at 5272 ............................................... 7

v

Pursuant to 28 U.S.C. § 517, the United States respectfully submits this Statement of Interest to address certain issues raised by Defendants Eli Lilly and Company ("Lilly") and Astellas Pharma US, Inc. ("Astellas") (collectively, "Defendants") in their jointly-filed motion to dismiss the relator's Amended Complaint in this action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Relator Ronald J. Streck ("Streck" or "Relator") brought this action pursuant to the *qui tam* provisions of the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, and corresponding state statutes. The United States submits this Statement of Interest to address issues of particular importance to the United States, relating to the proper application of the FCA's "knowledge" requirement and the proper interpretation and application of certain aspects of the Medicaid Drug Rebate Program (MDRP) on which this action is based.

The FCA is the United States' primary tool to combat fraud and recover losses due to fraud in federal programs. While the United States has not intervened in this action, it remains the real party in interest, entitled to the majority of any damages and penalties that may be recovered on its behalf. *See* 31 U.S.C. § 3730(d). The United States also has a substantial interest in the proper interpretation and application of both the FCA and the MDRP. Moreover, as reported to the Court in its Notice of declination and non-intervention (Dkt. No. 17), the United States' investigation of the claims asserted in this action against Lilly was (and still is) ongoing. As such, the United States has a continuing interest in the issues asserted in Defendants' motion to dismiss, both specifically as they relate to the claims asserted in *this* action, and also more broadly as those issues may relate to other FCA actions, and to drug manufacturers' compliance with the MDRP going forward.

In particular, Defendants ask this Court to follow – and give preclusive effect to – a recent non-precedential opinion by the Third Circuit Court of Appeals in *United States ex rel. Streck v.*

*Allergan, Inc., et al.* ("*Streck I*"), No. 17-1014 (3rd Cir. Aug. 16, 2018).[1] For the reasons discussed below, the Court should decline Defendants' invitation to follow the reasoning of that non-precedential opinion. The United States expresses no view on the ultimate issue of whether Relator's Amended Complaint in this case should be dismissed, but respectfully requests that, *if* the Court does dismiss that Complaint, the Court rule more narrowly than Defendants request and make clear that dismissal is *without* prejudice to the United States and the plaintiff states.

## I.    BACKGROUND

Pursuant to the MDRP, 42 U.S.C. § 1396r-8, drug manufacturers are required to report certain pricing information for all of their drugs to the Centers for Medicare and Medicaid Services ("CMS") on a quarterly basis, and to pay quarterly rebates to Medicaid that are calculated based on that pricing information. A central component for calculating the amount of the rebate due for a particular drug in a particular quarter is the "Average Manufacturer Price" (AMP) that the manufacturer reports to CMS for that drug. Ignoring (for the moment) certain specific requirements, a drug's AMP is generally the average price the manufacturer received from wholesalers (or, after passage of the Affordable Care Act in 2010, from wholesalers and retail pharmacies purchasing directly from the manufacturer) for purchases of the drug during the relevant time period. *See Streck I*, slip op. at 11-12 (quoting the statutory AMP definition before and after the Affordable Care Act); *see also* Medicaid Program; Drug Rebate Agreement, 56 Fed. Reg. 7049 (Feb. 21, 1991) (establishing national rebate agreement to be signed by all manufacturers who choose to participate in the MDRP). While the statutory rebate formula

---

[1] A copy of the Third Circuit's slip opinion is attached as Exhibit 1 hereto. The Opinion is labeled "NOT PRECEDENTIAL," slip op. at 1, which the court explains as follows: "This disposition is not an opinion of the full Court and pursuant to [Internal Operating Procedure] 5.7 does not constitute binding precedent." *Id.* at 4.

includes various components, generally, the higher the reported AMP for a drug, the greater the rebate the manufacturer must pay to Medicaid for the drug. *See Streck I*, slip op. at 5.

At issue in *Streck I*, and again here, is the proper MDRP treatment of certain provisions, sometimes generally referred to as "price appreciation credits," in agreements between drug manufacturers and wholesalers (hereinafter referred to as "wholesaler agreements"). *See id.* at 6. Importantly, wholesaler agreements, and "price appreciation" provisions therein, can vary significantly from manufacturer to manufacturer and over time, and an evaluation of the proper treatment of transactions – whether sales of drugs, fees for services, or some form of "price appreciation" clause – for MDRP purposes should be based on the terms and conditions of the agreements and transactions actually before the court in a particular case. But generally, the wholesaler agreements at issue establish terms and conditions pursuant to which the manufacturers sell drugs to the wholesalers, and the wholesalers provide certain services to the manufacturers. *See id.*

As alleged by the relator, the wholesaler agreements in *Streck I* included price appreciation credit provisions that, in substance, imposed retroactive prices increases on the wholesalers. The retroactive price increases generally applied to units of a manufacturer's drug that were still in a wholesaler's inventory (*i.e.*, the wholesaler had not yet sold the units to *its* customers) at the time the manufacturer announced a price increase for the drug in question. To illustrate the concept, assume that, for a particular drug in a particular quarter, a manufacturer sold 50,000 units to a wholesaler at an initial unit price of $100, such that the manufacturer initially received $5,000,000 (50,000 units x $100 per unit). Further assume the manufacturer announced a $20 price increase for the drug, from $100 to $120, and at the time of that announcement, the wholesaler still had 20,000 units of the drug in its inventory. Finally, assume that, pursuant to a price appreciation

3

clause in their contract, the manufacturer was able to, in essence, impose the $20 price increase on those 20,000 previously sold units, and receive an additional $400,000 (20,000 units x $20 price increase) in value from the wholesaler, such that the total value the manufacturer ultimately received from the wholesaler for the 50,000 units sold in the quarter was $5,400,000 ($5,000,000 initial proceeds + $400,000 additional value received via the price appreciation clause).

As described by the Third Circuit in *Streck I*, the wholesaler agreements at issue in that case worked as follows:

> Rather than taking the form of cash payments, however, the clawbacks [*i.e.*, the additional $400,000 in the above illustration] were structured as credits against service fees. Service fees, in turn, were payments owed by the manufacturers to wholesalers under separate provisions of the agreements in exchange for services provided by wholesalers. . . . Price-appreciation credits reduced the amount manufacturers had to pay to wholesalers for the services rendered by wholesalers on behalf of the manufacturers, such as product distribution services. Stated otherwise, *price-appreciation credits increased the value manufacturers received for the drugs purchased by the wholesalers*."

*Streck I*, slip op. at 6 (emphasis added).

The relator alleged that the defendants in *Streck I* excluded price appreciation credits from their AMP calculations, thus improperly reducing their AMPs and the rebates they owed to Medicaid. *Id.* Returning to the above illustration (and assuming no other sales of the drug during the quarter at issue), excluding the $400,000 of price appreciation credits from AMP would result in AMP of $100 per unit ($5,000,000 ÷ 50,000 units), whereas including the price appreciation credits in AMP would result in AMP of $108 per unit ($5,400,000 ÷ 50,000 units).

At issue in *Streck I* was whether the relator had adequately pleaded the FCA's "knowledge" requirement. The Third Circuit assumed that the defendants' alleged exclusion of the price appreciation credits from AMP was erroneous, and evaluated whether the relator had adequately

4

pleaded that the defendants had acted "knowingly" – *i.e.*, with at least "reckless disregard" of the truth or falsity of the information at issue. *See, e.g., Streck I*, slip op. at 8-10.

In evaluating that issue, the Third Circuit made several related yet distinct errors. First, looking only at the statutory language and ignoring the national rebate agreement and applicable regulations, the court concluded that the statutory definition of AMP was ambiguous because it did not include any "temporal language" as to whether "price" should be based on prices *initially* charged, or prices *ultimately* realized, for the sale of drugs. *See id.* at 12. Next, the court stated that in the context of ambiguous statutory language, the FCA knowledge inquiry turns on whether a defendant's interpretation of that ambiguity was "objectively reasonable," and if so, whether the defendant was "warned away" from its interpretation by available guidance. *See id.* at 10. While the United States contends the FCA "knowledge" inquiry should focus more simply and explicitly on the defendant's actual state of mind at the time of the alleged misconduct, *see infra* Section II.A.1, even the court's articulation would seem to require, at a minimum, an evaluation of the defendant's *actual* interpretation of the statute at the time of the alleged misconduct. *See also Streck I*, slip op. at 9 (noting FCA does not reach false claims made "*based on* reasonable but erroneous interpretations of a defendant's legal obligations" (emphasis added)). But in proceeding with its analysis, the court did not consider any defendant's actual interpretation of the statute (either as alleged by the relator or as asserted by any defendant), nor whether any defendant had actually been warned away from its interpretation. Instead, the district court posited, *sua sponte*, that the statutory AMP definition could be read to refer only to "the price initially paid to the manufacturer by the wholesaler," and the Third Circuit deemed certain administrative guidance insufficiently clear to have warned the defendants away from that hypothetical interpretation. *See id.* at 13-14.

But the court failed to acknowledge that the hypothetical interpretation the district court posited and deemed "objectively reasonable" was not the actual interpretation any of the defendants had adopted, or that the *Streck I* defendants had even conceded that the district court's hypothetical interpretation was incorrect. *See* Service Fee Defs.' Joint Resp. to Relator's Mot. to Alter or Amend the Judgment (Aug. 28, 2012) (copy attached hereto as Exhibit 2), at 3-4. Moreover, the court did not cite in its analysis the definition of AMP set forth in the national rebate agreement established by CMS, and required to be signed by all participating manufacturers, at the very inception of the MDRP. That definition concludes with the following sentence, which makes crystal clear that AMP is <u>not</u> based solely on the price "initially" paid to the manufacturer: "The Average Manufacturer Price for a quarter must be adjusted by the Manufacturer if cumulative discounts or other arrangements *subsequently adjust the prices actually realized*." Medicaid Program; Drug Rebate Agreement, 56 Fed. Reg. 7049, 7050 (Feb. 21, 1991) (emphasis added). In light of that language (and other regulatory provisions discussed below), the court's hypothetical interpretation was not "objectively reasonable."

Regardless of whether this Court ultimately determines that Relator has adequately pleaded that the defendants in *this* case acted with the requisite FCA "knowledge," this Court should not follow in the Third Circuit's erroneous analytical footsteps.

## II. ARGUMENT

### A. This Court Should Not Follow the Erroneous Analysis in the Third Circuit's Non-Precedential Opinion in Streck I

#### 1. The FCA "Knowledge" Element Focuses on the Defendant's Actual State of Mind at the Time of the Alleged Misconduct

The FCA's knowledge element requires the plaintiff to show that the defendant acted "knowingly," which is defined to include "actual knowledge" of falsity, or "deliberate ignorance"

or "reckless disregard" of the truth or falsity of the information at issue. 31 U.S.C. § 3729(b)(1) (2010); 31 U.S.C. § 3729(b) (2006). If a court concludes that the relevant statutory, regulatory, or contractual requirement at issue is susceptible to more than one meaning, the "knowledge" element requires the court to determine whether, in light of the ambiguity, the defendant nevertheless knew or should have known that its conduct violated the relevant requirement. FCA "knowledge" will almost certainly exist when the defendant relies on an unreasonable interpretation of a statute or regulation. But even an "objectively" reasonable interpretation may give rise to liability if the defendant actually knew of, deliberately ignored, or recklessly disregarded the proper interpretation of the law. *See United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 463 n.3 (9th Cir. 1999) (rejecting "reasonable interpretation" exception to liability where defendant acts with at least "reckless disregard" as to falsity). For example, a defendant who knows the government's authoritative interpretation of a regulation but nonetheless chooses to rely on a different reading has "actual knowledge," regardless of any ambiguity. *See United States ex rel. Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1053-54 (8th Cir. 2002). And if a defendant has notice of the possibility that its interpretation is wrong and fails to make a limited inquiry regarding the proper interpretation, then the defendant may be found to have acted with deliberate ignorance or reckless disregard. *See* S. Rep. No. 99-345, at 7, *reprinted in* 1986 U.S.C.C.A.N. at 5272.

This reading of the statute is consistent with congressional intent. In amending the FCA, Congress recognized that a claim's falsity may not be clear at the time of the relevant conduct. Rather than foreclose liability in such cases, Congress defined the term "knowingly" to impose liability on defendants that act in bad faith. The legislative history of the amendments explains that Congress sought not only to distinguish "honest mistakes" from "'ostrich-like' conduct" and

other forms of bad faith, but also to require defendants to conduct "a limited inquiry" to resolve the uncertainty and "ensure the claims they submit are accurate." *Id.* And because the "knowingly" standard is evaluated at the time of the alleged violation, a defendant cannot escape FCA liability by developing a *post hoc* interpretation of the relevant rule that may, in the abstract, be considered "objectively" reasonable. *See* 31 U.S.C. 3729(a)(1)(A)-(B) (liability exists where a person "knowingly presents, or causes to be presented a false or fraudulent claim," or "knowingly makes, uses, or causes to be made or used a false record or statement").

Indeed, in addressing the required mental state in a different context – statutory "enhanced damages" for patent infringement – the Supreme Court rejected the notion that the defendant's liability turns on "the ability of the infringer to muster a reasonable (even though unsuccessful) defense at the infringement trial." *Halo Elec., Inc. v. Pulse Elec., Inc.*, 136 S. Ct. 1923, 1933 (2016). The Court noted that, under common law principles, "culpability is generally measured against the knowledge of the actor at the time of the challenged conduct." *Id.* In light of those principles, the Court rejected an "objective recklessness" standard employed by the Federal Circuit, because an "objective" standard would enable "someone who plunders a patent – infringing it without any reason to suppose his conduct is arguably defensible," to escape liability for enhanced damages "solely on the strength of his attorney's ingenuity" at the time of trial. *Id.*

Returning to the FCA context, while the Seventh Circuit Court of Appeals has not squarely addressed this issue, decisions of other Courts of Appeals, and district courts within the Seventh Circuit, have rejected the proposition that an "objectively reasonable" *post hoc* interpretation of a statutory or regulatory requirement precludes FCA liability. In *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148 (11th Cir. 2017), for example, the Eleventh Circuit held that the district court had erred in concluding that a "defendant's identification of a reasonable

8

interpretation of an ambiguous regulation that would have permitted its conduct" necessarily precluded the FCA "knowledge" requirement from being satisfied. *Id.* at 1155. Under that erroneous standard, the court noted that "a defendant could avoid liability by relying on a 'reasonable' interpretation of an ambiguous regulation manufactured *post hoc*, despite having knowledge of a different authoritative interpretation." *Id.* Instead, the Eleventh Circuit held that FCA knowledge must be based on whether the defendant "actually knew or should have known that its conduct violated a regulation at the time of the alleged violation." *Id.*

Similarly, the Eighth Circuit held in *Allina* that a defendant's actual knowledge, deliberate ignorance, or reckless disregard of the proper interpretation of an ambiguous regulation satisfies the FCA "knowledge" requirement. 276 F.3d at 1053-56. The *Allina* court explained that if "the defendants certified compliance with the regulation knowing that the [government] interpreted the regulations in a certain way and that their actions did not satisfy the requirements of the regulation as the [government] interpreted it, any possible ambiguity of the regulations is water under the bridge." *Id.* at 1053.[2] In *Oliver*, the Ninth Circuit rejected the defendant's contention that a "reasonable interpretation" of an ambiguous regulation precludes satisfaction of the FCA "falsity" element, noting that if there were such a rule, a "defendant could submit a claim, knowing it is

---

[2] In *United States ex rel. Donegan v. Anesthesia Assoc. of Kansas City*, 833 F.3d 874 (8th Cir. 2016), the Eighth Circuit affirmed the district court's grant of summary judgment to the defendant, where the district court found that the defendant's interpretation of an ambiguous regulation was "objectively reasonable." *Id.* at 878-880. But in so doing, the Eighth Circuit clarified that the district court had *not* adopted a "sweeping rule that a defendant's reasonable interpretation of an ambiguous regulation precludes FCA liability, regardless of the defendant's state of mind." *Id.* at 879. Rather, the court noted that the district court's analysis was "in harmony" with the principle on which *Allina* was based – *i.e.*, "that summary judgment is not proper on the issue of scienter *if* a Relator (or the United States) produces sufficient evidence of government guidance that warn[ed] a regulated defendant away from an otherwise reasonable interpretation of an ambiguous regulation." *Id.* (citation and internal quotation marks omitted). In *Donegan*, the court found the relator had simply not submitted sufficient evidence on that point to preclude summary judgment. Moreover, the defendant's interpretation at issue in *Donegan* was *not* a *post hoc* interpretation, but rather one that, at the time of the alleged misconduct, had been adopted by the defendant's Professional Practice Committee and included in its Corporate Compliance Plan. *Id.* at 879.

false or at least with reckless disregard as to falsity, thus meeting the intent element, but nevertheless avoid liability by successfully arguing that its claim reflected a 'reasonable interpretation' of the requirements." 195 F.3d at 463 n.3. And in *United States v. Kellogg Brown & Root Services, Inc.*, 2014 WL 1282275 (C.D. Ill. Mar. 31, 2014), the court observed that "an objectively reasonable interpretation may nevertheless be knowingly false if the speaker is cognizant of facts that undermine the basis for that interpretation." *Id.* at \*7 (citing *United States ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818, 833 (7th Cir. 2011)).

### 2. The Hypothetical Interpretation of AMP Posited by the District Court in *Streck I* was not Reasonable

The perils of positing and evaluating hypothetical *post hoc* interpretations is demonstrated by *Streck I* itself. The court focused on a hypothetical interpretation of AMP that no party had advocated – *i.e.*, that AMP could be read to refer only to "the price *initially* paid to the manufacturer by the wholesaler." *Streck I*, slip op. at 12 (emphasis added). But that hypothetical interpretation would clearly conflict with the definition of AMP set forth in the national rebate agreement established by CMS, which required a drug's AMP for a quarter to be "adjusted by the Manufacturer if cumulative discounts or other arrangements *subsequently adjust the prices actually realized*." Medicaid Program; Drug Rebate Agreement, 56 Fed. Reg. 7049, 7050 (Feb. 21, 1991) (emphasis added). For their drugs to be covered by the Medicaid program, manufacturers were required to sign that standard rebate agreement, including that definition of AMP. *Id.* at 7049-50. Thus, from the very start of the program, the *Streck I* court's hypothetical interpretation would not have been "objectively reasonable."

Moreover, subsequent guidance has only reinforced the unreasonableness of any interpretation of AMP – whether alleged, actual, or hypothetical – that would limit AMP to prices wholesalers "initially" pay to drug manufacturers. Just months after CMS established the national

10

rebate agreement quoted above, CMS issued a Program Release to, *inter alia*, "highlight and discuss" the subjects of "discounts and other price arrangements." *See* Medicaid Drug Rebate Program Release No. 2 (Aug. 9, 1991) (copy attached hereto as Exhibit 3), at 2. In that Release, CMS reinforced the explicit requirement that AMP – as well as "Best Price," the other key benchmark on which the amounts of MDRP rebates owed are calculated – must be adjusted to reflect the amounts *ultimately* realized by the manufacturer for the sale of its drugs:

> We are taking this opportunity to highlight and discuss the subject of discounts or other price arrangements. As stated in paragraphs I(a) and I(d) of the rebate agreement, you must revise AMPs and/or [Best Price] to reflect the impact of cumulative discounts or other arrangements on prices actually realized.

*Id.; see also id.* (providing an example involving a "retroactive discount" applied at the end of the calendar year). Then three years later, another CMS Program Release again reinforced the fundamental principle that AMP and Best Price are to be determined based on the amounts manufacturers *ultimately* receive for the sale of their drugs:

> [I]n accordance with sections I(a) and I(d) of the rebate agreement, AMP and best price data ". . . must be adjusted by the Manufacturer if . . . other arrangements subsequently adjust the prices actually realized." Thus, we consider any price adjustment which ultimately affects the price actually realized by the manufacturer as "other arrangements" and, as required by the rebate agreement, included in the calculations of AMP and best price.

Medicaid Drug Rebate Program Release No. 14 (Dec. 21, 1994) (copy attached hereto as Exhibit 4), at 1 (ellipses and quotation marks in original).

The continuing vitality of that fundamental principle was again reinforced, years later, by regulations issued by CMS in 2007. In a subsection called "Further clarification of AMP calculation," the 2007 regulations state: "The manufacturer must adjust the AMP for a rebate period if cumulative discounts, rebates, or other arrangements subsequently adjust the prices

actually realized." 42 C.F.R. § 447.504(i)(3) (2007).[3] The 2007 regulations also defined a new term, "lagged price concession," to mean "any discount or rebate that is realized after the sale of the drug, [excluding] customary prompt pay discounts." 42 C.F.R. § 447.502 (2007). And the regulations described how manufacturers should include such lagged price concessions in AMP, and how they should report AMP revisions that are unrelated to lagged price concessions. *See* 42 C.F.R. § 447.510(b)(2) and (d)(2). Of course, the entire regulatory concept of "lagged price concessions" would make no sense if, as the *Streck I* court posited, AMP could be reasonably read to refer only to the prices wholesalers *initially* pay to manufacturers.

Indeed, though not mentioned in the Third Circuit's opinion, *all nine* of the "Service Fee Defendants" in *Streck I* had explicitly acknowledged that any hypothetical interpretation limiting AMP to the prices wholesalers *initially* paid would be clearly incorrect. *See* Service Fee Defs.' Joint Resp. to Relator's Mot. to Alter or Amend the Judgment (Aug. 28, 2012) (copy attached hereto as Exhibit 2), at 3-4. The defendants conceded that, prior to the issuance of the 2007 regulations noted above, the existing "regulations clearly made a reported AMP subject to change if the pricing data for a prior quarter changed – typically, the result of rebates or other pricing concessions that were not even calculable or available until after the close of the reporting period." *Id.* at 4 (citing regulations issued in 2003). And the defendants noted that, effective in 2007, "manufacturers are required to account for lagged data through application of a 12-month rolling average." *Id.* at 4 n.4 (citing regulations issued in 2007).

---

[3] In November 2010, CMS withdrew 42 C.F.R. § 447.504 for reasons unrelated to the fundamental principle discussed above. *See* 75 Fed. Reg. 69,591, 69591-92 (Nov. 15, 2010) (describing reasons for withdrawal). When CMS later re-issued § 447.504, the language quoted above was retained. *See* 42 C.F.R. § 447.504(f)(3) (2016). Defendants do not contend that, at *any* time, they interpreted AMP to be limited to prices wholesalers "initially" paid to manufacturers.

12

To be sure, the national rebate agreement and other formal and informal CMS guidance described above did not explicitly address "price appreciation credits" or other retroactive price *increases*. But neither was the rebate agreement or other guidance limited to retroactive price *decreases*. Rather, as described above, the regulatory and informal guidance spoke in neutral terms consistent with the fundamental principle that AMP (and Best Price) must account for all "other arrangements" that subsequently affect the prices ultimately realized by the manufacturer. *See, e.g.,* Medicaid Program; Drug Rebate Agreement, 56 Fed. Reg. at 7050 (AMP must be adjusted if "other arrangements subsequently adjust the prices actually realized"); 42 C.F.R. § 447.504(i)(3) (2007) (same). And to the extent (if any) there were ever any doubt regarding CMS's position that retroactive price increases must be included in AMP, any such doubt was laid to rest in February 2012, when CMS stated, in the preamble to proposed regulations:

> We note however that retroactive price adjustments, sometimes also known as price appreciation credits, do not meet the definition of a bona fide service fee as they do not reflect any service or offset of a bona fide service performed on behalf of the manufacturer.

Medicaid Program; Covered Outpatient Drugs, 77 Fed. Reg. 5318, 5332 (Feb. 2, 2012).

Defendants acknowledge that February 2012 CMS statement, but argue it was "non-binding agency commentary" that does not have the "force of law." Defs.' Mem. in Supp. of Rule 12(b)(6) Mot. to Dismiss, Dkt. No. 87 ("Defs. Mem."), at 20. But Defendants' argument misses the point – Relator does not contend that Defendants are liable because they violated that (or any other) CMS statement in the preamble to 2012 proposed rules, nor because they violated additional CMS statements in the preamble to final regulations issued in 2016.[4] Rather, this 2012 CMS

---

[4] In response to comments CMS had received on 2012 proposed rules regarding bona fide service fees, CMS stated that it "continue[d] to believe that price appreciation credits would likely not meet the definition of bona fide service fee," and further noted that credits that "adjust (increase) the wholesaler's purchase price of the drugs in such instances when the drugs were purchased at a certain price and are remaining in the wholesaler's inventory at the time the manufacturer's sale price of the drug increased" would amount

statement, issued after the *Streck I* allegations brought to light that some drug manufacturers were allegedly treating price appreciation credits as a component of "bona fide service fees" and thereby excluding them from AMP,[5] simply clarified CMS's position that such treatment would be improper under *existing* statutory requirements for AMP. Indeed, though Defendants contend it is common for a final rule issued after notice and comment to differ from the proposed rule, Defs. Mem., at 20, they acknowledge that CMS did *not*, in fact, "propose" in 2012 any new rule as to how price appreciation credits should be treated. *See id.* at 9 (stating that the 2012 proposed regulations were "silent on treatment of price appreciation credits").

In any event, neither the *Streck I* defendants, nor Defendants in *this* case, contend that they actually interpreted the statutory and regulatory AMP requirements, at *any* point in time, as being limited to prices wholesalers *initially* pay to manufacturers. Nor do they contend that they actually interpreted the statutory and regulatory AMP requirements, at *any* point in time, to mean that they were required to include in AMP arrangements that subsequently *decrease* prices ultimately realized but not arrangements that subsequently *increase* prices ultimately realized. If either Lilly or Astellas is able to introduce evidence that it actually and reasonably believed in either of those interpretations, it can do so at the summary judgment stage. Similarly, if either Lilly or Astellas is able to introduce evidence that it actually and reasonably believed, based on the *specific terms and conditions of its agreements and transactions with its wholesalers*, that any "price

---

to subsequent price adjustments that should be included in AMP. Medicaid Program; Covered Outpatient Drugs, 81 Fed. Reg. 5170, 5228 (Feb. 1, 2016). Defendants seize on the word "likely" in that 2016 comment, and argue that CMS "continued to equivocate." Defs. Mem., at 21. But CMS did not purport to establish new rules regarding price appreciation credits, and its use of the word "likely" simply reflected the unremarkable proposition that the proper treatment of transactions – whether "price appreciation credits" or otherwise – should be based on the terms and conditions of the actual agreements and transactions at issue.

[5] *See, e.g., United States ex rel. Streck v. Allergan, Inc.*, 894 F.Supp.2d 584, 599 (E.D. Pa. 2012) ("Service Fee Defendants contend that these price credits are properly part of bona fide service fees" and should "therefore" be "excluded from AMP calculations.")

appreciation" or similar provisions in its wholesaler agreements were not, in substance, retroactive price increases or "other arrangements" that subsequently adjust the prices actually realized for the sale of its drugs, it can introduce evidence to that effect as well. However, the United States respectfully suggests that, at the pleading stage, the Court should not declare as "objectively reasonable" an interpretation of AMP that would categorically exclude from AMP retroactive price increases in general, or "price appreciation credits" in particular.[6]

**B.** **The Government Has Neither Approved Of Nor Acquiesced In Defendants' MDRP Price Reporting Practices**

In arguing that Lilly was not "warned away" from its interpretation of AMP, Defendants contend that the Government was "fully aware of the industry position on price appreciation credits" by virtue of the allegations in *Streck I*. Defendants suggest that, because the Government declined to intervene in that action (and because Relator does not allege that CMS has initiated enforcement actions involving price appreciation credits), such "government knowledge" precludes FCA liability. Defs. Mem. at 22. Similarly, Defendants contend that, as a result of the allegations in *Streck I*, "the Government knew of and acquiesced in Astellas's position" regarding the treatment of wholesaler service fees. *Id.* at 25. Those arguments are incorrect for multiple reasons.

As a preliminary matter, in the current procedural posture of this case, evidence of Defendants' actual interpretations of the AMP definitions and requirements, and the rationales on

---

[6] Defendants also note the Third Circuit's reliance on a 2006 Inspector General's report recommending that CMS issue further guidance on certain aspects of AMP, including guidance on the treatment of administrative and service fees manufacturers pay to wholesalers. *See Streck I*, slip op. at 14-16; Defs. Mem., at 18. But as the Third Circuit acknowledged, the 2006 OIG report "was not concerned with price appreciation credits specifically." *Streck I*, slip op. at 14. And in any event, consistent with OIG's 2006 recommendation, CMS promptly proposed in 2006, and adopted in 2007, regulations on the subject of, *inter alia*, the proper treatment of service fees for AMP reporting purposes. *See* Medicaid Program; Prescription Drugs, 71 Fed. Reg. 77164 (Dec. 22, 2006) (proposed rules); Medicaid Program; Prescription Drugs, 72 Fed. Reg. 39142 (July 17, 2007) (final rules).

15

which they based their respective interpretations, is not in the record. And there is certainly no evidence in the record as to the significance, if any, that either Lilly or Astellas attributed to the Government's declination in *Streck I*.

Beyond that, it is well-established that the Government's decision not to intervene in a *qui tam* action does not mean the Government believes the relator's claims lack merit. *See, e.g. United States ex rel. Chandler v. Cook Cnty*, 277 F.3d 969, 974 n.5 (7th Cir. 2002)("There is no reason to presume that a decision by the Justice Department not to assume control of the suit is a commentary on its merits. The Justice Department may have myriad reasons for permitting the private suit to go forward including limited prosecutorial resources and confidence in the relator's attorney."); *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1087 n.6 (11th Cir. 2018) ("The government may decline to intervene based on its evaluation of factors other than the merits of the claim, such as the likely size of the recovery, available agency resources, or whether the relator and his counsel have resources to prosecute the action on their own."); *United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 455 (5th Cir. 2005) ("The [FCA], however, does not require the government to proceed if its investigation yields a meritorious claim. Indeed, absent any obligation to the contrary, it may opt out for any number of reasons.")

Moreover, what is sometimes referred to as a "government knowledge defense" is not a "defense" at all. Rather, in limited circumstances, the government's knowledge and approval of the particular facts and circumstances can be relevant to whether a defendant has acted "knowingly." *See, e.g., United States v. Bollinger*, 775 F.3d 255, 263 (5th Cir. 2014) ("This defense is inaptly-named because it is not a statutory defense to FCA liability but a means by which the defendant can rebut the government's assertion of the 'knowing' presentation of a false claim."). But to be probative on the issue of a defendant's state of mind, the government's

16

involvement must rise to a level of specificity far beyond anything remotely at issue in this case. For example, in *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542 (7th Cir. 1999), the court stated: "If the Government *knows and approves of the particulars* of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim." *Id.* at 545 (emphasis added).

Indeed, it is particularly curious for Defendants to suggest that the Government has agreed with or otherwise acquiesced in what they refer to as the "industry position on price appreciation credits" in light of CMS's February 2012 statement discussed above. To the extent Defendants contend the "industry position" is to exclude price appreciation credits from AMP as a component of bona fide service fees, CMS's February 2012 statement is directly at odds with that position. *See* Medicaid Program; Covered Outpatient Drugs, 77 Fed. Reg. 5318, 5332 (Feb. 2, 2012) ("We note however that retroactive price adjustments, sometimes also known as price appreciation credits, do not meet the definition of a bona fide service fee as they do not reflect any service or offset of a bona fide service performed on behalf of the manufacturer.").

In any event, if Lilly and/or Astellas contend that they actually and reasonably believed that the Government was fully aware of the facts and circumstances surrounding their respective wholesaler agreements and their respective treatments of price appreciation credit and/or service fee provisions therein, and actually and reasonably believed that the Government had approved of their respective treatments of any such provisions for MDRP reporting purposes, they can seek to introduce evidence to that effect at the summary judgment and/or trial phases of this case.

      **C.**      **If the Court Dismisses Relator's Amended Complaint, It Should Do So Narrowly, and Without Prejudice to the United States and the States**

Although Defendants' motion to dismiss is based on what they contend are Relator's pleading failures, *see* Defs.' Rule 12(b)(6) Mot. to Dismiss, Dkt. No. 86 ("Defs. Mot."), at 1-2;

Defs. Mem., at 2-3, their supporting brief makes sweeping arguments of potentially much broader scope. For example, Defendants contend that the Third Circuit rejected Relator's "Service Fee theory," and they argue this Court should do so as well. Defs. Mem., at 17. They further contend that the Third Circuit's non-precedential opinion is not only persuasive, but also "preclusive as to Streck's Service Fee allegations in this case." *Id.* at 18 n.15. And they contend the Third Circuit determined that "the regulatory landscape foreclosed pleading scienter as to the Service Fee Defendants." *Id.* If the Court grants Defendants' motion and dismisses Relator's Amended Complaint, it should do so far more narrowly than Defendants suggest, and the Court should specify in its Order that dismissal is without prejudice to the United States and the states.[7]

As already discussed, the Third Circuit's ruling is erroneous in several important respects, and this Court should decline Defendants' invitation to repeat those errors here. But beyond that, the Third Circuit's non-precedential ruling did not purport to "foreclose pleading scienter" against any and all drug manufacturers on a "Service Fee theory." Rather, the Third Circuit affirmed the district court's ruling that Streck's allegations were insufficient to plead that the nine "Service Fee Defendants" in that case had acted with the requisite "knowledge." *See, e.g., Streck I*, slip op. at 8 ("We turn now to the primary issue on appeal – whether the District Court properly dismissed the [Fourth Amended Complaint] for failure to allege the [Service Fee Defendants] acted with the

---

[7] Defendants seek dismissal of Relator's Amended Complaint "with prejudice," Defs. Mot., at 2, but they have not argued dismissal should be with prejudice to the United States or the states. The United States played no role in drafting or filing Relator's Amended Complaint, and if the Court deems that pleading to be deficient, any shortcomings cannot preclude a properly pleaded action brought by the United States or the states, in the event the federal and/or state governments choose to pursue such claims in the future. *See, e.g., United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 455 (5th Cir. 2005) (holding that district court abused its discretion by dismissing deficient *qui tam* Complaint with prejudice to the United States; noting that dismissal with prejudice to the United States would give relators incentive to file FCA suits with sweeping allegations, with the hope that the United States would feel obligated to intervene and "fill in the blanks" in order to protect against future claims being barred). If Astellas or Lilly later requests dismissal of Relator's claims with prejudice to the federal and/or state governments, the United States requests an opportunity to be heard on that issue before the Court rules.

18

required mental state.") The Court should not read the Third Circuit ruling any more broadly, and if the Court finds Streck's allegations in *this* case to be deficient, it should rule on that narrow basis, and not purport to "foreclose" any and all FCA claims – against Defendants here or any other drug manufacturers – involving price appreciation provisions in wholesaler agreements.

To begin, as already noted, the Third Circuit designated its opinion in *Streck I* as "Not Precedential" and stated that it "does not constitute binding precedent." *Streck I*, slip op. at 1, 4. The Third Circuit's Internal Operating Procedures explain the distinction between "Precedential" and "Not Precedential" opinions. "Precedential" opinions are those that have "precedential or institutional value." 3d Cir. I.O.P. 5.2 (2018). By contrast, an opinion is designated "Not Precedential" when it "appears to have value only to the trial court or the parties." 3d Cir. I.O.P. 5.3 (2018). By designating its opinion as "Not Precedential," the Third Circuit was clearly expressing its intention that its opinion not have preclusive effect on other proceedings.

Moreover, the district court began its analysis of the relator's allegations in *Streck I* by stating that the complaint "does not point to direct evidence that Defendants knew their conduct was fraudulent." *United States ex rel. Streck v. Allergan, Inc.*, 894 F.Supp.2d 584, 592 (E.D. Pa. 2012). As a result, the court framed its entire analysis as follows: "Therefore, Plaintiff's claims rest on the indirect evidence that the statutory and regulatory provisions involved were so clear that Defendants' calculation of AMP was at least reckless." *Id.* It was on *that* fundamental premise – *i.e.*, that there was no "direct evidence" of knowledge – that the district court proceeded with its analysis. Surely, neither the district court nor the Third Circuit intended to foreclose a "Service Fee theory" that may be based on more specific allegations regarding the defendant's state of mind.

Further, wholesaler agreements – and price appreciation provisions therein – can vary significantly from manufacturer to manufacturer and over time. Neither Lilly's nor Astellas's

19

wholesaler agreements, for *any* time period, were before the district court or the Third Circuit in *Streck I*, and this Court should reject Defendants' argument that the Third Circuit's ruling should be given "preclusive" effect for all periods through February 1, 2012. Defs. Mem, at 18 n.15.

For example, the price appreciation provision in the 2005 Lilly wholesaler agreement described in Relator's Amended Complaint does not purport to operate in the same fashion as the price appreciation provisions described by the Third Circuit in *Streck I* as follows:

> [A] price-appreciation credit is only triggered once a drug is distributed by a wholesaler to a third party after the manufacturer has increased the price of the drug above the amount by the wholesaler. Additionally, the value of a price-appreciation credit turns on the ultimate price the third party pays a wholesaler for a drug . . . .

*Streck I*, slip op. at 12-13. By contrast, the price appreciation provision in Lilly's 2005 agreement – referred to as "Price Increase Value" in that agreement – is not triggered only after a wholesaler sells drugs to a third party; rather, the Price Increase Value is triggered simply by a Lilly decision to announce a price increase. *See* Am. Compl., at ¶ 103 & Exh. 7. And the value Lilly receives from the Price Increase Value provision – for this 2005 agreement, in the form of an offset to the amount Lilly owes for the "Distribution Fee" earned by the wholesaler – does not turn on the "ultimate price the third party pays a wholesaler." Rather, the value Lilly receives is simply the amount of the price increase Lilly has announced multiplied by the number of units the wholesaler still has in its inventory at that time. *See id.*

Moreover, Defendants do not limit their argument to the time periods covered by the agreements attached to Relator's Amended Complaint; rather, they contend the Third Circuit's ruling precludes all "Service Fee theory" claims for the period through February 1, 2012. *See* Defs. Mem., at 18 n.15. But just as Lilly's 2005 wholesaler agreements were not before the Third Circuit, Lilly's subsequent wholesaler agreements, covering 2009 through February 2012 and beyond, were before *neither* the Third Circuit nor this Court, and those later agreements were

20

structured very differently.  Indeed, in Lilly's 2009 wholesaler agreements,[8] the "Distribution Fee" and "Price Increase Value" provisions are in entirely different sections of the agreement, and the amount of the Price Increase Value is not "credited" or offset against service fees or anything else. Rather, as described in the 2009 agreements, Lilly simply sends the wholesaler an invoice for the amount of the Price Increase Value, and the wholesaler pays that amount to Lilly via electronic funds transfer.  Clearly, that is not the structure of the wholesaler agreements described by the Third Circuit in *Streck I*, and the Third Circuit's ruling in *Streck I* is neither persuasive nor preclusive with respect to these agreements.

The United States respectfully requests that, if this Court deems Relator's allegations insufficient with respect to the 2005 Lilly agreement described in the Amended Complaint, the Court should not purport to foreclose the possibility that a "Service Fee theory" could be properly pleaded with respect to that agreement or any later Lilly agreements, nor purport to foreclose the possibility that a "Service Fee theory" could be properly pleaded as to any other wholesaler agreement, used by any other drug manufacturer, for any time period.  In a similar vein, if the Court deems Relator's "Discount Scheme" allegations against Astellas insufficient, the Court should not purport to foreclose the possibility that "Discount Scheme" claims could be properly pleaded against Astellas, or against any other drug manufacturer, as to any time period.

---

[8] To be clear, the United States does not contend that the Court should deny Defendants' motion to dismiss based on agreements or other evidence not before the Court.  Rather, the United States discusses these later agreements in support of its position that this Court should not deem the Third Circuit's ruling persuasive or preclusive with respect to any agreement not before the Third Circuit, and its position that this Court should not issue a broad ruling purporting to foreclose claims based on wholesaler agreements not before this Court.  Should the Court wish to review the 2009 Lilly agreements discussed herein, the United States is prepared to submit copies of those agreements.

## III.    CONCLUSION

The United States respectfully requests that the Court consider the legal arguments discussed above in addressing Defendants' motion to dismiss Relator's Amended Complaint pursuant to Rule 12(b)(6).  Should the Court conclude that dismissal is appropriate, the United States respectfully requests that the Court rule narrowly, as described in Section II.C above, and that the Court specify in its Order that dismissal is without prejudice to the United States and the States.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. LAUSCH, Jr.
United States Attorney

By: Linda A. Wawzenski
LINDA A. WAWZENSKI
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-1994
linda.wawzenski@usdoj.gov

MICHAEL D. GRANSTON
DANIEL R. ANDERSON
JUSTIN DRAYCOTT
JEFFREY A. TOLL
Attorneys, Civil Division
Commercial Litigation Branch
Post Office Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 305-3772
justin.draycott@usdoj.gov

Dated:  November 6, 2018

22