UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA *et al. ex rel.* RONALD J. STRECK,<br><br>                        Plaintiffs-Relator,<br><br>               v.<br><br>TAKEDA PHARMACEUTICALS AMERICA, INC., *et al.*,<br><br>                            Defendants. | Case No.: 1:14−cv−09412<br><br>**Judge Harry D. Leinenweber** |

**RELATOR'S MOTION FOR JUDGMENT AS A MATTER OF LAW
UNDER FEDREAL RULE OF CIVIL PROCEDURE 50(a)**

Pursuant to Federal Rule of Civil Procedure 50(a), Relator respectfully moves for judgment as a matter of law with respect to causation, materiality, and scienter.[1]

Federal Rule of Civil Procedure 50(a) provides that once "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." In considering Rule 50(a) motions, "[t]he standard for granting judgment as a matter of law mirrors that for the granting of summary judgment." Orlowski v. Eriksen, 2009 WL 5183226, at *1 (N.D. Ill. Dec. 30, 2009) (quotations omitted).

For the reasons described below, even viewing the evidence in the light most favorable to Lilly, the trial record establishes that the Court should enter judgment as a matter of law for Relator

---

[1] All references to trial transcript are in the form of "Tr. \_\_." All references to admitted exhibits are in the form of "RX-\_\_\_\_" for Relator's exhibits and "DX-\_\_\_" for Lilly's exhibits.

1

on causation, materiality, and scienter.

## I. The Undisputed Evidence Establishes Causation

The Seventh Circuit's most recent decision on causation in an FCA case provides that "the plaintiff must establish that the defendant's fraud was a material element and a substantial factor in bringing about the injury." U.S. v. Molina Healthcare of Illinois, Inc., 17 F.4th 732, 745 (7th Cir. 2021) (quotations omitted). Citing the Seventh Circuit's earlier decision in U.S. v. Luce, 873 F.3d 999 (7th Cir. 2017), Lilly contends that in addition to satisfying this test from Molina, Relator must also establish proximate cause. (Dkt. 391 at 13-14). Lilly describes this test as requiring Realtor to prove that the Government's loss "was reasonably foreseeable or anticipated as a natural consequence of defendants' conduct." Id. at 14.

Relator preserves his argument that Molina governs the causation inquiry. But, even under Lilly's formulation of the causation inquiry, the trial record establishes that Lilly's false AMPs and false certifications were both (1) a material element and a substantial factor in bringing about the Government's injury and (2) the Government's injury was a reasonably foreseeable and anticipated consequence of Lilly's conduct. Lilly has not seriously argued otherwise – indeed, in opening statements, Lilly's counsel said that the case was about scienter and materiality without even mentioning causation. Tr. 183:13-184:1. This is just as well, since the below-discussed evidence firmly establishes causation. Simply put, the facts in this case are as far as you can get from the unforeseeability of a guard assisting an unsteady passenger aboard a train, and in the course of doing so, unwittingly causing the passenger to drop a package of fireworks, which, in turn, causes scales to fall on the opposite end of the train platform, injuring a passerby. Cf. Palsgraf v. Long Island R. Co., 248 N.Y. 339, 341 (1928).

First, CMS provided two lengthy declarations that, in painstaking detail, explain how a manufacturer's submission of false AMPs directly leads to the manufacturer's underpayment of Medicaid rebates. RX-1358, RX-1359. To summarize, "based on the statutory design of the MDRP, higher AMPs result in higher rebates, and lower AMPs result in lower rebates," and thus, "[i]f a drug manufacturer incorrectly reports AMPs that are lower than they should be based on program requirements, the manufacturer will underpay the amount of MDRP rebates it owed to the government." RX-1359 ¶ 19.

Second, Lilly witnesses testified in a materially identical fashion. For example, Heather Dixson explained:

> Q. So let's talk just briefly process for a moment. Would you agree with this: Lilly calculates its AMPs, right, internally?
> A. Yes.
> Q. And the government has nothing to do with that, right, like the calculation?
> A. The calculation, no.
> Q. Okay. Lilly then sends its AMPs to the government?
> A. Correct.
> Q. Through the DDR system?
> A. Yes.
> Q. Okay. And then CMS calculates the unit rebate amount, right?
> A. Both CMS and the manufacturer have the responsibility to calculate the rebate amount.
> Q. Okay. And then CMS sends the unit rebate amount to all 50 states, right?
> A. Yes.
> Q. And the District of Columbia, let's not forget good old Washington?
> A. Absolutely.
> Q. Then each state and Washington, D.C. prepare these invoices that multiply the URA, the unit rebate amount, by the utilization for each individual Lilly product?
> A. That's typically how it works, yes.
> Q. Okay. So if the AMP is wrong for one individual Lilly product, one individual drug, the rebate amount sought by the invoice will be incorrect, right?
> A. Yes.

Tr. 766:7-767:10.

Third, Lilly's own internal documents show that the company was keenly aware that its submission of AMPs directly affected its rebate amounts (which of course is doing little more

than stating the obvious since this is the result of the operation and design of the rebate program).

For example, one Lilly document describes:

> Each calendar quarter, Lilly calculates an AMP for each product and a Best Price for those products that are classified as innovators, and AMP for any non-innovator products. Lilly submits the AMP and Best Price information for each product family to CMS within 30 days of the end of the quarter. Using that information, baseline information, and the CPI-U, CMS calculates the URA for each drug and disseminates those values to the States generally within 40 to 45 days of the end of the quarter. The States send rebate invoices to Lilly based on claims paid by the State and the URA information received from CMS, generally beginning 50 to 60 days from the end of the quarter.

RX-0067 at 0007-0008.

Fourth, Relator's damages expert (Eric Kimelblatt) similarly explained that "if an AMP was underreported, again, that's going to translate to an underpayment of Medicaid rebates from the manufacturer to the state and Medicaid programs." Tr. 574:5-10. Likewise, Mr. Kimelblatt's unrebutted calculation that Lilly's underreported AMPs led to underpayment of its rebates by $61 million further corroborates causation.

In short, whatever the parties' areas of disagreement, the trial record only permits one conclusion: that Lilly's false AMPs and false certifications caused Lilly's underpayment of its Medicaid rebates. This is true under both Relator's view of causation (only requiring that conduct play a material element and a substantial factor) and under Lilly's view of causation (also requiring that the Government's injury was a reasonably foreseeable and anticipated consequence). As such, the Court should enter judgment as a matter of law for Relator on causation.

## II. The Undisputed Evidence Establishes Materiality

A defendant's conduct is material under the FCA if it had "a natural tendency to influence, or be capable of influencing, the payment or receipt of money." 31 U.S.C. § 3729(b)(4). The trial record plainly establishes that Lilly's false AMPs directly and actually affected "the payment or receipt of money" in the form of the amount of Lilly's Medicaid rebates At the very least, Lilly's

underreported AMPs indisputably had the "natural tendency" and were "capable of influencing" the rebate amounts. A wide variety of documentary and testimonial evidence firmly establishes this point.

First, CMS representatives explained in unrebutted declarations that "[t]he amount of the MDRP rebate that a manufacturer must pay to the government for a particular drug in a particular quarter is based on a *mathematical formula*" and "[t]he *central component* for determining the amount of the rebate due for a particular drug in a particular quarter is the" AMP submitted by the manufacturer. RX-1359 ¶¶ 8-9 (emphasis added). Accordingly, "[b]ecause the amount of MDRP rebates the government receives *is mathematically determined* based on the AMPs and other pricing information reported by the manufacturers, the proper functioning of the MDRP *is directly dependent* upon the accuracy of that information, and it is therefore important that the manufacturers report AMPs and other pricing information in accordance with the MDRP statute, regulations, and Rebate Agreement. RX-1359 ¶ 21 (emphasis added).

Second, multiple Lilly witnesses corroborated CMS's explanation. For example, Frank Cunningham directly agreed that AMPs were material to State Medicaid programs:

> Q. Right. If the AMP is higher than it should be, Lilly could get a bill or an invoice that's higher than it's supposed to pay, right?
> A. Correct.
> Q. But if the AMP is lower, then Lilly is going to -- than it should be, than the law requires, then Lilly is going to get an invoice asking for less money in rebates from that state,
> right?
> A. That's correct. That's why we took such great pains to make sure that we got it right every time.
> **Q. Okay. Because you knew it was material to the states?**
> **A. Sure.**

5

Tr. 210:3-14 (emphasis added). Likewise, Heather Dixson agreed that "if the AMP is wrong for one individual Lilly product, one individual drug, the rebate amount sought by the invoice will be incorrect." Tr. 767:7 10.

Third, Lilly employees even went so far as to highlight the undisputed materiality of Lilly's AMP submission as a basis to explain why Lilly took its AMP submissions to seriously:

> Q. But if the AMP is lower, then Lilly is going to -- than it should be, than the law requires, then Lilly is going to get an invoice asking for less money in rebates from that state, right?
> A. That's correct. That's why we took such great pains to make sure that we got it right every time.

Tr. 210:7-12. Likewise, Mr. Cunningham explained that "it was critical that we had a knowledgeable person that would get our calculations right." Tr. 309:3-6. In the same vein, in describing why "[i]t was always our intention to get things right," Ms. Dixson described the AMP calculation as "the most important part of my job." Tr. 961:12-15. Lilly cannot simultaneously claim that its AMPs were of such importance to the Government that Lilly (supposedly) undertook herculean efforts to submit accurate AMPs every time but also maintain that its AMPs did not even have the "natural tendency to influence" the Government.

Fourth, Ms. Dixson explained that CMS would not even accept AMPs without Lilly's certification of accuracy and compliance with all applicable legal requirements:

> Q. Ms. Dixson, CMS won't -- you'll agree with me CMS won't accept the certified records unless they are certified to, correct?
> A. Yes, that's correct. If we -- if we upload that data and our certifier never goes into the system and pushes, "Certify," it would show that Lilly did not officially submit any AMP values for that period.

Tr. 953: 4-10.

Fifth, Mr. Kimelblatt's unrebutted testimony and opinions further confirm materiality. Mr. Kimelblatt calculated that Lilly's failure to include price increase value in AMP resulted in approximately $61.2 million in damages. RX-0030. Lilly has not offered any evidence in

6

opposition, and indeed, calculated a materially identical number through its own internal "impact analysis." Tr. 611:3-614:3. In the course of explaining his calculation, Mr. Kimelblatt – like the CMS and Lilly witnesses above – further explained how Lilly's false AMPs were directly material to the calculation of its rebate liability:

> Q. Is it important to calculate AMP accurately?
> A. Yes, it's absolutely important to calculate AMP accurately; otherwise, the downstream effect is that everything that AMP was used in is going to be incorrect if the AMP isn't correct. And that includes Medicaid rebates and other types of payments.
> ****
> Q. Very good. And are accurate AMPs material to the government's calculation of rebates?
> Yes, absolutely. If there is a -- if an AMP was underreported, again, that's going to translate to an underpayment of Medicaid rebates from the manufacturer to the state and Medicaid programs.

Tr. 572:11-16, 574:5-10.

The above-described evidence – all of which is entirely unrebutted – conclusively establishes that Lilly's false AMPs and false certifications had "a natural tendency to influence, or be capable of influencing, the payment or receipt of money." 31 U.S.C. § 3729(b)(4). Numerous FCA decisions have held that, although an *actual* effect on payment is not required under the FCA's "natural *tendency*" or "*capable* of influencing" materiality standard, a defendant's conduct is material if it does *actually* affect the amount of payment. This includes several cases premised on submission of inaccurate drug pricing data where the data directly affects the amount of payment.[2] For example, in a case brought by Relator relating to a manufacturer's failure to include

---

[2] See U.S. ex rel. Garbe v. Kmart Corp., 824 F.3d 632, 639 (7th Cir. 2016) (citations omitted) ("Garbe is required to show only that Kmart's allegedly false claims were material to Kmart's receipt of more money than it should have gotten. In other words, Kmart's misstatements had to be 'capable of influencing[ ] the decisionmaking body to which [they were] addressed.' Dr. Hay's report shows that, to the extent Kmart made false claims, they were material: those claims were the basis of the federal monies Kmart received."); U.S. ex rel. Rahimi v. Rite Aid Corp., 2018 WL 1744796, at *7 (E.D. Mich. Apr. 11, 2018) (explaining that in a pricing case "the other party's course of action is the Government's decision to reimburse at a particular price point" and finding

7

price increase value in its AMP submissions – *i.e.*, the same conduct at issue in this case – the district court held that there is no daylight between the conduct at bar and the materiality of the false statement: "Because the size of the rebate owed by the manufacturer increases as AMP increases, underreporting of AMP has the direct result of lowering the manufacturer's rebate obligations. ***Where the amount owed or received depends upon data supplied by the defendant, misstatement of that data is material because it directly influences the final amount***." U.S. ex rel. Streck v. Bristol-Myers Squibb Co., 2018 WL 6300578, at *18 (E.D. Pa. 2018) (emphasis added).

Courts have also found that materiality is established in various other contexts where a defendant submits information that, by virtue of the structure and operation of the government program at issue, directly and mathematically affects the amount of the payment at issue. See e.g., U.S. ex rel. Ruckh v. Salus Rehab., 963 F.3d 1089, 1105 (11th Cir. 2020) (describing "plain and obvious materiality" where, after nursing facilities submitted claims with a particular code to determine the amount of payment, "Medicare paid [facilities] higher amounts than they were truly owed"); U.S. ex rel. Heath v. Wisconsin Bell., 2020 WL 13048895, at *3 (E.D. Wis. Oct. 29, 2020) (explaining that under the circumstances of the government program at issue, "failing to comply with the … rule necessarily and mechanically has an effect on the behavior of the Government"); U.S. ex rel. Drummond v. BestCare Lab. Svcs., LLC, 2018 WL 1609578, at *2 (S.D. Texas, April 3, 2018) ("The false number of miles traveled was material, because it was used to calculate how much the government would pay BestCare.").

---

materiality where "[n]either party disputes that the U&C price is a factor in determining how much CMS will reimburse pharmacies"); U.S. ex rel. Strauser v. Stephen L. LaFrance Holdings, Inc., 2019 WL 1086363, at *14 (N.D. Okla. Mar. 7, 2019) (similar); Massachusetts v. Mylan Lab'ys, 608 F. Supp. 2d 127, 153 (D. Mass. 2008); U.S. ex rel. Ven-A-Care v. Actavis Mid Atl. LLC, 659 F. Supp. 2d 262, 271 (D. Mass. 2009).

As a further example, in U.S. ex rel. Asch v. Teller, Levit & Silvertrust, P.C., 2004 WL 1093784 (N.D. Ill. May 7, 2004) (Leinenweber, J.), this Court found that a relator was entitled to summary judgment on materiality in a case where materiality was inherent given the operation of the government program at issue. In Asch, a law firm (Teller) collected debts on behalf of a government agency in return for a fee of 18% of any payments it secured. Id. at **2-3. Teller "failed to credit payments made on the debts it was collecting in a timely manner," which increased the amount of interest due on the debts. As the Court explained, "[t]he benefit to Teller (and the false payment received from [the government agency] in the form of its fee), would occur when the debtor paid off the judgment" because "[t]his last payment contains the improperly added interest upon which Teller would claim its 18 percent share as its fee." Id. at *2. The Court found that materiality was established as a matter of law:

> *[M]ateriality … is necessarily present because, Teller, in effect, paid itself*. Its practice, countenanced by its agreement with ISAC, allowed Teller to deduct its fee of 18 percent from its submittals to ISAC. Thus, had Teller correctly credited the payments on the date they were received, it would have deducted 18 percent from the correct amount rather than an inflated amount. Thus, its submittal of false claims to ISAC allowed it to deduct inaccurately inflated amounts as its fees."

Id. at *3 (emphasis added).

The common principle in these cases is that where a defendant's misconduct has an undisputed and direct effect on the payments at issue, materiality is—as this Court put it in Asch— "necessarily present." Lilly's false AMPs are a paradigmatic example of this principle, since "rebate computations are based on" the AMPs submitted by drug manufacturers. U.S. ex rel. Streck v. Takeda Pharms. Am., Inc., 2022 WL 595308, at *1 (N.D. Ill. Feb. 28, 2022) (Leinenweber, J.).[3]

---

[3] The Supreme Court's decision in Universal Health Servs., Inc. v. U.S. ex rel. Escobar,, 579 U.S. 176 (2016), is not to the contrary, as evident from the fact that many of the decisions described above *post-date and apply* Escobar. See Ruckh, 963 F.3d at 1105; Streck, 2018 WL 6300578, at *18; Rahimi, 2018 WL 1744796, at *7; Strauser, 2019 WL 1086363, at *14; Luke, 2018 WL 3186941, at *6. Indeed, as one Seventh Circuit court explains, "[t]he discussion of materiality in

The trial record fully supports this fundamental reality, and there is no evidence in the record that could even potentially support a contrary conclusion. As such, the Court should enter judgment as a matter of law for Relator on materiality.

### III. The Undisputed Evidence Establishes that, At Minimum, Lilly Acted with Reckless Disregard

Under the FCA," knowingly" means that company "with respect to information— (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). Moreover, "no proof of specific intent to defraud" is required to establish a knowing violation. Id.

At trial, Lilly's defense boils down to three claims. First, Lilly claims that the entire decision falls on Heather Dixson and that it was reasonable or the company to entirely defer to and rely on her decision. Second, as ostensible justifications for why the company excluded price increase value from AMP, Lilly claims that Ms. Dixson regarded price increase value as "part of" the service fees that Lilly paid to drug wholesalers and that she believed that AMP could only go *down* through post-initial sale transactions, whereas price increase value causes AMP to *increase*. Third, Lilly asserts that it was transparent with CMS and HHS-OIG regarding its treatment of price increase value. Either considered in tandem or individuals, the three prongs of Lilly's defense reflect, at minimum, reckless disregard for the truth of falsity of its AMPs.

---

[Escobar] considered a specific question: whether a misrepresentation that was technically a 'condition of payment' could lead to liability even where the government would not actually refuse to pay on that basis" but does not undermine materiality in the "quite different" circumstances where, under the operation of a government program, a defendant's conduct "*necessarily and mechanically has an effect on the behavior of the Government*." U.S. ex rel. Heath v. Wisconsin Bell., 2020 WL 13048895, at *3 (E.D. Wis. Oct. 29, 2020) (emphasis added).

10

***First***, Lilly cannot avoid liability by attempting to pin the blame for its misconduct on one of its 40,000 employees. Tr. at 660:11-12. **Lilly** is required to certify the accuracy of its AMPs every month and every quarter when it makes a submission to CMS. Indeed Ms. Dixson is not even senior enough to sign Lilly's certification, which instead must be signed by a senior executive. Tr. 941. Moreover, even if Lilly's narrative that Ms. Dixson was solely responsible for Lilly's government pricing submissions was factually accurate, it would still amount to reckless disregard for Lilly – a global pharmacy pharmaceutical company with 40,000 employees and annual sales measured in the billions – to entrust such an important decision to one person particularly where, as described above, Lilly recognizes the critical importance of submitting accurate AMPs. See <u>U.S. ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co.</u>, 5 F.4th 315, 348 (3d Cir. 2021) (affirming scienter finding where defendant "recklessly delegated to unknowledgeable individuals the responsibility for ensuring that employees were properly classified").

***Second,*** with respect to the interpretations of the legal requirements offered by Ms. Dixson (who is not a lawyer), the Court has already found that these interpretations were "objectively unreasonable" as a matter of law at summary judgment. <u>U.S. ex rel. Streck v. Takeda Pharm. Am., Inc.</u>, 14 C 9412, 2022 WL 595308, at *12 (N.D. Ill. Feb. 28, 2022) (Leinenweber, J.). First, the Court held that Lilly's proffered interpretation ignores the plain language of the legal requirements governing the calculation of AMP:

> Lilly cannot and does not deny a "price increase value" or "price adjustment credit" was an "adjust[ment]" "paid to the Manufacturer" and "by the wholesalers" on a per unit basis. Instead, Lilly argues that the statute was unclear as to whether Lilly needed to include the entire price or simply the initial price of the product in the AMP. As already explained, the definition of Average Manufacturer's Price states that subsequent price increases and decreases must be included. For this reason, the explicit text of the statute makes Lilly's position unreasonable.

11

Id. at *12. Second, the Court similarly found that Lilly's attempt to claim that price increase value received *from* wholesalers was part of service fees paid *to* wholesalers was objectively unreasonable.

> By definition, bona fide service fees are "fees paid by manufacturer to an entity ... for a ... service." In contrast, a "price increase value" is never paid by the manufacturer and is never for a service. Therefore, the Court finds the proximity of the words "price increase value" to the words "bona fide service fee" in the FFS Agreements irrelevant to the Court's analysis. The history of the bona fide service fees in FFS Agreements furthers this conclusion. As recounted by Lilly in its briefing, CMS specifically rejected the bundling of "service fees" with product pricing in 2007. As noted by Lilly, some drug manufacturers tried to incorporate service fees with the full price of the product, which illegally lowered their AMP calculations and thus their payments to the government. Lilly, characterizing itself as taking "a conservative approach," decided to only bundle price adjustments with service fees. However, there is nothing conservative about an approach where two distinct transactions that were explicitly not permitted to be coupled, the price of the product and the service fees, are nonetheless combined to lower AMP calculations. A fundamental truth in mathematics and law is that $10(price) - $1(fee) is equal to $9(price) - $1(fee) + $1(price adjustment). Although one uses more steps, they are the same equation and create the same result. Lilly readily admits that CMS prohibits the first equation ($10 - $1) because it artificially lowers the price of AMP. Therefore, it is decidedly not reasonable for Lilly to assume that it may instead use second equation ($9 - $1 + $1), simply because the steps take place a different or more complicated order.

Id. at *13 (citation omitted). Given that the Court has already held that the two legal interpretations offered by Lilly are objectively *unreasonable*, it necessarily follows and that Lilly "failed to make such inquiry as would be *reasonable and prudent* to conduct under the circumstances." U.S. v. King-Vassel, 728 F.3d 707, 713 (7th Cir. 2013) (quotations omitted) (emphasis added).

***Third***, trial revealed that Lilly's claims of transparency with CMS and HHS-OIG ring hollow. For example, in March 2005, Lilly sent a letter that described its treatment of service fees without even mentioning price increase value. Thus, as Ms. Dixson acknowledged, nothing in this letter would even alert the reader to the existence of price increase value, let alone that Lilly was excluded it from AMP. Tr. 831:10-14 ("Is there anything in this letter that would reveal to the

12

reader that Lilly was receiving price increase value to the tune of hundreds of millions of dollars over the next years that followed? A. No.").

Then, upon learning of the Streck I lawsuit, Lilly sent a letter to CMS even though it knew that CMS had specifically instructed manufacturers *not* to send such letters and that if manufacturers disregarded this clear instruction, doing so did not reflect any acquiescence by the agency. RX-0066. This letter was unaccompanied by any other disclosure to CMS, even though Lilly had multiple channels of communications available to it. In short, contrary to Lilly's suggestion that the July 2011 Letter reflects a bona fide attempt at requesting guidance or transparency, it bears all of the hallmarks of a pretextual "CYA" document designed to create an exculpatory record without actually disclosing anything. See U.S. v. DiCosola, 867 F.3d 793, 798 (7th Cir. 2017) (finding evidence that a defendant reached out to the IRS as circumstantial evidence of fraud where "one might also reasonably interpret it as an attempt to create an exculpatory record").

In sum, "[i]In defining knowingly, Congress attempted "to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted." U.S. ex rel. Swoben v. United Healthcare Ins. Co., 848 F.3d 1161, 1174 (9th Cir. 2016) (quotations omitted). The evidentiary record at trial establishes that, at minimum, Lilly acted as such, claiming to rely on objectively unreasonable legal interpretations reached by a non-lawyer and refusing to seek input or guidance from the Government.

## **CONCLUSION**

For these reasons, the Court should enter judgment as a matter of law against Lilly on causation, materiality, and scienter.

Date: August 2, 2022                                Respectfully submitted,

By:   */s/ Daniel R. Miller*

**WALDEN MACHT & HARAN LLP**
Daniel R. Miller (*pro hac vice*)
Jonathan Z. DeSantis (*pro hac vice*)
2000 Market Street, Suite 1430
Philadelphia, PA 19103
Tel: (212) 335-2030
dmiller@wmhlaw.com
jdesantis@wmhlaw.com

Jim Walden (*pro hac vice*)
250 Vesey Street, 27th Floor
New York, NY 1028
Tel: (212) 335-2030
jwalden@wmhlaw.com

**BEHN & WYETZNER, CHARTERED**
Michael Behn
17 N. State Street, Suite 1600
Chicago, IL 60602
Tel: (312) 236-0000
Fax: (312) 878-1342
mbehn@behnwyetzner.com

**MARTIN LAW, P.C.**
Jackson Martin (*pro hac vice*)
1934 Old Gallows Road, Suite 350
Tysons Corner, Virginia 22182
Tel: (202) 909-3455
Fax: (202) 449-8278
jackson@martinlawpc.com

***Attorneys for Relator Ronald J. Streck***

**CERTIFICATE OF SERVICE**

I hereby certify that on August 2, 2022, I caused a copy of the foregoing to be served via this Court's ECF filing system, which will provide a copy to all counsel of record.

By: /s/ *Daniel R. Miller*
*Attorney for Relator*